Dean M. Harvey (*pro hac vice*)
Jallé H. Dafa (*pro hac vice*)
Benjamin A. Trouvais (*pro hac vice*)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Phone: (415) 956-1000
Fax: (415) 956-1008
dharvey@lchb.com
jdafa@lchb.com
btrouvais@lchb.com

Emily N. Harwell (NY Bar # 5985585)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Phone: (212) 355-9500
Fax: (212) 355-9592
eharwell@lchb.com

Benjamin D. Elga (NY Bar #5332861)
Janet Herold (*pro hac vice*)
JUSTICE CATALYST LAW
40 Rector St
New York, NY 10006
Telephone: (518) 732-6703
belga@justicecatalyst.org
jherold@justicecatalyst.org

*Counsel for Plaintiffs and the Proposed Class*
(Additional counsel listed below)

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. ELVISHA DHAMALA, DR. SHELLEY FACENTE, DR. ROBERT MAHON, and DR. LUCINA UDDIN,<br><br>        Plaintiffs,<br><br>vs.<br><br>ELSEVIER, B.V., INFORMA PLC, INTERNATIONAL ASSOCIATION OF SCIENTIFIC, TECHNICAL, AND MEDICAL PUBLISHERS, JOHN WILEY & SONS, INC., SAGE PUBLICATIONS, INC., SPRINGER NATURE AG & CO. KGaA., TAYLOR & FRANCIS GROUP, LLC, TAYLOR & FRANCIS GROUP, LTD., WOLTERS KLUWER HEALTH, INC., WOLTERS KLUWER N.V., and JOHN DOES 1 THROUGH 50,<br><br>        Defendants. | Case No. 1:24-cv-06409-HG<br><br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ......................................................................................... 1

II.  JURISDICTION AND VENUE .................................................................... 5

III.  PARTIES ....................................................................................................... 6

    A.  Plaintiffs ............................................................................................. 6

    B.  Defendants .......................................................................................... 7

IV.  FACTUAL ALLEGATIONS ...................................................................... 10

    A.  The Publisher Defendants Dominate the Academic Journal Industry ....... 10

    B.  The Publisher Defendants Implemented an Unlawful Scheme to Increase Profits and Maintain Market Dominance ...................................................... 12

    C.  The Publisher Defendants Maintain Their Anticompetitive and Unlawful Scheme Through the Present Day ............................................................... 35

V.  The Relevant Markets Impacted by The Publisher Defendants' Scheme ............. 37

    A.  The Market For Publication by Peer-Reviewed Journals ......................... 37

    B.  The Related Market for Peer Review Services ...................................... 39

VI.  CLASS ACTION ALLEGATIONS ............................................................ 41

VII.  PRAYER FOR RELIEF .............................................................................. 45

VIII.  JURY DEMAND ......................................................................................... 46

## I.    __INTRODUCTION__

1.      Scholars and scientists Dr. Elvisha Dhamala, Dr. Shelley Facente, Dr. Robert Mahon, and Dr. Lucina Uddin (the "Scholar Plaintiffs") bring this antitrust class action to challenge collusion among the world's six largest for-profit publishers of peer-reviewed scholarly journals: (1) Elsevier B.V.; (2) John Wiley & Sons, Inc.; (3) Sage Publications, Inc.; (4) Springer Nature AG & Co. KGaA; (5) Taylor & Francis Group, LLC, Taylor and Francis Group, Ltd., and Informa plc (together, "Taylor & Francis"); and (6) Wolters Kluwer Health, Inc. and Wolters Kluwer N.V. (together, "Wolters Kluwer") (collectively, the "Publisher Defendants").  In violation of Section 1 of the Sherman Act, the Publisher Defendants conspired to unlawfully appropriate billions of dollars that would have otherwise funded scientific research (the "Scheme").

2.      The Publisher Defendants' Scheme has three primary components.  First, the Publisher Defendants agreed to not compensate scholars for their labor, in particular not to pay for their peer review services (the "Unpaid Peer Review Rule").  In other words, the Publisher Defendants agreed to fix the price of peer review services at zero.  The Publisher Defendants also agreed to coerce scholars into providing their labor for nothing by expressly linking their unpaid labor with their ability to get their manuscripts published in the Publisher Defendants' journals.  In the "publish or perish" world of academia, the Publisher Defendants essentially agreed to hold the careers of scholars hostage so that the Publisher Defendants could force them to provide their valuable labor for free.

3.      Second, the Publisher Defendants agreed not to compete with each other for manuscripts by requiring scholars to submit their manuscripts to only one journal at a time (the "Single Submission Rule").  The Single Submission Rule substantially reduces competition among the Publisher Defendants, substantially decreasing incentives to review manuscripts

promptly and publish meritorious research quickly. The Single Submission Rule also robs scholars of negotiating leverage they otherwise would have had if more than one journal offered to publish their manuscripts. Thus, the Publisher Defendants know that if they offer to publish a manuscript, the submitting scholar has no viable alternative and the Publisher Defendant can then dictate the terms of publication.

4.    Third, the Publisher Defendants agreed to prohibit scholars from freely sharing the scientific advancements described in submitted manuscripts while those manuscripts are under peer review, a process that often takes over a year (the "Gag Rule"). From the moment scholars submit manuscripts for publication, the Publisher Defendants behave as though the scientific advancements set forth in the manuscripts are their property, to be shared only if the Publisher Defendants grant permission. Moreover, when the Publisher Defendants select manuscripts for publication, the Publisher Defendants will often require scholars to sign away all intellectual property rights, in exchange for nothing. The manuscripts then become the actual property of the Publisher Defendants, and the Publisher Defendants charge the maximum the market will bear for access to that scientific knowledge.

5.    These three major elements of the Publisher Defendants' Scheme are each individually per se unlawful under Section 1 of the Sherman Act. In the alternative, they are also unlawful under either a quick-look or rule of reason mode of antitrust analysis. Each element of the Scheme mutually reinforces each other and is part of a common understanding among the Publisher Defendants to create a set of rules that cement their market dominance and maximize the amount of money they can divert from scientific research into their pockets.

6.    The Scheme has been remarkably profitable for the Publisher Defendants, while doing tremendous damage to science and the public interest.

7.      Through the Scheme, the Publisher Defendants have sustained profit margins that far exceed the most successful corporations in the economy.  For instance, in 2023, Elsevier alone generated $3.8 billion in revenue from its peer-reviewed journals, with an operating profit margin of 38 percent.  This profit margin exceeded Apple's (30 percent) and Google's (28 percent).  That same year, Taylor & Francis made $739 million from its peer-reviewed journals, with a profit margin of 35 percent.  In 2023, the Publishing Defendants together received over $10 billion in revenue from their peer-reviewed journals.  These astounding revenues and profits margins are sustained through collusion, and unlawfully divert billions of taxpayer dollars every year from science to the Publisher Defendants.

8.      *NewScientist* described aspects of the Scheme as "indefensible," and the "most profitable business in the world," explaining that the "reason it is so lucrative is because most of the costs of its content is picked up by taxpayers.  Publicly funded researchers do the work, write it up and judge its merits.  And yet the resulting intellectual property ends up in the hands of the publishers.  To rub salt into the wound they then sell it via exorbitant subscriptions and paywalls, often paid for by taxpayers too."  Deutsche Bank aptly describes the Scheme as a "bizarre" "triple pay system" whereby "the state funds most of the research, pays the salaries of most of those checking the quality of the research, and then buys most of the published product."  As another observer explained, the Publishing Defendants' Scheme "is as if the *New Yorker* or the *Economist* demanded that journalists write and edit each other's work for free, and asked the government to foot the bill."

9.      Many in the scientific community have opposed the Publisher Defendants' business practices, and have tried to break their "iron grip" on academic publishing.  For instance, over 20 thousand scientists and scholars have publicly opposed aspects of the Scheme

challenged here, focused in particular on Elsevier.  Their Statement of Purpose explains: "Elsevier, Springer, and a number of other commercial publishers . . . all exploit our volunteer labor to extract very large profits from the academic community.  They supply some value in the process, but nothing like enough to justify their prices."

10.     Meanwhile, the extraordinary harm to the public interest resulting from the Scheme is difficult to overstate.  The Publisher Defendants' Scheme diverts billions of dollars every year in taxpayer money away from scientific research to the Publisher Defendants.  This is an enormous amount of funding that would have otherwise gone to pay for critical scientific research.  Instead, it has gone to line the pockets of the Publisher Defendants, none of whom engage in scientific research themselves.  In addition, the Scheme has resulted in a variety of perverse market failures that impair the ability of scientists to do their jobs and slow dramatically the pace of scientific progress.  The Scheme has resulted in a worsening peer review crisis, whereby it has become increasingly difficult to coerce busy scholars into providing their valuable labor for nothing.  Submitted manuscripts sit awaiting peer review for many months or even years.  The Scheme also prevents or substantially frustrates scholars from freely exchanging scientific knowledge with each other.  The Scheme has held back science, delaying advances across all fields of research.  It will take longer to find effective treatments for cancer.  It will take longer to make advancements in material science that will support quantum computing.  It will take longer to find technological tools to combat climate change.  And on and on.

11.     The Publisher Defendants' Scheme should end.  The Scholar Plaintiffs bring this antitrust class action on behalf of themselves and a proposed class of scholars in the United States who submitted manuscripts or provided peer review to the Publisher Defendants (the "Class" or "Class Members").

## II.   <u>JURISDICTION AND VENUE</u>

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), because this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Class are citizens of a state different from any Defendant.

13.     Defendants are subject to the jurisdiction of this Court because, *inter alia*, each Defendant either directly or through the ownership and/or control of its subsidiaries:  (a) transacted business throughout the United States, including in this District; (b) transacted for the publication of articles in peer-reviewed journals and labor associated with peer review throughout the United States and in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.  Defendants' conduct directly targeted the publication by peer-reviewed journals market and peer review labor market and was within the flow of, was intended to, and did have, a substantial effect on the interstate commerce of the United States.

14.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391(b)-(c) because one or more Defendants transacted business or is otherwise subject to personal jurisdiction in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

### III.    PARTIES

#### A.    Plaintiffs

##### i.    Dr. Elvisha Dhamala

15.    Dr. Elvisha Dhamala is an assistant professor of psychiatry at Northwell Health, New York State's largest healthcare provider.  Northwell Health serves the New York City metropolitan area, including Manhattan, Queens, Long Island, and Westchester.  Dr. Dhamala has appointments at the Feinstein Institutes for Medical Research, the research arm of Northwell Health, and the Zucker School of Medicine, the medical school of Northwell Health.  Dr. Dhamala also directs the Brain-Based Predictive Modeling Lab at the Zucker Hillside Hospital in Glen Oaks, New York.  Prior to her appointments at Northwell Health, Dr. Dhamala earned her BSc in Neuroscience from McGill University, and her PhD in Neuroscience from Weill Cornell Medicine.  Dr. Dhamala completed her postdoctoral training at Yale University.  Dr. Dhamala's research includes understanding how different aspects of brain, behavior, and brain-behavior relationships vary across sexes and genders, and whether those differences impact psychiatric illness.  To date, Dr. Dhamala has published 18 academic articles.  Dr. Dhamala has also provided peer review services for over 30 journals, including journals owned by three of the six Publisher Defendants: Elsevier, Springer, and Wiley.

##### ii.    Dr. Shelley Facente

16.    Dr. Shelley Facente is an assistant adjunct professor of community health sciences at the University of California, Berkeley and the principal consultant of Facente Consulting LLC.  Prior to her current roles, Dr. Facente held research positions at the University of California, San Francisco and the San Francisco Department of Public Health.  Dr. Facente's research focuses on how infectious diseases like hepatitis C and HIV affect marginalized groups in society.  To date, Dr. Facente has published 51 academic articles.  Dr. Facente has also provided peer review

services for 16 journals, including journals owned by each of the six Publisher Defendants: Elsevier, Wolters Kluwer, Wiley, Sage, Taylor & Francis, and Springer.

    iii.  <u>Dr. Robert Mahon</u>

  17.  Dr. Robert Mahon is an associate professor of earth and environmental sciences and civil and environmental engineering at the University of New Orleans ("UNO"). Prior to his roles at UNO, Dr. Mahon was a postdoctoral fellow at the University of Arkansas. His current research projects include analyzing sediment transport in ancient rivers and deltas, and studying the relationship between river flows and the formation of rock layers. To date, Dr. Mahon has published approximately 14 academic articles. Dr. Mahon has also provided peer review services for approximately 10 journals, including journals owned by two of the six Publisher Defendants: Wiley and Taylor & Francis.

    iv.  <u>Dr. Lucina Uddin</u>

  18.  Dr. Lucina Uddin is a professor of neuroscience at the University of California, Los Angeles ("UCLA"). Prior to her role at UCLA, Dr. Uddin held appointments at Stanford University, New York University, and the University of Miami. Her current research projects include understanding dynamic brain network interactions underlying cognitive inflexibility in neurodevelopmental conditions, such as autism spectrum disorder. To date, Dr. Uddin has published over 175 academic articles. Dr. Uddin has also provided peer review services for over 150 journals, including journals owned by each of the six Publisher Defendants: Elsevier, Wolters Kluwer, Wiley, Sage, Taylor & Francis, and Springer.

  **B.**  **Defendants**

    i.  <u>Elsevier, B.V.</u>

  19.  Defendant Elsevier, B.V. ("Elsevier") publishes scholarly articles in journals it owns. Elsevier's principal place of business is located at Radarweg 29, 1043 NX Amsterdam,

The Netherlands.  Elsevier operates in the United States through Elsevier, Inc., located at 230

Park Avenue, 7th Floor, New York, NY 10169.  Elsevier was a founding member of the

International Association of Scientific, Technical, and Medical Publishers ("STM") and

continues to be an STM member.

        ii.        <u>International Association of Scientific, Technical, and Medical Publishers</u>

20.      Defendant International Association of Scientific, Technical, and Medical

Publishers ("STM") is an international trade association that represents the interests of publishers

of academic journals.  STM is a Dutch *stichting* ("foundation") with a principal place of business

at Prins Willem-Alexanderhof 5, 2595 BE The Hague, The Netherlands.  STM's other main

office is located at Prama House, 267 Banbury Road, Oxford OX2 7HT, United Kingdom.  Each

of the above-listed defendants is an active member of STM and serves in STM's leadership.

        iii.       <u>John Wiley & Sons, Inc.</u>

21.      Defendant John Wiley & Sons, Inc. ("Wiley") publishes scholarly articles in

journals it owns.  Wiley's principal place of business is located at 111 River Street, Hoboken, NJ

07030.  Wiley was a founding member of STM and continues to be an STM member.

        iv.       <u>Sage Publications, Inc.</u>

22.      Defendant Sage Publications, Inc. ("Sage") publishes scholarly articles in journals

it owns.  Sage's principal place of business is located at 2380 Conejo Spectrum Street, Thousand

Oaks, CA 91320.  Sage joined STM in or before 1999 and has remained an active member of

STM.

        v.       <u>Springer Nature AG & Co. KGaA</u>

23.      Defendant Springer Nature AG & Co. KGaA ("Springer") publishes scholarly

articles in journals it owns.  Springer's principal place of business is located in Germany, at

Heidelberger Platz 3, 14197 Berlin, Germany.  Springer also has offices located in the United

States at 1 New York Plaza, Suite 4600, New York, NY 10004 and Harborside Plaza II, 200

Hudson Street, Jersey City, NJ 07302. Springer joined STM shortly after it was founded, and

Springer has remained an active member of STM.

> vi.    Taylor & Francis Group, Ltd., Taylor & Francis Group, LLC, and Informa plc

24.    Defendants Taylor & Francis Group, Ltd. and Taylor & Francis Group, LLC

publish scholarly articles in journals they own. Taylor & Francis Group, Ltd.'s principal place of

business is located at 4 Park Square, Milton Park, Abingdon, OX14 4RN, United Kingdom.

Taylor & Francis Group, LLC's principal place of business is located at 2385 NW Executive

Center Drive, Suite 320, Boca Raton, FL 33431. Taylor & Francis Group, LLC also has offices

at 52 Vanderbilt Avenue, New York, NY 10017 and 530 Walnut Street, Suite 850, Philadelphia,

PA 19106. Taylor & Francis Group, Ltd. and Taylor & Francis Group, LLC are wholly-owned

subsidiaries of Informa plc ("Informa"), a British publishing company with principal place of

business at 5 Howick Place, London, SW1P 1WG, United Kingdom. In 2004, Taylor & Francis

merged with Informa and has been the academic publishing division of Informa plc since then.

Accordingly, Defendants Taylor & Francis Group, Ltd., Taylor & Francis Group, LLC, and

Informa shall be referred to collectively as "Taylor & Francis." Taylor & Francis joined STM in

or before 1999 and has remained an active member of STM.

> vii.    Wolters Kluwer Health, Inc. and Wolters Kluwer N.V.

25.    Defendants Wolters Kluwer Health, Inc. and Wolters Kluwer N.V. publish

scholarly articles in journals they own. Wolters Kluwer Health, Inc.'s principal place of business

is located at 2001 Market Street, Philadelphia, PA 19103. Wolters Kluwer N.V.'s principal

place of business is located at Zuidpoolsingel 2, 2408 ZE Alphen aan den Rijn, The Netherlands.

Wolters Kluwer Health, Inc. and Wolters Kluwer N.V. also have offices throughout the United

States, including an office located at 28 Liberty Street, New York, NY 10005. Wolters Kluwer

Health, Inc. is a wholly-owned subsidiary of Wolters Kluwer N.V. and is part of Wolters Kluwer

N.V.'s academic publishing division. Accordingly, Defendants Wolters Kluwer Health, Inc. and

Wolters Kluwer N.V. shall be referred to collectively as "Wolters Kluwer." Wolters Kluwer

joined STM in or before 1994 and has remained an active member of STM.

> viii.    John Does 1 through 50

26.    In addition to the above-named Defendants, other organizations and natural

persons may have colluded with Defendants in the creation, maintenance, or enforcement of

Defendants' anticompetitive conduct. These individuals, listed presently as "John Does 1

through 50," will be identified during discovery and subsequently joined as parties.

## IV.    FACTUAL ALLEGATIONS

### A.    The Publisher Defendants Dominate the Academic Journal Industry

#### 1.    The Emergence of Commercial Publishers

27.    Academic journals are the primary way scientists and scholars disseminate

research and discoveries, both to each other and to the public.

28.    Academic journals began as non-commercial endeavors focused on the

advancement of human knowledge. The earliest journals were supported by non-profit learned

societies and university presses. These institutions provided the resources necessary to regularly

publish academic journals without seeking to extract remuneration. This public interest model

governed journal publication for nearly 300 years.

29.    Academic publishing experienced a significant shift in the mid-20th Century.

New weapons developed during World War II, including jet airplanes, rockets, and atomic

bombs, exposed the existential importance of higher education and scientific research. Countries

increased their research investments dramatically and poured resources into expanding academic training.

30.    Before the 1940s, a doctoral program graduate usually received a professorship as their first job.  The post-WWII increase in doctoral graduates resulted in a more stringent and competitive process to become a university professor, transforming the role of journals into not just a means for communicating scholarly developments but also becoming a critical process through which academics could prove their research bona fides sufficient to win career advancement, such as securing tenure.  New academics' first jobs became non-tenured positions and their university employers expected them to become respected researchers before promotion: "publish or perish."  Academics—particularly those who had not yet received tenure—began publishing at rates never before seen.

31.    The increase in the supply of scholarly work led to the emergence of new commercial publishers who, unlike their predecessors, sought to extract profit from the academic process and charge for access to their journals.

32.    As they entered the academic journal industry, the new commercial publishers began racing to become the first publisher with a journal in each field, creating a massive array of specialized subject areas that did not exist before.  The goal of being first was to become indispensable to universities who needed to supply scholarship in particular subject areas. Almost overnight, the new for-profit publishers dramatically increased the number of journals and established themselves as the dominant supplier of those journals.

## 2.    The Publisher Defendants' Market Consolidation

33.    The Publisher Defendants began acquiring competing publishers and solidifying their market dominance in the 1990s, after the advent of the internet enabled them to substitute hardcopy publications for digital journals and significantly decrease their costs.

34.    The first major wave of market consolidation occurred in 1997 and 1998.  Taylor & Francis acquired several journals in critical subject areas from Gordon & Breach Science Publishers, Harwood Academic Publishers, Scandinavian University Press, Carfax Publishing, and Routledge.  During the same period, Elsevier acquired key competitors Butterworth-Heinemann, Ablex Publications, JAI press, Gauthier-Villas, and Expansion Scientifique Francaise.  By 1996, the Publisher Defendants increased their market share to 30 percent.

35.    A second wave of journal acquisition occurred in 2001, with Elsevier purchasing Academic Press, Churchill Livingstone, Mosby, and WB Saunders.  Wiley steadily acquired 39 journals annually from 2001 to 2004.  After this mass consolidation, the Publisher Defendants' market share swelled to 50 percent by 2006.

36.    Today, the Publisher Defendants dominate the academic journal industry.  As of 2022, the Publisher Defendants own approximately 53 percent of all academic journals.

**B.    The Publisher Defendants Implemented an Unlawful Scheme to Increase Profits and Maintain Market Dominance**

37.    The Publisher Defendants devised an anticompetitive three-part Scheme to maximize their profits and maintain their market dominance.  First, the Publisher Defendants agreed to not compensate scholars for their valuable labor, in particular not to pay for their peer review services: the **Unpaid Peer Review Rule**.  Second, the Publisher Defendants colluded to require scholars to submit their articles to only one journal at a time, suppressing competition between publishers and substantially decreasing incentives to review submissions promptly and publish research quickly: the **Single Submission Rule**.  Third, the Publisher Defendants agreed to prevent scholars from freely sharing their scientific findings: the **Gag Rule**.

### 1.    The Publisher Defendants Formed a Cartel Through Their Trade Association STM to Devise and Implement the Scheme

38.    In the publishing community, STM is known as the place to go "to learn, in order to earn."  STM's founders included Daan Frank of North Holland Publishing Company (now a part of Elsevier), Piet Bergmans of Elsevier, and Bradford Wiley of Wiley.  Shortly thereafter, Heinz Goëtze of Springer joined STM.

39.    Through this industry trade association they controlled, the Publisher Defendants agreed to fix the price of peer review services at $0, restrict article submission to only one journal at a time, and prohibit scholars from publicly sharing their work without permission. They also agreed to favor publication of articles written by authors who acquiesced in providing free labor.  This agreement was memorized in STM's so-called "International Ethical Principles for Scholarly Publication" (the "Principles"), and published to STM's website in 2013.

40.    Each Publisher Defendant, including Elsevier, Wolters Kluwer, Wiley, Sage, Taylor & Francis, and Springer, have expressly agreed to the Principles.

41.    STM requires members, including the Publisher Defendants, to "adhere to these guidelines" and also requires all new STM members to abide by the Principles:

> 23. Please confirm that you have read the STM Ethical Principles for Scholarly Publishing (note that all STM members must adhere to these guidelines), and are agreeing that your organization abides by these principles or equivalent principles, such as those of the  Committee on Publication Ethics. https://www.stm-assoc.org/2013_05_21_STM_Ethical_Principles_for_Scholarly_Publication.pdf *
>
>  Confirmed and agreed

42.    Former CEO of STM, Michael Mabe, played a key role in drafting the Principles. Mabe served as CEO from May 2006 to October 2019.  Prior to joining STM, Mabe was the Director of Academic Relations at Elsevier, where he wrote policies on publishing ethics.

43.    Further, the Publisher Defendants unlawfully colluded to implement their unlawful Scheme through STM Board Meetings, STM annual meetings, and STM membership publications.

44.    STM Board meetings are held at least once per year in October prior to the Frankfurt Book Fair in Frankfurt, Germany.  The Frankfurt Book Fair is an annual mid-October event for professionals in publishing, multimedia, and technology.

45.    The STM Board Members that approved and ratified the Principles in 2012-2013 included senior executives from each of the six Publisher Defendants:

- Michael Mabe, CEO (formally of Elsevier)
- Mark Seeley,  Chair of Copyright & Legal Affairs Committee (Elsevier)
- Grace Baynes, Chair of Communications Committee (Springer)
- Howard Ratner, Chair of Futurelab Committee (Springer)
- Ian Bannerman (Taylor & Francis)
- Youngsuk "YS" Chi (Elsevier)
- Reed Elfenbein (Wiley)
- Eric Merkel-Sobotta, Board Chair (Springer)
- Carol Richman (Sage)
- Peter Ashman (formally of Springer)
- Paul Weisogel, Treasurer (Wolters-Kluwer)
- Jayne Marks (Wolters-Kluwer)

46.    The Publisher Defendants also furthered their Scheme through STM's Annual General Meeting ("AGM").  For decades, the AGM has been held immediately after the STM Board meeting and immediately prior to the Frankfurt Book Fair in Frankfurt, Germany.

47.    The AGM is not open to the public.  Only STM board-approved members may attend the AGM.

48.    The AGM is an annual day-long private meeting where the Publisher Defendants further develop and enforce their three-part anticompetitive Scheme.  The AGM is a formal, closed-door meeting where executives from the Publisher Defendants present and share their

policies and practices, including their enforcement of the Unpaid Peer Review Rule, Single

Submission Rule, and Gag Rule.

49.     Publishing professionals have described STM as a trade association that "works

through the consensus of its members" with a "structure that by design gives greater say to the

larger companies," including the Publisher Defendants, to defend "legacy models on which []

members have long depended."

**2.      The Publisher Defendants Derive Enormous Profits from the Anticompetitive Scheme of Not Compensating Scholars for Their Peer Review Services**

**a.      Peer Review Is Essential Work in the Business of Academic Publishing**

50.     The academic publishing process contains two facets of distinct, but related, work

for scholars.  First, scholars conduct their own research, draft manuscripts based on their

findings, and submit these completed manuscripts to journals for publication.  Second, publishers

of journals recruit scholars who did not work on these manuscripts but are subject matter experts

to review them and scrutinize their findings.

51.     Peer review is the process of subjecting an author's manuscript to the scrutiny of

others who are experts in the same field.  Peer review confirms the validity of research through

other scholars who decide whether the methods and conclusions of a particular study are proper

and worthy of publication.  Ultimately, peer review is what transforms an author's manuscript

into an article that other scientists and scholars can use.  Peer review is a necessary component

that gives the Publisher Defendants a marketable and valuable product.

**b.    Each Publisher Defendant Enforced Their Agreement to Fix the Price of Peer Review at Zero**

52.    STM Principle 1 states peer review is uncompensated or "volunteer work."  STM Principle 3.3.1 further states, "It is generally agreed that scholars who wish to have their own work published in journals have an obligation to do a fair share of reviewing for these journals."

53.    By enforcing an "obligation" that peer reviewers must fulfill "to have their own work published in journals" the Publisher Defendants coerced peer reviewers into working for free.

54.    Further, each of the Publisher Defendants implemented and enforce the Unpaid Peer Review Rule:

a.    *Elsevier*: Peer reviewers are described as "researchers that are experts in the same subject area as the paper" who perform their peer review services on a "volunteer" basis.

b.    *Wolters Kluwer*: The simple recognition of being a peer reviewer is sufficient for compensation purposes and Wolters Kluwer seeks to take advantage of academics early in their careers: "Being invited as a peer reviewer by a journal amounts to being accepted as an expert in the field. It is a kind of recognition in itself to be known as a peer reviewer, and this can be a stepping stone for novice researchers."

c.    *Wiley*: "Reviewers are volunteers and have given up their own time to evaluate your paper in order to contribute to the research community.  Reviewers very rarely receive formal compensation beyond recognition from the editors of the effort they have expended."

d.    *Sage*: Peer reviewers are offered a discount on Sage services, but Sage does not offer any monetary compensation for peer review.

e.     *Taylor & Francis*: "While most reviewers see their work as providing services to the academic community, it's still a voluntary service and one of many demands on their time."

f.     *Springer*: "Similar to editorial board members, the role of a reviewer is a voluntary position and it is more about the prestige and honor of being a reviewer rather than other benefits."  Further, Springer explains "Peer review is an integral part of scientific publishing that confirms the validity of the science reported.  Peer reviewers are experts who volunteer their time to help improve the journal manuscripts they review—they offer authors free advice."

### c.     The Publisher Defendants Have Secured Enormous Profits by Agreeing Not to Pay for the Peer Review Services Essential to Their Business

55.     The Publisher Defendants' unlawful Scheme allows them to extract enormous sums from scientific research by ducking the majority of their publishing costs and getting public entities to fund the remainder.

56.     Members of the Class create research under their own direction.  That research is largely funded by governments or public universities through grants, research funding, or endowments.  Class Members produce manuscripts based on their research and provide those manuscripts to the Publisher Defendants for publication in their journals.  The Publisher Defendants do not pay Class Members for the manuscripts they produce.  The bulk of the editing process—checking the validity of a manuscript's methods and conclusions—comes from peer review services.

57.     As memorialized in the STM Principles, the Publisher Defendants have agreed to not compensate peer reviewers for their work.  After the editorial process is complete, the

Publisher Defendants incorporate the edited articles into their journals, and then sell those journals back to government-funded institutions, university libraries, and scientists who, in a collective sense, created the finished product.

58.     In 2004, a parliamentary science and technology committee report remarked that the scientific publishing industry stood in stark contrast to "a traditional market" in which "suppliers are paid for the goods they provide."  In 2005, Deutsche Bank described the editorial process as a "bizarre," "triple-pay" system where "the state funds most of the research, pays the salaries of most of those checking the quality of the research, and then buys most of the published product."

59.     Adrian Sutton, a physicist at Imperial College in London, lambasted the industry, declaring that scientists "are all slaves to publishers."  He then asked, "What other industry receives its raw materials from its customers, gets those same customers to carry out the quality control of those materials, and then sells the same materials back to the customers at a vastly inflated price?"

60.     A 2021 study by Drs. Balazs Aczel, Barnabas Szaszi, and Alex Holcombe entitled "A Billion-Dollar Donation: Estimating the Cost of Researchers' Time Spent on Peer Review" explains just how much Defendants profit from the Unpaid Peer Review Rule.  The study estimated that in 2020, peer reviewers performed the equivalent of 15,000 years of peer review work.  The study estimated that in the United States alone, peer reviewers' 2020 labor had an estimated value of $1.5 billion.  In fact, the study recognized that this $1.5 billion figure "is almost certainly an underestimate," because the researchers chose conservative methods of calculation and did not include every journal.

61.     Even the Publisher Defendants' own public messaging recognizes their immense gains from not paying peer reviewers. STM's 2012 Report estimated the global value of peer review services at "£1.9 billion annually, equivalent to about £1200 per paper." In today's American dollars, that comes out to $3.7 billion a year.

### d. The Publisher Defendants' Anticompetitive Scheme Has Created an Ongoing Peer Review Crisis, Gravely Injuring the Public Interest

62.     Since World War II, the number of articles submitted for publication exploded. In 2006 alone, scholars submitted 1.3 million articles for publication in 23,750 journals. Each year since, the number of articles submitted for publication has increased.

63.     With a greater number of submitted articles comes a greater demand for peer reviewers. In efficient labor markets, greater demand for labor means higher wages. That did not happen in the market for peer reviewers. Despite a growing demand for peer reviewers, Defendants remained steadfast in their agreement to pay them nothing. The result was, and continues to be, a labor shortage: a "peer review crisis."

64.     A shortage of peer reviewers injects delay into the editorial process. Each peer reviewer needs to review more, and consequently gets burned out faster, thus extending even further the time required to secure a non-burned-out reviewer and a review. It also takes longer and longer to find and convince experts in the relevant fields to provide valuable services for free. Submitted papers that contain cutting-edge research advancements languish. Authors often cannot be published in time for their findings to be used by policymakers or others who could benefit.

65.     Another cause of the peer review crisis is growing reviewer fatigue. It has become increasingly difficult to recruit peer reviewers to perform their services for free. Peer

reviewers either do not respond to requests for peer review services or state they do not have time. This is in large part because the work load for peer review has exploded. The length of manuscripts have increased, peer review reports have also increased in length, multiple rounds of review are now common, and there are a larger number of journals sending peer review requests than ever before.

66.    Publons' 2018 Global State of Peer Review report notes that "an editor in 2017 needed to send out 2.4 peer review invitations to get one peer review report done. This has increased from an average of 1.9 invitations in 2013." Publons also notes that reviewer invitations have been increasing 9.8 percent a year while article publication rates have only been increasing by 4.9 percent a year. Publons cites both metrics of increasing review invitations to conclude that "reviewer fatigue is setting in[.]" That same report found that 83 percent of academics believe that greater incentives would have a positive or extremely positive impact on the efficacy of peer review. In other words, Publons found that nearly all peer reviewers believe the Publisher Defendants are not providing enough incentives to effectively address the peer review crisis their Scheme created.

67.    Since the pandemic, reviewer fatigue has increased substantially. Certain respondents to Wiley's self-conducted 2023 Peer Review Survey stated that peer review has been more challenging since the pandemic. Other studies have found that after the pandemic, in 2021 and 2022, only 9% of all invited reviewers agreed to provide a review, whereas during the years prior to the pandemic, peer reviewers agreed to provide their services approximately 35% of the time.

68.    Defendants could fix the peer review crisis they created, by doing what all other companies do in all other industries: pay for the labor they need.

69.    In September of 2020, at the height of the COVID-19 pandemic, academic James Heathers penned a scathing article called "The 450 Movement," decrying the Publisher Defendants' failure to pay peer reviewers.  The article's very first paragraph reads, "I do peer review and I want you to pay me four hundred and fifty dollars.  I'll even say please."  Heathers recounts meeting homeless graduate students, academics who couldn't afford to be academics anymore, adjunct professors who had their classes—and thus their income—cut, and pre-tenure professors worried about their debts from school.  But for their Scheme, the Publisher Defendants would have paid these scholars for the expertise and peer review work that made the Publisher Defendants' immense profits possible.  Heathers also notes that the continuing effects of the COVID-19 pandemic further exacerbate these academics' economic situations.  Heathers concludes by stating a common-sense proposition:  "I want to be compensated for my labor in the same way any other grinning fool in LITERALLY ANY OTHER COMMERCIAL CONTEXT ON THE ENTIRE PLANET WOULD BE."  Heathers' article garnered significant attention and support from academics, and has been favorably cited by a host of articles commenting on the peer review crisis.

70.    In 2021, the Researcher to Reader Conference—an organization dedicated to discussing the international scholarly content supply chain—moderated a debate between those in favor of and those against compensation for peer reviewers.  During that debate, Taylor & Francis's own Senior Vice President Brad Fenwick argued in favor of paying peer reviewers. Fenwick was first careful to explain that his views did not represent the views of Taylor & Francis.  He then explained that paying peer reviewers would "result in publications of higher quality in a timelier fashion.  The positive tradeoff between paying reviewers and any marginal additional cost strongly favors [paying peer reviewers]."  As Fenwick's comments make clear,

even the Publisher Defendants' own executives recognize that paying peer reviewers is the solution to the peer review crisis. The Publisher Defendants would do so, but for their unlawful agreement not to.

71.    Moreover, a study published by one of Elsevier's own journals confirms that paying peer reviewers would alleviate the peer review crisis. In 2014, economists Raj Chetty and Emmanuel Saez, as well as then-PhD candidate Laszlo Sandor, published an article entitled "What Policies Increase Prosocial Behavior? An Experiment with Referees at the Journal of Public Economics." The article studied the effects that cash and non-cash incentives have on the time it takes to peer review articles. The article's researchers offered their incentives to 1,500 peer reviewers working for Elsevier's *Journal of Public Economics*. The researchers assigned peer reviewers to four groups: one with a four-week deadline, one with a six-week deadline, one with a promise that they would be paid $100 if they completed the article within four weeks, and one that was told their completion time would be publicly posted (known as "social incentives"). The researchers then tracked the median completion time of each of these groups to determine which had worked the fastest, dividing the results by tenured and non-tenured peer reviewers.

72.    The study found that both tenured and non-tenured peer reviewers who were promised $100 completed articles much faster than those who were not. The study also found that social incentives are nowhere as effective as cash payments. In fact, social incentives were less effective than just implementing a four-week deadline with no cash payment. The study concludes by noting that cash incentives do not decrease the quality of reviews.

73.    In related labor markets not subject to the Publisher Defendants' conspiracy, peer reviewers are paid for their labor. Researchers will often seek funding from institutions in a process known as "grant writing." Institutions deciding whether to fund proposed research

submitted to them during the grant writing process retain reviewers to analyze the proposed research. The function of reviewers in grant writing is the same as their function in academic journals: ensuring that the research is valid and aligns with the goals of the sponsoring body (i.e., publishers or funding institutions, respectively).

74.    Much like peer review for journals, reviewing grant proposals is essential to budding academics' careers. Becoming a grant reviewer helps increase the chances that an academic will have their own grants approved. And grant approval is critical in the research and publishing landscape. Projects that don't receive grant funding are often not completed, and uncompleted projects do not result in publishable studies that would advance an academic's career.

75.    Sponsoring organizations in the grant writing review market often pay their reviewers. For example, the Bureau of Justice Assistance in the United States Department of Justice pays non-federal employees an honorarium to review research proposals. AmeriCorps similarly pays an honorarium for 4 to 6 weeks of research proposal review work.

> **e.    Instead of Compensating Scholars for Their Services, the Publisher Defendants Charge Class Members Exorbitant "Article Processing Charges" or "APCs"**

76.    Not only have the Publisher Defendants unlawfully colluded not to pay peer reviewers, the Publisher Defendants have increasingly *charged* scholars Article Processing Charges ("APCs") when an article is selected for publication.

77.    Universities have long demanded that for-profit publishers decrease their excessive subscription fees. The Publisher Defendants charge libraries, universities, and other institutions yearly subscriptions to gain access to the Publisher Defendants' journals, set at the profit-maximizing price. Several public institutions—including Louisiana State University, the

University of California, the University of Iowa, Temple University, West Virginia University, the University of Oklahoma, and Florida State University—have previously cut ties temporarily with commercial publishers over their exorbitant fees.  Private universities have also felt the pressure of rising subscription costs.  In April 2012, Harvard University's Library Faculty Advisory Council stated that subscription prices had increased by over 145% and the Publisher Defendants "made the scholarly communication environment fiscally unsustainable and academically restrictive."

78.     The Publisher Defendants sell subscriptions on a bundled basis, known in the publishing industry as the "Big Deal."  In "Big Deal" arrangements, the Publisher Defendants require institutions to pay a subscription fee for a "bundle" of journals that includes sought-after journals, as well as journals the institution may not want.  The price of the bundle reflects the number and type of journals included, as well as the institution's budget.

79.     For example, Elsevier established a tiered pricing schedule based on an institution's research intensity and size.  Larger institutions with a lot of research activity pay more than smaller institutions with little research activity.  With over 3,000 journals, Elsevier charges fees to individual institutional customers that can easily reach into millions annually.  To quote Jeffrey MacKie-Mason, head of the University of California, Berkeley's libraries, "[Elsevier is] a monopolist, and they act like a monopolist."

80.     Unlike commercial publishers, open access publishers do not charge universities fees to subscribe and read their online journals.  In order to compete with open access journals, the Publisher Defendants introduced APCs to shift their excessive fees from universities to Class Members.  The Publisher Defendants use APCs to augment or replace traditional subscription or

paywall fees. Thus, while open access articles charge no fees to the reader, most open access articles are published by commercial publishers who charge APCs to the scholar.

81.     Depending on the journal, the corresponding APC can range from hundreds to thousands of dollars. Elsevier sets its APCs on a journal-by-journal basis, charging as much as $10,400 per manuscript. Springer charges up to $11,390 per article to publish in its journals.

82.     An open access journal's market power, rather than costs, determines its APC level. Elsevier created CiteScore—the world's primary tool for ranking journals by prestige. By maintaining CiteScore, Elsevier essentially determines what prestige ranking each Publisher Defendant journal will have, and consequently what the Publisher Defendants' APCs will be.

83.     Today, the Publisher Defendants have largely transitioned from subscription-only journals to open access or "hybrid" journals. "Hybrid journals" are journals where authors have the option to designate their article open access. If an author makes their article open access, the author may retain the copyright but must pay a higher APC.

84.     Scientists who work tirelessly to promote human progress are thus faced with a difficult dilemma: pay an excessive APC fee to make their work open access, or relinquish their copyright to avoid the APC fee, and restrict access to their research.

85.     In other words, APCs are essentially fines levied on scholars who want to make their scientific findings available to the public. Rather than encourage the public sharing of scientific research, the Publisher Defendants punish scholars by charging exorbitant fees. The effect on the public interest is catastrophic: it takes longer to cure diseases and make scientific breakthroughs. Excessive APCs are a barrier to scientific progress.

86.     Scholars rely on a mix of research grants, library funds, and personal assets or savings to pay APCs.

87.     The Publisher Defendants represent that APCs help cover the costs of peer review, yet the Publisher Defendants admit they do not pay for peer review services.  For example, Elsevier represents that "[t]he fees that authors pay help to support the extensive work that goes into the editorial review, peer review and publishing process" yet at the same time Elsevier acknowledges that peer review services are uncompensated or "voluntary."

88.     Thus, the Publisher Defendants are able to pocket nearly all of their charged APCs as profit because the Publisher Defendants do not pay for research, do not pay for peer review, and have lower production costs in the digital era.

89.     Globally, a total of $8.349 billion ($8.968 billion in 2023 US dollars) were spent on APCs between 2019 and 2023.  Annual spending almost tripled from $910.3 million in 2019 to $2.538 billion in 2023.  In 2023, Elsevier ($582.8 million) and Springer Nature ($546.6 million) generated the most revenue from APCs.

90.     The Publisher Defendants not only gain enormous profits from subscription fees and APCs, they have also begun entering into highly lucrative agreements with artificial intelligence ("AI") companies to sell access to scientific information and data from published articles.  In 2024, Wiley entered into AI contracts with two different undisclosed tech companies for $23 million and $21 million respectively.  Taylor & Francis signed AI contracts with Microsoft and a second undisclosed tech company, resulting in AI revenues exceeding $75 million in 2024 alone.  Elsevier entered into an agreement with AI company OpenEvidence for an undisclosed amount.

### 3.     The Publisher Defendants Agreed to Prohibit Scholars From Submitting Their Article to More Than One Journal at a Time

91.     The Scheme includes an agreement prohibiting scholars from submitting their article to more than one journal at a time: the **Single Submission Rule**.  STM Principle 3.1.4

states "[s]ubmitting the same manuscript to more than one journal concurrently [] constitutes unethical behaviour and is unacceptable."

92.    The Publisher Defendants are competitors for manuscripts from scholars. Each Publisher Defendant wants scholars to submit their best manuscripts to them, rather than to another competing Publisher Defendant. Publishing the best science makes a journal more valuable to readers, and more desirable for scholars, who want to maximize the readership and impact of their research. As a Publisher Defendant attracts and publishes top manuscripts, that Publisher Defendant can charge higher subscription fees to readers, and higher APCs to scholars.

93.    The Single Submission Rule substantially decreases this competition among the Publisher Defendants. STM Principle 3.1.4 prohibits authors from fielding favorable publication terms from competing publishers by requiring authors to interface with only one Publisher Defendant at a time. Once an author submits a manuscript to a Publisher Defendant for publication, that author immediately loses all bargaining leverage. The author cannot submit their manuscript to more than one publisher, which would increase competition between publishers and increase incentives to review the submission promptly and publish worthy research quickly.

94.    This anticompetitive agreement has several perverse consequences. Class Members must choose the one journal to which they send a manuscript very carefully, since the review process may take many months or even years (as a result of the Unpaid Peer Review Rule and the ongoing peer review crisis). If they choose a more selective journal, they run the risk of waiting only to be rejected, and then must restart the process from scratch at another journal, delaying publication significantly and potentially injuring their career. Or, the Class Member may "play it safe" and submit to a less selective journal. While this may increase the chance of

publication, it also means that the manuscript will be read by fewer scholars, will have less of an impact, and will be less helpful to the scholar's career.

95.    If Class Members were permitted to submit to more than one journal at a time (for instance, to a "reach" journal as well as a "safety" journal), manuscripts would be more correctly allocated to the journals that best suit the scholar; the review process would be faster and better (since journals would not want to lose the manuscript to a competitor); and, if multiple journals wanted to publish the same manuscript, those journals would compete with each other to offer the Class Member the best terms of publication (such as not requiring the scholar to give up her copyright as a condition of publication).

96.    Each of the Publisher Defendants enforce STM Principle 3.1.4:

a.    *Elsevier*: Under its "Simultaneous Submission" factsheet, Elsevier states "The main rule of thumb: articles submitted for publication . . . must not have been submitted to any other publication."  The factsheet also states: "Avoid submitting a paper to more than one publication at a time. Even if a submitted paper is currently under review and you do not know the status, wait to hear back from the publisher before approaching another journal, and then only if the first publisher will not be publishing the paper."  Elsevier's website page entitled "Multiple, duplicate, concurrent publication/simultaneous submission" also states, "Articles submitted for publication . . . must not have been submitted to any other publication."

b.    *Wolters Kluwer*: Under its "Ethical Guidelines" Wolters Kluwer states "Submitted manuscripts should not have been . . . currently submitted elsewhere."

c.    *Wiley*: Under "Common reasons for rejection" Wiley describes one of the "main reasons that papers can be rejected" is that they are "currently under review at another journal (submitting the same paper to multiple journals at the same time is not allowed)."

d.  *Sage*: Under "Ethics & Responsibility" Sage states that "Authors should

ensure that . . . their work has . . . been submitted only to the journal."

e.  *Taylor & Francis*: The "Misconduct, Taylor & Francis Editorial Policies,"

state "Authors are required to declare upon submission that the manuscript is not under

consideration elsewhere, and as such the detection of a duplicate submission or publication is

typically considered to be a deliberate act."

f.  *Springer*: Under "Submitting research, Common issues" Springer states

"Submissions to multiple journals at the same time isn't allowed. If your paper is already under

review elsewhere we can't consider it."

97.  The Publisher Defendants also enforce their Single Submission Rule through

STM's "Integrity Hub."  Created in 2022, the Integrity Hub is a cloud-based product that allows

STM members to share and access data on articles submitted to each of their journals.

98.  The Integrity Hub allows STM members to "collaborate with other parties of their

choosing to develop and operate screening tools," including a "Duplicate Submission Checker

Tool" that detects whether an article has been submitted to another journal.  According to Joris

van Rossum—Product Director of the Integrity Hub and a previous employee of Elsevier—the

Duplicate Submission Checker Tool "supports the automatic checking of duplicate submissions

across journals, publishers, and editorial systems."  Wiley's Senior Vice President of Research

Publishing, Liz Ferguson, and Springer's Director of Research Integrity, Chris Graf—who both

currently occupy positions in STM's leadership—have praised the Duplicate Submission Tool's

ability to improve "integration" and "collaboration" across academic publishers.

99.  The Publisher Defendants directly contribute to the Integrity Hub and the

Duplicate Submission Checker Tool:

a.      *Elsevier*: Elsevier improved the Duplicate Submission Checker Tool by creating an enhancement that checks manuscripts' full text for duplication, not just the manuscripts' metadata.  A select number of publishers are testing Elsevier's enhancement, and it will be available to all STM members by the end of 2024.

b.      *Springer*: Chris Graf, Springer's Director of Research Integrity and an STM Board Member, helped launch the Integrity Hub in 2022.  He was involved in the launch of the Integrity Hub's "demonstrator," a proof-of-concept intended to show that the Integrity Hub could detect "simultaneous duplicate submissions."

c.      *Wiley and Sage*: Both companies jointly developed a "Papermill Detection" service to check for multiple submissions.  Wiley has publicly stated that its Papermill Detection service "is complementary to the STM Integrity Hub, which has been established to provide a shared infrastructure both for screening and information sharing across publishers."

d.      *Taylor & Francis*: Apart from participating in "cross-publisher working groups and task forces within . . . STM, focused on developing industry-wide guidance, policies, and tools," Taylor & Francis is also "piloting and testing a range of research integrity tools, including STM's paper mill detection tool[.]"

**4.      The Publisher Defendants Agreed to Prohibit Scholars From Freely Sharing Their Research**

100.    The Publisher Defendants also agreed to prevent scholars from freely sharing their scientific findings: the **Gag Rule**.  STM Principle 2.2 prohibits the Scholar Plaintiffs and Class Members from sharing or discussing research described in submitted manuscripts without permission.  STM Principle 2.2 states that submitted manuscripts "must not be shown to or discussed with others except as authorised by the editor."  Thus, the Publisher Defendants treat

even unpublished manuscripts as their property, and prohibit authors from sharing their manuscripts with their colleagues, or even discussing the substance of their research with them.

101.    The Publisher Defendants' confidentiality requirements as to submissions govern scientists and scholars regardless of whether an article's findings are critical to other researchers, policymakers, or society more broadly, and regardless of the author's wishes.  Scientists and scholars subject to the Gag Rule cannot publicly share their discoveries without the Publisher Defendants' permission.

102.    The Publisher Defendants enforce the Gag Rule prior to and after publication. Prior to publication, the Publisher Defendants prohibit the public sharing of submitted manuscripts.  After publication, the Publisher Defendants require authors whose articles are published in subscription journals to relinquish their copyrights, after robbing them of their bargaining power through the Single Submission Rule.

        a.    *Elsevier*: Prior to publication, Elsevier enforces "embargo periods."  The embargo periods range from 12 to 36 months for each journal.  During this time, scholars may share their accepted manuscript for internal institutional uses but scholars are prohibited from sharing their article on hosting platforms, such as their institutional repository.  The public can only access the article by visiting the author's personal homepage.  Thus, Elsevier prohibits scholars from sharing their accepted manuscripts on public platforms accessible to the greater academic community.  After publication, Elsevier's subscription journals require scholars to relinquish their copyrights without compensation.  Elsevier's copyright policy states ". . . the author typically transfers copyright to the publisher" via a publishing agreement executed between the scholars and Elsevier.  The "Assignment of Copyright" clause in Elsevier's publishing agreement states:

I hereby assign to the Journal the copyright in the manuscript identified above (where Crown Copyright is asserted, authors agree to grant an exclusive publishing and distribution license) and any tables, illustrations or other material submitted for publication as part of the manuscript (the "Article"). This assignment of rights means that I have granted to the Journal the exclusive right to publish and reproduce the Article, or any part of the Article, in print, electronic and all other media (whether now known or later developed), in any form, in all languages, throughout the world, for the full term of copyright, and the right to license others to do the same, effective when the Article is accepted for publication. This includes the right to enforce the rights granted hereunder against third parties.

b.      *Wolters Kluwer*: Prior to publication, accepted manuscripts can only be posted in "private groups" on the "Scholarly Collaboration Networks" (SCNs) that cooperate with Wolters Kluwer journals.  After publication, if the article is not open access, Wolters Kluwer requires scholars to relinquish their copyrights without compensation.  The "Copyright Assignment" agreement states that authors must assign to Wolters Kluwer "your right of title and interest in and to the copyright in the article for any and all Wolters Kluwer publications[.]" Wolters Kluwer also requires the academic community to request permission from Wolters Kluwer to use any part of the scholar's work.

c.      *Wiley*: Prior to publication, Wiley enforces a 12-month embargo period for articles submitted to scientific, medical, and technical journals and 24 months for social science and humanities (SSH) journals.  Before the embargo lifts, authors may only share their article as a hidden "closed deposit" on their personal website or internal institutional repository, or in private research groups.  Only after the embargo lifts can scholars publicly share their article on these sites.  Further, Wiley also requires scholars who publish in subscription journals to relinquish their copyright.  The "Copyright Transfer Agreement" states "The Author and each Co-Author hereby assigns to [Wiley], during the full term of copyright and any extensions or renewals, all copyright in and to the Contribution, and all rights therein, including but not limited

-32-

to the right to publish; republish; transmit; sell; distribute; and otherwise use the Contribution in whole or in part in electronic and print editions of the Journal and in derivative works throughout the world[.]"

        d.     *Sage*: Sage prohibits scholars from sharing the article's final published PDF on any public websites or repositories without permission from Sage.  Sage also requires scholars who publish in subscription journals to license their copyright exclusively to Sage for the entire legal term of their copyright.  The "Journal Contributor's Publishing Agreement" states that "Sage requires the author as the rights holder to sign a Journal Contributor's Publishing Agreement for all articles we publish. Sage's Journal Contributor's Publishing Agreement is a license agreement under which the author retains copyright in the work but grant Sage the sole and exclusive right and license to publish for the full legal term of copyright."

        e.     *Taylor & Francis*: Prior to publication, Taylor & Francis enforces embargo periods for all of its journals ranging from 12 to 18 months.  During the embargo period, scholars may not share their accepted manuscript on any intuitional repository or scholarly collaboration network, such as ResearchGate.  After publication, Taylor & Francis requires scholars who publish in subscription journals to assign their copyright to Taylor & Francis without compensation.  The "Agreement in Relation to Copyright in an Article for a Taylor & Francis/Routledge Journal" states "I hereby assign to Taylor & Francis the copyright in the above specified manuscript (government authors not transferring copyright hereby assign a non-exclusive license to publish) and any accompanying tables, illustrations, data and any other supplementary information intended for publication in all forms and all media . . . throughout the world, in all languages, for the full term of copyright, to take effect if and when the article is accepted for publication."

f.    *Springer*: Prior to publication, Springer enforces a six-month embargo for all of its subscription journals. During this period, scholars are prohibited from publicly releasing their article. Springer also prohibits scholars from releasing their accepted manuscripts under a Creative Commons license.

103.    During the COVID-19 pandemic, the Publisher Defendants relaxed the Gag Rule to facilitate the speedy development of a vaccine. The Publisher Defendants' decision to create a limited exception worked:  scientists developed a vaccine for COVID-19 in less than a year— three years faster than the next-fastest developed vaccine ever created. The COVID-19 vaccine's quick development was due in no small part to the Publisher Defendants' suspension of the Gag Rule, allowing scientists to freely share their discoveries and knowledge with each other. The Publisher Defendants' relaxation of the Gag Rule during the COVID-19 pandemic demonstrates that the Rule impedes the pursuit of critical cures for other serious medical ailments like cancer, Alzheimer's, and HIV.

104.    Dr. Dritjon Gruda, a Lecturer in Organizational Behavior at Maynooth University, provides an example of how the Scheme has harmed society: "During the COVID-19 pandemic, my colleagues and I submitted a paper to a premier journal in our field, examining the effects of the onset of the pandemic on individuals' mental health, on the basis of their personality traits. This was a time-sensitive piece because people began to adapt as the pandemic accelerated. The paper languished for several months without even being sent out for peer review. Multiple e-mails to the journal yielded no progress. We had to withdraw the paper and submit it elsewhere, losing valuable time. This could have been avoided had we been allowed to submit the manuscript elsewhere simultaneously."

C.    **The Publisher Defendants Maintain Their Anticompetitive and Unlawful Scheme Through the Present Day**

105.    The STM Principles have remained unchanged since 2013.  As it did when it first adopted the Principles, STM still requires its member organizations to agree.  STM requires applicants to agree to follow the Principles before STM will even consider an applicant for membership.

106.    Prior to the filing of the original complaint on September 12, 2024, clicking on the hyperlink "STM Ethical Principles for Scholarly Publishing" in STM's online Code of Conduct (located at https://stm-assoc.org/wp-content/uploads/2024/08/2024_04_29_STM_Code_of_Conduct.pdf) led to the text of the Principles.

107.    However, sometime after the filing of the original complaint on September 12, 2024, that same link no longer leads to the Principles.  Instead, that link now leads to:

# 404 Not Found

nginx

108.    Further, the Publisher Defendants continue to hold many important positions on STM's leadership committees and Board of Directors:

- From **Elsevier**:

  o  Victoria Eva (Open Research Committee Member)

  o  Laura Hassink (Board Member)

  o  Sarah Jenkins (Vice Chair of Research Integrity Committee)

-35-

- o   Rachel Martin (Chair of Social Responsibility Committee and *ex officio* Board Member)

- o   Judy Verses (Board Member)

- o   Mark Wilmshurst (Standard & Technology Committee Member)

- From **Sage**:

  - o   Jo Lacey (Social Responsibility Committee Member)

- From **Springer**:

  - o   Samuel Goodchild (Board Member and Treasurer)

  - o   Chris Graf (Chair of Research Integrity Committee and *ex officio* Board Member)

  - o   Steven Inchcoombe (Open Research Committee Member and Board Sponsor)

  - o   Joyce Lorigan (Board Member and Open Research Committee Member)

  - o   Henning Schoenenberger (Standard & Technology Committee Member)

- From **Taylor & Francis**:

  - o   Andrew Kelly (Standard & Technology Committee Member)

  - o   Priya Madina (Chair of Open Research Committee and *ex officio* Board Member)

  - o   Jennie Mcmillan (Social Responsibility Committee Member)

  - o   Coromoto Power-Febres (Research Integrity Committee Member)

- From **Wiley**:

  - o   Liz Ferguson (Research Integrity Committee Member and Board Sponsor)

  - o   Guido Herrmann (Board Member)

- o   Jay Neill (Standard & Technology Committee Member)

- o   Anna Reeves (Research Integrity Committee Member)

- o   Ralf Schimmer (Social Responsibility Committee Member)

- o   Kathryn Sharples (Open Research Committee Member)

- From **Wolters Kluwer**:

- o   Rafael Sidi (Board Member, term ended in 2024)

109.    The Publisher Defendants thus continue to control STM and ensure the ongoing maintenance and enforcement of the Scheme.

## V.    The Relevant Markets Impacted by The Publisher Defendants' Scheme

### A.    The Market For Publication by Peer-Reviewed Journals

110.    Publication by peer-reviewed journals is a relevant antitrust market.  For scholars who seek to communicate their scientific research, there is no adequate substitute for publication in a peer-reviewed journal.  Peer-reviewed journals establish the validity of scientific research through the peer review process, communicate that research to the scientific community, and avoid competing claims to the same scientific discovery.  Publication in peer-reviewed journals is also important to Class Members' career advancement because it creates a clear record of Class Member scientific achievement.  Recognitions from earning tenure to receiving a Nobel Prize depend upon correctly crediting scientific discoveries, and are often made in reference to publications in peer-reviewed journals.

111.    The relevant geographic scope of the market for publication by peer-reviewed journals is worldwide.

112.    The Publisher Defendants possess significant market power in the global market for publication by peer-reviewed journals.  The Publisher Defendants own a majority, approximately 53 percent, of the world's peer-reviewed journals.  The Publisher Defendants also

own a majority of peer-reviewed journals in most disciplines and sub-disciplines. The Publisher Defendants own majorities in 92 percent of disciplines and 78 percent of sub-disciplines. The Publisher Defendants own supermajority shares (i.e., more than 66 percent) in 42 percent of disciplines and 47 percent of sub-disciplines.

113.    Further, the more prestigious the journal, the greater the Publisher Defendants' market power. The Publisher Defendants enjoy substantial market power across the full spectrum of scientific disciplines. For example, the Publisher Defendants own all ten of the top ten peer-reviewed journals in the fields of Chemical Engineering and Neurology. They own nine of the top ten peer-reviewed journals in Biochemistry, Dentistry, and Materials Sciences. They own eight of the top ten peer-reviewed journals in Decision Sciences, Energy, Engineering, and Medicine. They own seven of the top ten peer-reviewed journals in Arts & Humanities, Chemistry, Earth and Planetary Sciences, Environmental Sciences, Immunology & Microbiology, Pharmacology, and Physics & Astronomy. And they own six of the top ten peer-reviewed journals in Agricultural & Biological Sciences, Business Management & Accounting, Economics, Econometrics, & Finance, Psychology, and Veterinary Sciences.

114.    Journal prestige gives the Publisher Defendants additional market power because universities consider prestige when making promotion and tenure decisions. Journal prestige is closely related to a journal's "impact factor" – a metric that measures how often academic articles within the journal are cited in other works. Journals with higher impact factors carry more prestige in their respective fields than those with lower values. Several graduate schools maintain internal journal rankings and require academics to publish in highly ranked journals with high impact factors to be considered for promotion.

115.    An additional measurement of the Publisher Defendants' market power is the number of citations per journal.  This is because academic journals experience network effects. Authors prefer to submit their articles to journals with high readerships, and readers prefer to access journals with the best articles.  More citations to a journal suggests both that the articles within that journal are higher quality and that more people are reading that journal. Considering the top 50 percent of journals in each sub-discipline, the Publisher Defendants collectively own 63 percent of the academic journal market as measured by citations.  For example, in the Forestry and Horticulture sub-disciplines, the Publisher Defendants own 46 percent of journals.  But considering citations to articles in journals in the Forestry and Horticulture sub-disciplines, Defendants' market share increases to 74 percent.

116.    There are significant barriers to entry in the market for publication by peer-reviewed journals.  Professors of Economics and Law Aaron Edlin and Daniel Rubinfeld have identified several barriers to entry that prevent meaningful competition, including substantial network effects, high switching costs, and institutional inertia.  All of these structural barriers significantly increase the costs potential market entrants face, making their entry into the market less likely.  Because of these structural barriers in the academic journal market, the Publisher Defendants face little competitive pressure from potential competitors who do not agree to the Scheme.  The Scheme also increases barriers to entry.  The Single Submission Rule and the Gag Rule both preserve the Publisher Defendants' market power by eliminating the ability of authors to switch publishers, and preventing authors from receiving the benefits of competition between rival journals.

### B.    The Related Market for Peer Review Services

117.    Peer review services for peer-reviewed journals is another, closely related, relevant antitrust market.

118.    A critical and defining aspect of peer-reviewed journals is peer review by qualified scholars.  There are substantial qualifications necessary to provide peer review to a scholarly peer-reviewed journal.  Peer reviewers are respected experts in their fields, and are scholars with advanced graduate degrees in their subject areas.  These scholars have often previously performed peer review services and published peer-reviewed academic articles of their own.  There are no adequate substitutes for peer review services because alternatives would defeat the value and purpose of peer-reviewed journals.  If the Publisher Defendants published manuscripts without the quality control and imprimatur that peer review provides, the value of the Publisher Defendants' journals would substantially diminish, along with the willingness of their customers to pay substantial sums for access.

119.    The relevant geographic scope of the market for peer review services is global.

120.    The Publisher Defendants have the same market shares in the market for peer review services as they do in the market for peer-reviewed journals, because one cannot exist without the other, in the same proportions.  By the same token, the Publisher Defendants have the same market power in the market for peer review services as they do in the market for peer-reviewed journals.

121.    The Scheme itself provides powerful tools to the Publisher Defendants to maintain and exert market power in the market for peer review services.  Through collusion, the Publisher Defendants have linked these two relevant antitrust markets, allowing the Publisher Defendants to leverage the power they have in the market for peer-reviewed journals to coerce Class Members to provide peer review services for free.  The Publisher Defendants do this by expressly linking publication with the provision of unpaid peer review services, and by implementing other aspect of their Scheme that substantially reduces competition among them.

122.    The fact that the Publisher Defendants can force Class Members to provide peer review services without paying them anything illustrates the Publisher Defendants' substantial market power.

## VI.    CLASS ACTION ALLEGATIONS

123.    The Scholar Plaintiffs bring this action as representatives of a Class under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3).  The class is defined as follows:

> All natural persons residing in the United States who performed peer review services for, or submitted a manuscript for publication to, any of the Publisher Defendants' peer-reviewed journals from September 12, 2020 to the present.

124.    Excluded from this definition are all employees, officers, and directors of Defendants; and any judges, justices, or chambers' staff assigned to hear or adjudicate any aspect of this litigation.

125.    The Class is so numerous that joinder of all persons and entities in the Class is impracticable.  Members of the Class are widely dispersed throughout the country.  The exact number of Class members can be determined from information in the possession and control of the Defendants, but based on public records, the number of Class members is at least in the hundreds of thousands.

126.    Numerous common issues of law and fact exist and predominate over questions affecting only individual members.  These issues include, without limitation:

a.    Whether the Publisher Defendants combined and/or conspired to fix, lower, maintain, or stabilize the price of labor for peer review services obtained from scholars in the United States at any time during the Class Period;

b.  Whether the Publisher Defendants combined and/or conspired to require authors to submit manuscripts to only one journal at a time, and prohibited authors from sharing their work;

c.  If the Publisher Defendants entered into such a combination or conspiracy, whether that conduct violates Section 1 of the Sherman Act under the *per se*, quick look, or rule of reason modes of analysis;

d.  If the Publisher Defendants entered into such a combination or conspiracy, whether that conduct has in fact artificially deflated, maintained, or stabilized wages for peer reviewers relative to competitive levels;

e.  Whether the Scholar Plaintiffs and members of the Class were injured by Defendants' conduct and, if so, the proper measure of damages; and

f.  The contours of appropriate injunctive relief to remediate the anticompetitive effect of the challenged conduct in the future.

127.    The Scholar Plaintiffs' claims are typical of the claims of the Class members. Defendants artificially suppressed prices and restrained trade, and thereby injured all members of the Class in substantially similar fashion.

128.    The Scholar Plaintiffs will fairly and adequately protect the interests of the Class. The Scholar Plaintiffs' interests are not antagonistic to or in conflict with the interests they seek to represent as Class representatives.  The Scholar Plaintiffs' counsel is experienced in prosecuting complex antitrust class actions and intends to prosecute this action vigorously.

129.    This action is maintainable as a class action under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds generally

-42-

applicable to the Class, thereby making appropriate monetary, injunctive, and other equitable relief in favor of the Class.

130.    This action is maintainable as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class predominate over any individual questions, and a class action is superior to other methods available for the fair and efficient adjudication of this controversy.

131.    Questions of law and fact common to Class members, including legal and factual issues relating to violation and damages, predominate over any questions that may affect only individual Class members, because Defendants have acted on grounds generally applicable to the entire Class.

132.    A class action is also superior to the other available methods for the fair and efficient adjudication of this controversy.  Requiring Class members to pursue their claims individually would invite a host of separate suits, with concomitant duplication of costs, attorneys' fees, and demands on judicial resources.  The Scholar Plaintiffs know of no difficulty that could arise from the management of this litigation that would preclude its maintenance as a class action.

**FIRST CLAIM FOR RELIEF**
**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**

133.    The Scholar Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

134.    The Publisher Defendants and their co-conspirators entered into and engaged in unlawful agreements in restraint of the trade and commerce described above in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

135.    The Publisher Defendants and their co-conspirators agreed to artificially deflate, maintain, or stabilize the wages of peer reviewers providing peer review services to the Publisher Defendants through the implementation and enforcement of STM's Principles and Publisher Defendants' policies as described above.

136.    The Publisher Defendants and their co-conspirators also agreed to restrict competition for academic articles by requiring authors to submit their manuscripts to only one journal at a time and preventing authors from sharing their accepted manuscripts through the implementation and enforcement of STM's Principles and Publisher Defendants' policies as described above.

137.    The Publisher Defendants and their co-conspirators' agreement to artificially deflate, maintain, or stabilize the wages of peer reviewers providing peer review services to the Publisher Defendants had the purpose and effect of restraining competition in the labor market for peer review services.

138.    Defendants and their co-conspirators' agreement to prohibit authors from submitting their article to more than one journal and sharing their accepted manuscripts had the purpose and effect of restraining competition among the Publisher Defendants.

139.    The Scholar Plaintiffs and the Class have suffered, and will continue to suffer, antitrust injury because they provided, and will continue to provide, peer review services to the Publisher Defendants at artificially deflated wages than they otherwise would have absent Defendants' agreement.

140.    Defendants' agreement occurred in or had an effect on interstate commerce.

141.    Defendants' conspiracy was not ancillary to, nor reasonably necessary for, any legitimate business collaboration among the Defendants.  Defendants' conspiracy did not result

in any procompetitive benefits. If it did, any such benefits were substantially outweighed by the tremendous competitive harm alleged herein. Further, any such benefits could have been accomplished through alternative, far less restrictive means.

142. The Defendants' conspiracy is unlawful *per se* as a naked agreement among competing publishers to fix the price of labor over which Defendants would have otherwise competed. Defendants' conspiracy is also unlawful *per se* as a naked agreement to refuse to deal with authors who (1) do not restrict their article submission to one journal at a time, and (2) publicly share their accepted manuscripts.

143. In the alternative, Defendants' cartel is unlawful under either a quick look or rule of reason mode of analysis.

144. Pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, the Scholar Plaintiffs seek to recover treble damages, an injunction, and other relief as prayed for below, on their own behalf and on behalf of the proposed class they seek to represent.

## VII.    PRAYER FOR RELIEF

WHEREFORE, the Scholar Plaintiffs, on behalf of themselves and the Class, respectfully pray for the following relief:

A.    An order certifying the action as a class action pursuant to Federal Rule of Civil Procedure 23, and appointing the Scholar Plaintiffs as representatives of the Class, and appointing their counsel as Class Counsel;

B.    An order declaring that Defendants' conduct was an unlawful agreement in restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    An injunction enjoining Defendants from continuing to violate the law by requiring them to dissolve the challenged unlawful agreements;

D.    An award of treble damages to the Scholar Plaintiffs and members of the Class, in

an amount to be determined at trial, for their provision of peer review services to the Publisher

Defendants at artificially deflated wages;

E.    The costs of bringing this suit, including reasonable attorneys' fees;

F.    An award of pre- and post-judgment interest, to the extent allowable; and

G.    Such other further relief that the Court deems reasonable and just.

## VIII.  <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury

on all issues so triable.

Dated: November 15, 2024             Respectfully submitted,

Dean M. Harvey (*pro hac vice*)
Jallé H. Dafa (*pro hac vice*)
Benjamin A. Trouvais (*pro hac vice*)
LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Phone: (415) 956-1000
Fax: (415) 956-1008
dharvey@lchb.com
jdafa@lchb.com
btrouvais@lchb.com

Emily N. Harwell (NY Bar # 5985585)
LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Phone: (212) 355-9500
Fax: (212) 355-9592
eharwell@lchb.com

Benjamin Elga (NY Bar #5332861)
Janet Herold (*pro hac vice*)
JUSTICE CATALYST LAW
40 Rector St
New York, NY 10006
Telephone: (518) 732-6703

-46-

belga@justicecatalyst.org
jherold@justicecatalyst.org

Roberta D. Liebenberg (*pro hac vice forthcoming*)
Gerard A. Dever (*pro hac vice forthcoming*)
Jeffrey B. Gittleman (*pro hac vice forthcoming*)
FINE, KAPLAN AND BLACK, R.P.C.
One South Broad Street, 23rd Floor
Philadelphia, PA  19107
Telephone: (215) 567-6565
Fax: (215) 568-5872
rliebenberg@finekaplan.com
gdever@finekaplan.com
jgittleman@finekaplan.com

Eric L. Cramer (*pro hac vice forthcoming*)
BERGER MONTAGUE
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3009
ecramer@bm.net

*Counsel for Plaintiffs and the Proposed Class*