UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DR. ELVISHA DHAMALA, DR. SHELLEY
FACENTE, DR. ROBERT MAHON, and DR.
LUCINA UDDIN,

                                        Plaintiffs,

            vs.

ELSEVIER, B.V., INFORMA PLC,
INTERNATIONAL ASSOCIATION OF
SCIENTIFIC, TECHNICAL, AND MEDICAL
PUBLISHERS, JOHN WILEY & SONS, INC.,
SAGE PUBLICATIONS, INC., SPRINGER
NATURE AG & CO. KGaA, TAYLOR &
FRANCIS GROUP, LLC, TAYLOR & FRANCIS
GROUP, LTD., WOLTERS KLUWER HEALTH,
INC., WOLTERS KLUWER N.V., and JOHN
DOES 1 THROUGH 50,

                                        Defendants.

Case No. 1:24-cv-06409-HG

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT
MOTION TO DISMISS THE AMENDED COMPLAINT**

**Table of Contents**

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ........................................................................................................2

I.      Scholarly Publishing. ....................................................................................2

II.     STM and the Principles. .................................................................................3

III.    Peer Review. ..................................................................................................4

IV.     Concurrent Manuscript Submission. ..............................................................6

V.      Manuscript Confidentiality. ...........................................................................6

LEGAL STANDARD .................................................................................................7

ARGUMENT ..............................................................................................................8

I.      Plaintiffs Fail To Plead Facts Showing the Alleged Unlawful Agreements.......................8

        A.      The Principles Are Not Evidence of the Alleged Agreements. .............9

                i.      The Principles Do Not Contain an Agreement Not To Pay Peer Reviewers...........11

                ii.     The Principles Do Not Contain an Agreement To Ban Concurrently Submitted Manuscripts. ...........12

                iii.    The Principles Do Not Contain an Agreement Prohibiting the Sharing of Research in Submitted Manuscripts...........14

                iv.     The Principles Do Not Evidence the Alleged "Scheme."..........15

        B.      Plaintiffs Rightfully Disclaim Reliance on Circumstantial Evidence of the Purported Agreements. .........15

II.     Plaintiffs Fail To Allege an Unreasonable Restraint of Trade..........18

        A.      Neither the *Per Se* Rule Nor Quick Look Review Applies to the Purported Agreements. ...........18

        B.      Plaintiffs Fail To Allege a Rule of Reason Violation. ...........21

                i.      Plaintiffs Fail To Allege a Properly Defined Relevant Product Market...........21

                ii.     Plaintiffs Fail To Allege Direct Evidence of Actual Harm to Competition...........23

CONCLUSION ..........................................................................................................25

i

## Table of Authorities

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. Fed. Trade Comm'n*, 1 F.4th 102 (2d Cir. 2021) ....................................24

*Allstate Ins. Co. v. Rozenberg*, 771 F. Supp. 2d 254 (E.D.N.Y. 2011)........................................9

*Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87 (2d Cir. 2018) .....................................16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...........................................................................7, 15, 17

*Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir. 1994)........................................................................22

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................7, 8, 16, 17

*Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*, 142 F. Supp. 2d 296 (E.D.N.Y. 2001).....................22

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612
     (S.D.N.Y. 2013) .............................................................................................20, 22, 23

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1 (1979)..........................................19

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) .............................................................22

*Caithness Long Island II, LLC v. PSEG Long Island LLC*, No. 18-CV-4555, 2019
     WL 6043940 (E.D.N.Y. Sept. 30, 2019).........................................................................8

*Cal. Dental Ass'n v. Fed. Trade Comm'n*, 526 U.S. 756 (1999)................................................19

*Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537 (2d
     Cir. 1993) ...................................................................................................................18

*Celestin v. Martelly*, 698 F. Supp. 3d 443 (E.D.N.Y. 2023)...........................................8, 9, 12, 13

*Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230 (2d Cir. 2008)............................................22

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381
     (2d Cir. 2024) .................................................................................................... passim

*Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46 (2d Cir. 2016) .........................................22

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) .......................................................4

*DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104 (2d Cir. 2010)...................................................9

*Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.*, 312 F. Supp. 2d 379
     (E.D.N.Y. 2004) ............................................................................................................21

*Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150 (2d Cir. 2006)........................9

*In re Citric Acid Litig.*, 191 F. 3d 1090 (9th Cir. 1999)..............................................................13

*In re German Auto. Mfrs. Antitrust Litig.*, 497 F. Supp. 3d 745 (N.D. Cal. 2020).......................22

*In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346 (S.D.N.Y. 2022).....................10

*In re Inclusive Access Course Materials Antitrust Litig.*, 544 F. Supp. 3d 420
     (S.D.N.Y. 2021) ............................................................................................................21

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010)........................................8, 12, 17

*In re Synchrony Fin. Secs. Litig.*, 988 F.3d 157 (2d Cir. 2021)........................................................5

*In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896 (6th Cir. 2009)....................................17

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Pracs. & Prods. Liab. Litig.*, No.
    09-MD-02100-DRH-PMF, 2011 WL 5547133 (S.D. Ill. Nov. 15, 2011) ...............................19

*Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008) .........................................................17

*LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136 (E.D.N.Y. 2010) ........................................7

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) .............................18, 20

*LLM Bar Exam, LLC v. Barbri, Inc.*, 271 F. Supp. 3d 547 (S.D.N.Y. 2017) ..................................8

*Long Island Anesthesiologists PLLC v. United Healthcare Ins. Co. of N.Y. Inc.*, No.
    22-CV-04040 (HG), 2025 WL 1031093 (E.D.N.Y. Apr. 7, 2025)....................................16, 21

*MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172 (2d Cir. 2016) .........................21

*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008) ..........18, 19, 20

*Mayor of Baltimore v. Citigroup, Inc.*, 709 F.3d 129 (2d Cir. 2013) .................................. passim

*Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679 (1978) ...................................10, 13, 20

*Nicosia v. Amazon.com, Inc.*, 834 F.3d 220 (2d Cir. 2016)............................................................5

*Nostalgic Partners, LLC v. Off. of Comm'r of Baseball*, 637 F. Supp. 3d 45
    (S.D.N.Y. 2022) ...........................................................................................................................19

*Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) ...............................................................21, 23, 24

*Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.*, 61 F.4th 299 (2d Cir. 2023), *cert.
    denied*, 144 S. Ct. 1391 (2024) ............................................................................................10, 13

*RxUSA Wholesale, Inc. v. Alcon Lab'ys, Inc.*, 661 F. Supp. 2d 218 (E.D.N.Y. 2009).................17

*State Oil Co. v. Khan*, 522 U.S. 3 (1997)......................................................................................19

*Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) ....................................................................................18

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ......................................................................22

*Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90 (2d Cir. 1998) ............................................21

*TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588 (S.D.N.Y. 2013)............................................9

*United States v. Pacheco*, 225 F.3d 148 (2d Cir. 2000)................................................................14

*Videri, Inc. v. ONAWHIM (OAW) Inc.*, No. 23-CV-2535-GHW, 2024 WL 4027980
    (S.D.N.Y. Sept. 3, 2024) ..............................................................................................................5

Defendants Elsevier B.V., Informa PLC, John Wiley & Sons, Inc., Sage Publications, Inc., Springer Nature AG & Co. KGaA, Taylor & Francis Group, LLC, Taylor & Francis Group, Ltd., Wolters Kluwer Health, Inc., Wolters Kluwer N.V. (the "Publishers"), and the International Association of Scientific, Technical, and Medical Publishers ("STM") respectfully submit this memorandum in support of their joint motion to dismiss the Amended Complaint ("AC").

## Preliminary Statement

This action hinges on Plaintiffs' contention that STM's ethical guidelines for scholarly journal publishing (the "Principles")—which have been publicly available on STM's website for over a decade—directly evidence a sweeping conspiracy among the Publishers to (i) not pay peer reviewers, (ii) not accept manuscripts that have been concurrently submitted to other journals, and (iii) not allow authors to share the research described in submitted manuscripts. Plaintiffs' claim fails for multiple independent reasons and should be dismissed with prejudice.

**First**, Plaintiffs fail to plead facts demonstrating the existence of *any* of the agreements alleged to comprise the purported conspiracy, much less all of them working together as "components" in a broad "scheme." Plaintiffs stake their case on the assertion that the Principles are direct evidence of the alleged agreements,[1] but the plain text of the ***actual*** Principles, which the Court can and should consider in deciding this motion,[2] does not reveal direct "smoking gun" evidence of the alleged agreements among the Publishers. There is nothing in the Principles

---

[1] *See* Pls.' Letter in Response to Defs.' Joint Pre-Motion to Dismiss Letter, ECF No. 107 (Mar. 4, 2025) at 1 ("Defendants' conspiracy is expressly set forth in a set of mandatory rules to which all Defendants have agreed."), 3 ("Plaintiffs do not rely upon an inference of collusion from parallel conduct.").

[2] The Principles are both incorporated by reference into and are integral to the Amended Complaint. *See infra* at pp. 9-10. They are attached as Exhibit ("Ex.") 1 to the Declaration of Jesse M. Weiss, dated May 5, 2025, and are also publicly accessible at: https://stm-assoc.org/document/stm-ethical-principles-for-scholarly-publication/.

1

remotely akin to, for example, a requirement that "journals shall not pay peer reviewers" or that "peer review must be voluntary" (*infra* at pp. 11-12). Indeed, volunteer peer review is mentioned only once in the Principles, in an introductory acknowledgment of "the often unsung volunteer work undertaken by peer reviewers." Ex. 1 § 1. The same defects doom the alleged agreements on concurrent manuscript submissions and the sharing of research in submitted manuscripts (*infra* at pp. 12-15), neither of which is stated in the ***actual*** text of the Principles.

*Second*, even if Plaintiffs sufficiently had alleged the purported agreements, Plaintiffs fail to plead that the alleged agreements harmed competition in a properly defined relevant antitrust market, meaning that Plaintiffs fail to make out a claim under the rule of reason—the appropriate analytical framework for assessing each alleged agreement. *Infra* at pp. 18-25.

## Background[3]

### I.    Scholarly Publishing.

Scholarly journals provide an opportunity for scholars to disseminate research, communicate discoveries, and demonstrate their research bona fides. AC ¶¶ 27-28, 30. Journals typically focus on a particular field among a large and diverse array of subjects (*e.g.*, physics, humanities, finance, dentistry, or sub-disciplines thereof). *Id.* ¶¶ 32, 113. Publication in a peer-reviewed scholarly journal is "important to" facilitate a scholar's "career advancement because it creates a clear record" of their "scientific achievement." *Id.* ¶ 110. "Recognitions from earning tenure to receiving a Nobel Prize depend upon correctly crediting scientific discoveries, and are often made in reference to publications in peer-reviewed journals." *Id.* Plaintiffs acknowledge that the output of articles submitted for scholarly publication has "exploded" since World War II, and "has increased" every year since 2006. *Id.* ¶ 62.

---

[3] This Motion assumes the truth of Plaintiffs' non-conclusory factual allegations, many of which are inaccurate or incomplete.

## II.    **STM and the Principles.**

STM is an international trade association for scholarly journal publishers with over 150 members, including the Publishers.  AC § III.B.  Plaintiffs allege that the Publishers, through their participation in STM, formed a "scheme" by which they allegedly agreed to (i) not pay peer reviewers, (ii) not accept manuscripts that have been concurrently submitted to other journals, and (iii) not allow authors to share research described in their submitted manuscripts.  *Id.* ¶¶ 2, 39.[4]

Plaintiffs allege that these purported agreements are "expressly set forth" in the Principles (ECF No. 107 at 1; *see* AC ¶ 39), a set of guidelines for the "maintenance of ethical standards in publication" published online by STM in 2013 (Ex. 1 § 1).  The Principles were "approved and ratified" by STM's board, some members of whom were executives of the Publishers, "in 2012-2013."  AC ¶ 45.  The Principles address a range of ethical issues in scholarly publishing, such as conflicts of interest, confidentiality, plagiarism, and error retraction.  *See* Ex. 1 §§ 2.2, 2.3, 3.1.1, 3.1.3, 3.1.6, 3.1.7.  Recognizing that the "publication of research results" is important to "[p]rogress in science," the Principles provide "guidelines" for all participants—"authors, journal editors, peer reviewers, publishers or societies for society-owned or sponsored journals"—in scholarly publishing.  *Id.* § 1.  They express the aspiration that "[a]ll involved" act with "honesty and fairness" and that publishing "processes . . . be transparent and trustworthy."  *Id.*

Despite the plain purpose of the Principles to constitute ethical guidelines for scholarly publishing, Plaintiffs pervert their meaning in an effort to rely on them as purported direct evidence of the allegedly unlawful agreements.  *See* ECF No. 107 at 1, 3.  Specifically, Plaintiffs allege that each Publisher "expressly agreed to the Principles," and that the Principles mandate

---

[4] Plaintiffs label each of these as a "rule" (*e.g.*, AC ¶¶ 2-4)—a word that does not appear anywhere in the Principles, and that Plaintiffs appear to have simply made up.

the supposed "rules" on voluntary peer review, concurrent manuscript submissions, and the confidentiality of research in submitted manuscripts. AC ¶¶ 40-41. However, as shown below (*infra* at pp. 9-15), Plaintiffs misrepresent the Principles' actual text, which does not mandate any of those things.

Plaintiffs also assert that the Publishers each "enforce" the alleged agreements through their individual policies. AC ¶¶ 54, 96, 102. Plaintiffs do not allege *when* any Publisher adopted any of their purported policies, but acknowledge that such policies were in place "long before the creation of the Principles." *See* ECF No. 107 at 3; AC ¶¶ 58, 61. Plaintiffs also do not and cannot allege that any Publisher adopted or changed any policy *after* or *because* of the Principles, or was planning to adopt or change any policy but did not *because* of the Principles, or that the Publishers adopted the alleged policies around the same time as one another, or that any Publisher's policy contravenes the Publisher's independent economic self-interest. In other words, Plaintiffs' own allegations indicate that each Publisher is doing what it has always done, consistent with its independent economic self-interest, before and after the creation of the Principles. This does not meet Plaintiffs' burden to allege facts establishing the existence of the alleged agreements. *Infra* at pp. 15-18.

## III. <u>Peer Review.</u>

Peer review is "the process of subjecting an author's manuscript to the scrutiny of others who are experts in the same field." AC ¶ 51. Scholarly journals rely on peer review to ensure that unbiased subject-matter experts act as neutral arbiters of cutting-edge research in their respective fields. *Id.* ¶¶ 50-51, 54; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993) ("[S]ubmission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected."). "Peer-reviewed journals establish the validity of scientific research through the peer

review process, communicate that research to the scientific community, and avoid competing claims to the same scientific discovery."  AC ¶ 110.

Peer review has long been a voluntary undertaking in scholarly publishing.  Peer reviewers—who are professionals such as academics and scientists, doctors and engineers, and even Nobel laureates—choose to participate in the peer review process for a range of reasons. AC ¶¶ 16-18, 110.  As the Publisher policies relied upon by Plaintiffs indicate, peer review "is a kind of recognition in itself," because it "amounts to being accepted as an expert in the field," can be "a stepping stone for novice researchers," and can benefit a scholar's "career advancement," including through promotions such as tenure.  *Id.* ¶¶ 54(b), 110.  Peer review is often seen as a professional obligation—scholars who review the work of their peers may have their own work vetted by other experts in their field who volunteer to do the same.  *See id.*  And it is also viewed as an academic responsibility, as a way of giving back to the research community and contributing to the integrity of published work in a researcher's field.  *See id.* ¶ 54(c), (e).  Plaintiffs' allegations indicate that the Publishers have different practices and approaches with respect to rewarding peer reviewers.  *See, e.g.*, *id.* ¶ 54(d) (alleging that Sage "offered a discount on Sage services" to peer reviewers).[5]

---

[5] Publisher webpages from which Plaintiffs quote and on which Plaintiffs rely for their allegations about the Publishers' individual policies likewise indicate differing approaches.  *See, e.g.*, Ex. 2 (Elsevier webpage quoted at AC ¶ 54(a), describing Elsevier's "Reviewer Hub" which "provides reviewers with a means of showcasing their efforts and receiving credit for their work," its offer of complimentary access to Elsevier products, and its offer of discounts on several Elsevier services).  The Court may consider such Publisher webpages (*see* AC ¶¶ 54, 96, 102) in deciding this Motion that are incorporated by reference in and integral to the Amended Complaint.  *See In re Synchrony Fin. Secs. Litig.*, 988 F.3d 157, 171 (2d Cir. 2021); *see, e.g.*, *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 234 (2d Cir. 2016) (affirming incorporation of a webpage involved in plaintiffs' alleged injury); *Videri, Inc. v. ONAWHIM (OAW) Inc.*, No. 23-CV-2535-GHW, 2024 WL 4027980, at *7 (S.D.N.Y. Sept. 3, 2024) (considering a webpage to which the complaint clearly and substantially referenced).

IV.     **Concurrent Manuscript Submission.**

Concurrent manuscript submission is the practice of submitting the same manuscript to more than one journal at the same time for potential publication.  The practice may raise concerns for the receiving journals about the submission's validity, efficient use of the journal's editorial resources, and consistent treatment of scientific findings.[6]  For example, a concurrently submitted manuscript may indicate that an article comes from a "paper mill," an entity that submits fraudulent articles, often to multiple journals, designed to resemble genuine research. *See* AC ¶ 99(c)-(d) (acknowledging paper mill detection efforts).

V.     **Manuscript Confidentiality.**

Plaintiffs allege that each Publisher has its own unique manuscript confidentiality policies, which differ materially between each Publisher.  *See* AC ¶ 102.  Specifically, Plaintiffs allege that Elsevier has a "12 to 36 month[]" period during which accepted manuscripts, "[p]rior to publication," may be shared "for internal institutional uses" and on the "author's personal homepage"; Wolters Kluwer Health, Inc. permits accepted manuscripts to be posted to private network groups; Wiley allows authors to "share their article as a hidden 'closed deposit' on their personal website or internal institutional repository, or in private research groups" during a 12-24 month "embargo period"; Taylor & Francis has a "12 to 18 month[]" period during which "scholars may not share their accepted manuscript" on institutional repositories or scholarly collaboration networks; Sage is not alleged to have any pre-publication restrictions; and Springer has a six-month period that covers only pre-publication of an article accepted for publication in a

---

[6] Such concerns are reflected in the Publisher webpages from which Plaintiffs quote and on which Plaintiffs rely (*see* AC ¶ 96), which the Court may consider in deciding this Motion.  *See supra* note 5.  For example, the Elsevier "Simultaneous Submission" factsheet quoted at AC ¶ 96(a) explains that "submit[ting] a paper to different publications at the same time . . . can result in more than one journal publishing that particular paper," which is "considered a breach of publishing ethics" and which calls into question the paper's originality.  Ex. 3.

subscription journal.  *Id.*

Plaintiffs allege no facts establishing that any Publisher prohibits authors from sharing the research contained in their submitted manuscripts.  Nor could they.  While Plaintiffs suggest that the Publishers do so (*see* AC ¶ 102), the materials relied upon by Plaintiffs unambiguously refute the suggestion.  For example, the Elsevier webpage on which Plaintiffs rely (*id.* ¶ 102(a)) states that "[a]uthors who publish in Elsevier journals can share their research in several ways," including in "preprints" (*i.e.*, "research results and analysis that has not been peer reviewed") "anywhere at any time," *see* Ex. 4, and the Taylor & Francis webpage on which Plaintiffs rely (AC ¶ 102(e)) explains that authors can share their "original manuscript," or preprint, "as much as [they] like" at any time, and can post "accepted manuscripts" online "at any point after publication," *see* Ex. 5.

## Legal Standard

To survive a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  To do so, a plaintiff "cannot rely on mere 'labels and conclusions,' or 'naked assertions' absent 'further factual enhancement.'"  *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 390 (2d Cir. 2024) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "[T]he 'plausibility' standard applies to a complaint's *factual* allegations," not "legal conclusions couched as factual allegations."  *Mayor of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 135, 137 (2d Cir. 2013) (internal citation omitted).  Requiring a plaintiff to plead facts showing more than the "mere possibility of misconduct" is particularly important in an antitrust case given the "enormously expensive and time-consuming" discovery it entails.  *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 154-55 (E.D.N.Y. 2010).

7

To plead a Section 1 claim, a plaintiff must allege facts plausibly showing that (i) the challenged conduct is the product of agreement and (ii) the alleged agreement unreasonably restrains trade. *See LLM Bar Exam, LLC v. Barbri, Inc.*, 271 F. Supp. 3d 547, 576 (S.D.N.Y. 2017). Plaintiffs fail to plead either of these essential elements.

## Argument

### I.    Plaintiffs Fail To Plead Facts Showing the Alleged Unlawful Agreements.

The threshold question in a Section 1 case is "whether the challenged conduct stems from independent decision or from an agreement." *Citigroup*, 709 F.3d at 135; *see City of Pontiac*, 92 F.4th at 391. "The ultimate existence of an 'agreement' under antitrust law . . . is a legal conclusion, not a factual allegation." *Citigroup*, 709 F.3d at 135-36. To avoid dismissal, a plaintiff must allege "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 555-56. This means that the allegations must show that the defendants had a "conscious commitment to a common scheme." *Caithness Long Island II, LLC v. PSEG Long Island LLC*, No. 18-CV-4555, 2019 WL 6043940, at *4 (E.D.N.Y. Sept. 30, 2019).

An agreement must be alleged with direct or circumstantial evidence. *Citigroup*, 709 F.3d at 136-38. "Direct evidence is evidence that is explicit and requires no inferences to establish" the existence of the alleged agreement. *See Celestin v. Martelly*, 698 F. Supp. 3d 443, 465 (E.D.N.Y. 2023) (internal quotation marks and citation omitted). In other words, it is a "smoking gun" akin to "a recorded phone call in which two competitors agreed to fix prices at a certain level," *Citigroup*, 709 F.3d at 136, or "a document . . . explicitly manifesting the existence of the agreement in question," *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 n.23 (3d Cir. 2010). Absent such direct evidence, a conspiracy must be alleged by circumstantial evidence of parallel conduct "reinforced by 'plus factors' that provide a basis to infer that a

conspiracy arose." *City of Pontiac*, 92 F.4th at 391 (quoting *Citigroup*, 709 F.3d at 136).

Plaintiffs allege neither direct nor circumstantial evidence of the allegedly unlawful agreements.

### A.    The Principles Are Not Evidence of the Alleged Agreements.

Plaintiffs stake their claim on their theory that the Principles are direct evidence of the

allegedly unlawful agreements. *See* ECF No. 107 at 1 ("Defendants' conspiracy is expressly set

forth in a set of mandatory rules to which all Defendants have agreed."), 3 ("Plaintiffs do not rely

upon an inference of collusion from parallel conduct.").  That theory fails as a matter of law.

The plain language of the relevant Principles demonstrates that they do not even suggest—much

less state explicitly, without requiring any inferences—any of the alleged agreements.  For that

reason alone, Plaintiffs' claim should be dismissed.

As an initial point, the Court can and should consider the text of the *actual* Principles,

rather than accept Plaintiffs' misleading characterizations.  There is no question that the

Principles are "incorporated by reference in" and "integral" to the Amended Complaint.  *See*

*DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  Plaintiffs "clear[ly],

definite[ly,] and substantial[ly] reference" the Principles, *see Allstate Ins. Co. v. Rozenberg*, 771

F. Supp. 2d 254, 268 (E.D.N.Y. 2011), and they rely heavily on the Principles' "terms and

effect" as the only purported evidence of the alleged agreements, *see Glob. Network Commc'ns,*

*Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006).  *See, e.g.*, AC ¶¶ 39, 52, 91, 93, 100.

And because Plaintiffs' allegations about the Principles' content are refuted by the full text of the

Principles themselves, the Court need not and should not credit those allegations.  *TufAmerica,*

*Inc. v. Diamond*, 968 F. Supp. 2d 588, 592 (S.D.N.Y. 2013) ("If a document relied on in the

complaint contradicts allegations in the complaint, the document, not the allegations, control, and

the court need not accept the allegations in the complaint as true." (internal quotation marks and

citation omitted)); *see also Celestin*, 698 F. Supp. 3d at 468 (rejecting alleged direct evidence of

a conspiracy where the relied-upon evidence did not actually support what was alleged); *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 373, 376 (S.D.N.Y. 2022) (dismissing Section 1 claim where the "express terms" of the relevant contractual provision, "on its face," contradicted the plaintiffs' claim that it required coordinating bidding).

Here, Plaintiffs selectively quote the Principles and distort their plain meaning. The ***actual*** text of the Principles does not state or reflect any of the allegedly unlawful agreements. For that reason, try as they might (*see* ECF No. 107 at 1), Plaintiffs cannot fit their claim under the rubric of cases such as *Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.*, 61 F.4th 299 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 1391 (2024), in which an association's policy was held to constitute direct evidence of the alleged anticompetitive agreement. In fact, *Relevent Sports* illustrates why the Principles fail as direct evidence of the alleged agreements. In *Relevent Sports*, the allegedly anticompetitive "rule" prohibiting soccer leagues from hosting matches outside their markets was explicitly mandated "on [the] face" of the challenged policy to which all members were required to agree. *See* 61 F.4th at 304 (association policy mandated that "official league matches ***must*** be played within the territory of the respective member association") (emphasis added)); *see also Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 683 n.3 (1978) (association canon expressly prohibited member engineers from "solicit[ing] or submit[ting] engineering proposals on the basis of competitive bidding"). Here, at most, Plaintiffs allege that the Publishers agreed to the Principles (*see* AC ¶ 41), but in contrast to *Relevent Sports*, the Principles do not mandate any of the restrictions that Plaintiffs allege are anticompetitive—they include no restrictions on payments to peer reviewers, they do not mandate that Publishers reject concurrently submitted manuscripts, and they do not purport to supplant each individual Publisher's confidentiality policies. Therefore, unlike in *Relevent*

10

*Sports*, many unsupported inferences are necessary to leap from the Principles' plain text to the conclusion that the Publishers formed the allegedly unlawful agreements. The Principles thus do not, and cannot, constitute direct evidence of the alleged agreements.

      i.    *The Principles Do Not Contain an Agreement Not To Pay Peer Reviewers.*

Plaintiffs allege that Principle 1 embodies an agreement among the Publishers to "fix the price of peer review services at $0" because of just two words in the Principle's text: "volunteer work." AC ¶¶ 39, 52. However, the full text of Principle 1, which is an introductory paragraph explaining the "Aims and Scope" of the Principles, reveals no such agreement:

> Publication (usually in a peer reviewed learned journal) is an important component of the overall research process, and provides prima facie evidence for the quality and impact of the research work of its authors and, by extension, the institutions that support them and the agencies which funded them. Progress in science depends on publication of research results. It is important to set standards of behaviour for authors, journal editors, peer reviewers, publishers or societies for society---owned or sponsored journals. All involved must act with honesty and fairness, and the processes must be transparent and trustworthy. These guidelines concentrate on the maintenance of ethical standards in publication, recognising that it is an important role of the publisher to support the huge efforts made by journal editors, and the often unsung ***volunteer work*** undertaken by peer reviewers, in maintaining the integrity of the scholarly record. The publisher has a supporting, investing and nurturing role in the scholarly communication process but is also ultimately responsible for ensuring that best practice is followed in its publications.

Ex. 1 § 1 (emphasis added). There is absolutely nothing in this Principle about compensation, much less an agreement among the Publishers not to pay peer reviewers.

Grasping at straws, Plaintiffs contend that Principle 1 works with Principle 3.3.1 to establish an agreement to "coerce[] peer reviewers into working for free." AC ¶ 53. The fact that Plaintiffs attempt to combine two unrelated provisions in an effort to support their purported reading alone shows that these Principles are not direct evidence of the alleged agreement.[7] And,

---

[7] Nor do Principles 1 or 3.3.1 reference the other in support of Plaintiffs' alleged combined "rule." *Compare* Ex. 1 §§ 1, 3.3.1 *with id.* § 3.4.1 (referencing another principle explicitly).

once again, the plain text of the referenced Principle reads nothing like what Plaintiffs allege:

> Peer review assists editors in making editorial decisions and may also assist authors in improving their papers.  Peer review is an essential component of formal scholarly communication, and lies at the heart of the scientific method.  ***It is generally agreed that scholars who wish to have their own work published in journals have an obligation to do a fair share of reviewing for these journals.***

Ex. 1 § 3.3.1 (emphasis added).  Principle 3.3.1 does not use the word "free" or "voluntary."  It does not prohibit Publishers from paying compensation to peer reviewers.  It does not even require any publisher to adopt any specific practice.  The plain language of the Principle acknowledges only that scholars who wish to publish in peer-reviewed journals, and thereby benefit from scholars' peer review, might expect to do some peer review themselves.  In short, nothing in Principle 1 or Principle 3.3.1, individually or taken together, even suggests a common design or understanding not to pay peer reviewers, much less "explicitly manifest[s]" one as required in a direct evidence case.  *See In re Ins. Brokerage*, 618 F.3d at 324 n.23; *see also Celestin*, 698 F. Supp. 3d at 465-66 (finding that evidence that "require[d] the Court to draw many unreasonable inferences to conclude that an agreement existed" was "far from direct").

> ii.    *The Principles Do Not Contain an Agreement To Ban Concurrently Submitted Manuscripts.*

Plaintiffs allege that Principle 3.1.4 directly evidences an agreement among the Publishers to prohibit the submission of manuscripts that have been concurrently submitted to other journals.  *See* AC ¶ 91.  But that is not what the actual text of the Principle says:

> An author should not in general publish manuscripts describing essentially the same findings in more than one journal of primary publication.  ***Submitting the same manuscript to more than one journal concurrently also constitutes unethical behaviour and is unacceptable.***  In general, an author should not submit for consideration in another journal a previously published paper.  Publication of some kinds of articles (eg, clinical guidelines, translations) in more than one journal is sometimes justifiable, provided certain conditions are met.  The authors and editors of the journals concerned must agree to the secondary publication, which must reflect the same data and interpretation as the primary document.  The primary reference must be cited in the secondary publication.

> Further detail on acceptable forms of secondary publication can be found at
> www.icmje.org.

Ex. 1 § 3.1.4 (emphasis added).  While Principle 3.1.4 acknowledges that concurrent

submissions are generally viewed to be unethical and unacceptable, nothing in the text prevents

any Publisher from accepting articles that have been concurrently submitted to other journals.

Indeed, nothing in the Principle dictates how any Publisher should behave in the event of a

concurrent submission.  *Contra Relevent Sports*, 61 F.4th at 304 (rule expressly mandating that

leagues must not play official season games outside of their home territory).  To find the alleged

agreement among the Publishers in Principle 3.1.4 would require inferences that go well beyond

the text of the Principle itself.  That alone means that the Principle is not direct evidence of the

purported agreement.  *See City of Pontiac*, 92 F.4th at 391; *Celestin*, 698 F. Supp. 3d at 465; *see

also In re Citric Acid Litig.*, 191 F. 3d 1090, 1104 n.8 (9th Cir. 1999) (explaining that a

"document is not direct evidence" where "there remains a gap between the document and the

conclusion that" the defendants formed a conspiracy "that can be bridged only by making some

sort of inference").

In their pre-motion letter, Plaintiffs go even further to claim that this Principle expresses

a "prohibit[ion] [on] members . . . competing for manuscripts" akin to the ethical canon at issue

in *National Society of Professional Engineers*.  ECF No. 107 at 2.  However, the canon

challenged in that case expressed on its face "a total ban on competitive bidding."  *Nat'l Soc'y of

Pro. Eng'rs*, 435 U.S. at 696 & 683 n.3 ("Section 11—The Engineer will not compete unfairly

with another engineer by attempting to obtain employment or advancement of professional

engagements by competitive bidding . . . . He shall not solicit or submit engineering proposals on

the basis of competitive bidding.").  Here, in contrast, the Principles do not refer to competition

at all.  Plaintiffs' attempt to transform the Principles into a ban on competition is baseless.

iii.    *The Principles Do Not Contain an Agreement Prohibiting the Sharing of Research in Submitted Manuscripts.*

Finally, the plain text of Principle 2.2 does not, as Plaintiffs assert, establish an agreement among the Publishers to prohibit scholars from "freely sharing their scientific findings" in manuscripts submitted for publication, AC ¶ 100, or to prohibit "the public sharing of submitted manuscripts" prior to publication, *id.* ¶ 102, or to "prevent[] authors from sharing their accepted manuscripts," *id.* ¶ 136, or to require "authors whose articles are published in subscription journals . . . to relinquish their copyrights," *id.* ¶ 102. Here again, the plain text of the Principle simply does not say what Plaintiffs claim it says:

> No information shall be disclosed about any submitted manuscript to anyone other than the corresponding author, potential reviewers, actual reviewers, other editorial advisers, and the publisher, as appropriate. Manuscripts received for review must be treated as confidential documents. They must not be shown to or discussed with others except as authorized by the editor.

Ex. 1 § 2.2. Nothing in the language of Principle 2.2 mandates that publishers prohibit scholars from sharing research or accepted manuscripts, nor do the Principles reflect any understanding on how publishers will behave if an author chooses to disclose their research or a manuscript. And Principle 2.2 says nothing whatsoever about copyrights. Furthermore, the full Principles demonstrate an intention to *protect* the scholar's work during the review process, rather than restrict the scholar. *See* Ex. 1 § 2.3 (noting unpublished materials should not be used in an editor or reviewer's own research "without the express written consent of the author"). Plaintiffs should not be permitted to cherry-pick words or phrases from certain Principles and point to those as direct evidence of the alleged agreement, without consideration for the Principles as a whole. *Cf. United States v. Pacheco*, 225 F.3d 148, 154 (2d Cir. 2000) (stating that courts must "interpret a specific provision in a way that renders it consistent with the tenor and structure of the whole act or statutory scheme of which it is a part" (citation and alteration omitted)). And

14

even the cherry-picked words on their own do not state the alleged agreement. Principle 2.2 is thus not direct evidence of any such agreement.

iv. <em>The Principles Do Not Evidence the Alleged "Scheme."</em>

The Principles also fail to support Plaintiffs' claim of a three-part "mutually reinforc[ing]" "Scheme." AC ¶ 5. Nothing in the Principles' text remotely evidences that theory. Indeed, nothing in the text suggests that the Principles are intended to do anything other than what they are expressly designed to do—provide ethical guidelines for a "transparent and trustworthy" scholarly journal publication process. Ex. 1 § 1. For these reasons, Plaintiffs' attempt to turn the Principles into direct evidence of an antitrust conspiracy fails.

**B. Plaintiffs Rightfully Disclaim Reliance on Circumstantial Evidence of the Purported Agreements.**

Absent direct evidence of a conspiracy, a Section 1 claim requires factual allegations of parallel conduct "reinforced by 'plus factors' that provide a basis to infer that a conspiracy arose." *City of Pontiac*, 92 F.4th at 390 (quoting *Citigroup*, 709 F.3d at 136). For good reason, Plaintiffs expressly disclaim reliance on circumstantial evidence of agreement here. *See* ECF No. 107 at 3 ("Plaintiffs do not rely upon an inference of collusion from parallel conduct."). Plaintiffs fail to (and cannot) allege parallel conduct among the Publishers, and Plaintiffs fail to allege any plus factors suggesting that the challenged conduct flowed from a preceding agreement. Indeed, Plaintiffs' own allegations show that there are non-collusive rationales for the alleged practices, making them "more likely explained by lawful, unchoreographed free-market behavior" than by agreement. *Iqbal*, 556 U.S. at 680.

While Plaintiffs devote much of the Amended Complaint to allegations about the purported individual policies of each Publisher, *e.g.*, AC ¶¶ 54, 96, 102, Plaintiffs fail to put forward a theory explaining how those unilaterally adopted policies support their claim. If

15

Plaintiffs mean for these allegations to qualify as circumstantial evidence of the allegedly unlawful agreements, that effort fails. "Proof of unilateral action does not suffice [to allege concerted action]; rather, the facts alleged must reveal a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Long Island Anesthesiologists PLLC v. United Healthcare Ins. Co. of N.Y. Inc.*, No. 22-CV-04040 (HG), 2025 WL 1031093, at *9 (E.D.N.Y. Apr. 7, 2025) ("*LIA*") (internal quotation marks omitted). Plaintiffs allege no such facts.

> *First*, Plaintiffs fail to allege parallel action. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 104 (2d Cir. 2018) (defining parallel action as "identical actions within a time period suggestive of prearrangement"). As Plaintiffs acknowledge, the individual publisher policies cited in the Amended Complaint reflect long-standing practices, *see* ECF No. 107 at 3, and Plaintiffs' own allegations imply that such policies have been around since the "mid-20th Century," *see* AC ¶¶ 31-32, 80-83. Plaintiffs do not allege when any Publisher adopted its purported policies, let alone that all Publishers adopted them around the same time. *See, e.g.*, *Anderson News*, 899 F.3d at 104; *Twombly*, 550 U.S. at 556 n.4 (describing example of parallel conduct as a change in conduct by competitors at the same time). Plaintiffs allege neither a change to pre-existing unilateral practices *after* the adoption of the Principles nor that the Publishers planned to change their individual practices but did not *because* of the Principles. Without any well-pleaded facts suggesting that the Publishers took (or chose not to take) any action after the purported agreements, the Court cannot infer that the Publishers' alleged practices "flowed from a preceding agreement rather than from their own business priorities." *Citigroup*, 709 F.3d at 138; *City of Pontiac*, 92 F.4th at 391 (parallel conduct allegations must suggest an "antecedent agreement"). Moreover, even Plaintiffs' cherry-picked phrases from

16

Publisher webpages establish substantive differences between the Publishers' individual policies. For example, as alleged, each Publisher has materially different confidentiality policies and the Publishers take different approaches to rewarding peer review. *See supra* at pp. 4-7.

*Second*, Plaintiffs do not allege plus factors tending to exclude the possibility of "unilateral, independent conduct of competitors." *Citigroup*, 709 F.3d at 137 (quoting *In re Ins. Brokerage*, 618 F.3d at 323). Plaintiffs do not and cannot allege that the policies contravene each Publisher's independent economic self-interest. In fact, Plaintiffs' own allegations indicate specific reasons why it makes perfect business sense for each of the Publishers to unilaterally adopt such policies. *See Iqbal*, 556 U.S. at 682 (a court may infer from a complaint's factual allegations "obvious alternative explanation[s]" that imply lawful conduct). For example, Plaintiffs allege that journals receive millions of article submissions a year. *See AC* ¶ 62. It is clearly in the independent economic self-interest of each journal to avoid expending its own limited editorial resources on an article that another journal may also be publishing. *See AC* ¶¶ 62-64. That rationale is all the more compelling with the rise of paper mills. *See supra* at p. 6. Plaintiffs simply fail to allege any facts suggesting that the Publishers' alleged practices are evidence of the purported agreements rather than a continuation of pre-existing, unilateral, rational business practices. *See RxUSA Wholesale, Inc. v. Alcon Lab'ys, Inc.*, 661 F. Supp. 2d 218, 231-32 (E.D.N.Y. 2009) ("[T]he conduct claimed to be conspiratorial is nothing more than the continuation of preexisting . . . patterns.").[8]

---

[8] Plaintiffs' conclusory assertions of "collusion" through unspecified STM meetings and publications (*see, e.g.*, AC ¶¶ 43-49, 97-99) are equally unavailing. *See Twombly*, 550 U.S. at 555 (explaining that courts are not required to accept conclusory assertions as true). Participation in legitimate trade associations such as STM is "lawful, free-market behavior." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 911 (6th Cir. 2009); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) ("Even participation on [an] association's board of directors is not enough by itself.").

17

In sum, Plaintiffs' conspiracy theory is divorced from the actual text of the Principles, is unsupported by any well-pleaded factual allegations, and is wholly implausible. Plaintiffs' claim rests on the notion that the Publishers conspired to do what each of them was already doing—long before the Principles were published—for their own rational independent reasons; that the Publishers effectuated the purported agreements in a document (the Principles) that does not actually express those agreements in its plain text; and that the Publishers then continued to do their own thing with their own unique (non-identical) policies and practices, consistent with each Publisher's individual self-interest. That theory manifestly fails as a matter of law and Plaintiffs' claim therefore must be dismissed.

## II.    Plaintiffs Fail To Allege an Unreasonable Restraint of Trade.

Even if Plaintiffs had adequately alleged the existence of the purported agreements (they have not), their Section 1 claim must be dismissed because they fail to allege plausibly that any of the purported agreements constitutes an "unreasonable restraint of trade." *See Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993).

### A.    Neither the *Per Se* Rule Nor Quick Look Review Applies to the Purported Agreements.

In antitrust cases, courts "presumptively appl[y] rule of reason analysis." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 315 (2d Cir. 2008) (quoting *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)). The *per se* rule applies only to a small universe of "manifestly anticompetitive" restraints that "always or almost always tend to restrict competition and decrease output" and "lack . . . any redeeming virtue." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (citations omitted). The Supreme Court has refused to "adopt *per se* rules with regard to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." *Id.* at 887 (quoting

18

*State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)); *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19 n.33 (1979) ("[T]he *per se* rule is not employed until after considerable experience with the type of challenged restraint."). Similarly, "[i]f an arrangement 'might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition,' more than a 'quick look' is required." *Salvino*, 542 F.3d at 318 (quoting *Cal. Dental Ass'n v. Fed. Trade Comm'n*, 526 U.S. 756, 771 (1999)). Neither the *per se* rule nor quick look review is appropriate here.

Plaintiffs' assertion that the Publishers "agreed to fix the price of peer review services at zero" (AC ¶ 2) is entirely conclusory. Neither the *per se* rule nor quick look review is appropriate when evaluating a long-standing historical practice that has obvious legitimate rationales. Here, the publication of reliable scientific research in peer-reviewed journals requires that impartial subject matter experts "scrutinize [authors'] findings," and "confirm[] the validity of research," evaluating "whether the methods and conclusions of a particular study are proper and worthy of publication." AC ¶¶ 50-51. Transforming that long-standing system designed to ensure reliable, unbiased science into one of salaried work could warp incentives and fundamentally change the nature of scholarly journals, subjecting the alleged restraint to the rule of reason. *See Nostalgic Partners, LLC v. Off. of Comm'r of Baseball*, 637 F. Supp. 3d 45, 53 (S.D.N.Y. 2022) (quick look review "insufficient to evaluate the effects on competition from changes to" a "complex relationship"); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 09-MD-02100-DRH-PMF, 2011 WL 5547133, at *2 (S.D. Ill. Nov. 15, 2011) ("The peer review process is vital to academic quality."). Plaintiffs' own allegations reflect the complex practical and policy considerations involved in such a

transformation.  *See* AC ¶¶ 70-73 (describing alleged studies and debate on the implications of paid peer review).

*Per se* and quick look treatment are likewise inappropriate for the purported agreements on concurrent manuscript submission and manuscript confidentiality.  Neither purported agreement is the type of restraint that courts have identified as manifestly anticompetitive like price-fixing, market division, or group boycotts of competitors.  *See Leegin*, 551 U.S. at 886.  Plaintiffs' own allegations identify procompetitive benefits arising from the alleged concurrent manuscript submission agreement, such as combatting fraudulent paper mill submissions.  *Supra* at p. 6; *see Salvino*, 542 F.3d at 318.  And confidentiality and licensing policies are necessary in publishing as a means of preserving the value of original work and protecting their rights.  *Cf. Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 619 (S.D.N.Y. 2013) (acknowledging the valid "economic interest" of book publishers in "preventing copyright violations").

Equally baseless is Plaintiffs' new assertion that the alleged concurrent manuscript submission agreement is a "naked agreement not to compete."  *See* ECF No. 107 at 2.  Plaintiffs rely on *National Society of Professional Engineers* to support this assertion, but their reliance is misplaced.  In that case, the challenged policy was an express ban on engineers submitting competing price bids to customers.  435 U.S. at 696 ("We are faced with a contention that a total ban on competitive bidding is necessary because otherwise engineers will be tempted to submit deceptively low bids.").  In contrast, here, the alleged agreement has nothing to do with price or competition.  Plaintiffs do not allege that the purported agreement prohibits journals from making competing offers to authors at any time, or claim that there is an absence of competition among Publishers to attract the best authors and articles to their journals.

20

In short, Plaintiffs are trying to shoehorn conduct that falls outside the typical realm of *per se* claims and that has clear and legitimate procompetitive justifications into a framework that does not allow those justifications even to be considered. Even if Plaintiffs had adequately pleaded the purported agreements, those agreements would be subject to rule of reason analysis. As addressed below, the Amended Complaint falls far short of plausibly asserting a claim under the rule of reason.

**B.      Plaintiffs Fail To Allege a Rule of Reason Violation.**

Under the "rule of reason," Plaintiffs must allege that "the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *See Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) ("*Amex*"). "To survive a motion to dismiss, a Sherman Act claim must . . . define a relevant market." *LIA*, 2025 WL 1031093, at *8 (quoting *In re Inclusive Access Course Materials Antitrust Litig.*, 544 F. Supp. 3d 420, 432 (S.D.N.Y. 2021)). In addition, Plaintiffs must plead facts either constituting "direct evidence of harm to competition . . . in the market as a whole," or establishing that Defendants have "sufficient 'market power' to cause an adverse effect, 'plus some other ground for believing that the challenged behavior' has harmed competition." *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016) (quoting *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97 (2d Cir. 1998)). Plaintiffs do none of the above.

i.      *Plaintiffs Fail To Allege a Properly Defined Relevant Product Market.*

Plaintiffs fail to adequately allege the existence of "a relevant market where the alleged anticompetitive effects are being felt." *See Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.*, 312 F. Supp. 2d 379, 390 (E.D.N.Y. 2004). A "relevant market is legally insufficient and a motion to dismiss may be granted" where a plaintiff "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products."

21

*Bookhouse*, 985 F. Supp. 2d at 621 (quoting *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008)); *Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*, 142 F. Supp. 2d 296, 303 (E.D.N.Y. 2001) ("[M]any district courts have dismissed antitrust complaints for failure to identify substitute products and failure to distinguish among apparently comparable products or to allege other pertinent facts related to cross-elasticity of demand." (internal quotation marks and citations omitted)). The "relevant market definition must encompass the realities of competition," *Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994) (citations omitted), and "practical indicia" such as "industry or public recognition, . . . the product's peculiar characteristics and uses, . . . [and] distinct customers," *see Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

Plaintiffs advance two purported product markets: (1) "publication by peer-reviewed journals" and (2) "peer review services for peer-reviewed journals." AC § V. Each putative market is overly broad on its face—both assume that all journals compete for the same articles and peer reviewers regardless of a journal's discipline or sub-discipline, and a reviewer's area of expertise, among the "massive array of specialized subject areas" on which different journals focus. *Id.* ¶ 32; *see also In re German Auto. Mfrs. Antitrust Litig.*, 497 F. Supp. 3d 745, 757 (N.D. Cal. 2020) (rejecting a relevant product market that "defie[d] common sense"). Plaintiffs also make no allegations regarding the reasonable interchangeability of journals from an author's or a subscriber's perspective. *See Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 54 (2d Cir. 2016) ("[A]n antitrust complaint must explain why the market it alleges is the relevant, economically significant product market."); *Bookhouse*, 985 F. Supp. 2d at 620 (rejecting market that bore "no rational relation" to the "analysis of the interchangeability of use or the cross-elasticity of demand" (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001)).

Likewise, Plaintiffs do not and cannot allege that all peer reviewers are interchangeable. To the contrary, the highly context-specific nature of scholarly articles (as Plaintiffs' own allegations suggest, *see, e.g.*, AC ¶ 112) confirms that peer-reviewed journals are far from interchangeable, as are the peer reviewers that review articles in different fields. For example, a peer reviewer for an engineering journal would have no business reviewing for a medical journal and vice versa.

Plaintiffs' inattention to alleging a properly defined product market alone dooms their case under the rule of reason. Because their alleged markets are overbroad, they fail to allege market-wide harm to competition or that the Publishers have market power sufficient to cause an adverse effect across the alleged market. *See Bookhouse*, 985 F. Supp. 2d at 620-21.

Plaintiffs' overbroad market definition is also a transparent attempt to exaggerate the Publishers' collective market power. As noted, Plaintiffs aggregate together journals that are plainly *not* substitutes—and in doing, so attempt to increase the Publishers' alleged market share. Even where Plaintiffs purport to break down market share by journal discipline, they fail to allege any facts demonstrating how they grouped "disciplines" or "sub-disciplines" to arrive at their percentages, or how they arrived at their characterization of certain journals as "top ten," or why these groupings are appropriate under applicable market definition principles. *See* AC ¶¶ 112-15. Because Plaintiffs fail to define their putative markets with reference to interchangeable substitutes, their alleged markets are insufficient as a matter of law.

      ii.     *Plaintiffs Fail To Allege Direct Evidence of Actual Harm to Competition.*

Plaintiffs likewise fail to plead facts showing that the alleged agreements caused any "actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Amex*, 585 U.S. at 542 (internal quotation marks, citations, and alterations omitted). "[T]he question is whether [Plaintiffs] can show an actual anticompetitive change in prices after the restraint was implemented." *1-800 Contacts, Inc. v. Fed. Trade*

23

*Comm'n*, 1 F.4th 102, 118 (2d Cir. 2021). The Amended Complaint fails in this regard. There is no basis to infer that a purported agreement to treat peer review as "voluntary" harms competition when peer review has been voluntary since its inception and there are alleged differences among Publishers as to their approach to rewarding peer review. *Supra* at pp. 4-5; *see, e.g.*, AC ¶ 54(d) (alleging that Sage "offered a discount on Sage services" to peer reviewers). That is all the more true given Plaintiffs' utter failure to allege facts showing that the Principles—the alleged agreements here—had any impact on peer review compensation or output whatsoever.

Similarly, Plaintiffs do not and cannot allege facts showing that the purported agreements on concurrent manuscript submission and manuscript confidentiality have had any adverse effect on the prices, output, or quality of manuscripts or peer-reviewed journals. Indeed, Plaintiffs generally allege an "explo[sive]" *increase* in the number of manuscripts submitted for publication over the past eighty years, *and* an increase in publishing "at rates never before seen." AC ¶¶ 30, 62-63.

In sum, Plaintiffs have failed to plead facts showing that the alleged agreements actually harmed competition. Plaintiffs claim that the alleged agreements are set forth in and effectuated through the Principles. But, again, Plaintiffs do not allege facts showing that the Publishers adopted their alleged individual policies *after* or *because of* the Principles, nor do they allege that the Publishers planned to change their policies but did not *because of* the Principles. Plaintiffs do not allege facts showing that the Principles had *any* effect *at all* on the status quo that has long existed independent of the Principles, much less that the Principles had an actual detrimental effect on competition. *Amex*, 585 U.S. at 542. For this reason also, Plaintiffs' claim

24

must be dismissed.[9]

## **Conclusion**

For the reasons above, Plaintiffs' claim is legally deficient, and amendment would be futile.  The Court should dismiss the Amended Complaint with prejudice.

---

[9] Plaintiffs suggest that the purported agreement on concurrent submissions has prevented authors from bargaining for "favorable publication terms," AC ¶ 93, but fail to allege facts supporting that bald contention.  Indeed, the materials upon which Plaintiffs rely show that authors have ways to showcase their research to journal editors outside the formal manuscript submission process (*e.g.*, by publishing the research in pre-prints).  *See supra* at pp. 6-7.  And Plaintiffs' own allegations indicate that the Publishers have every incentive to "publish[] the best science" and "cutting-edge research" in their fields in order to make their journals "more valuable to readers, and more desirable for scholars."  AC ¶¶ 64, 92.

Dated:          May 5, 2025

CRAVATH, SWAINE & MOORE LLP

*/s/ David R. Marriott*
David R. Marriott
Sharonmoyee Goswami
Jesse M. Weiss
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000
dmarriott@cravath.com
sgoswami@cravath.com
jweiss@cravath.com

*Attorneys for Defendant*
*Elsevier B.V.*

VENABLE LLP

*/s/ Danielle R. Foley*
Danielle R. Foley
Lisa Jose Fales
Andrew T. Hernacki
600 Massachusetts Avenue, NW
Washington D.C. 20001
Telephone: (202) 344-4000
drfoley@venable.com
ljfales@venable.com
athernacki@venable.com

*Attorneys for Defendant*
*Sage Publications, Inc.*

ARNOLD & PORTER
KAYE SCHOLER LLP

*/s/ C. Scott Lent*
C. Scott Lent
Esther Ha Yoon Sohn
Leah J. Harrell (admitted *pro hac vice*)
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
Fax: (212) 836-8689
scott.lent@arnoldporter.com
esther.sohn@arnoldporter.com
leah.harrell@arnoldporter.com

Matthew Tabas (admitted *pro hac vice*)
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
Telephone: (202) 942-5000
Fax: (202) 942-5999
matthew.tabas@arnoldporter.com

*Attorneys for Defendant*
*John Wiley & Sons, Inc.*

WEIL, GOTSHAL & MANGES LLP

*/s/ Adam C. Hemlock*
Adam C. Hemlock
Benjamin E. Marks
Rebecca R. Jacobson
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Fax: (212) 310-8007
adam.hemlock@weil.com
benjamin.marks@weil.com
rebecca.jacobson@weil.com

*Attorneys for Defendant International*
*Association of Scientific, Technical, and*
*Medical Publishers*

26

CLEARY GOTTLIEB STEEN &
HAMILTON LLP

*/s/ D. Bruce Hoffman*
D. Bruce Hoffman
Kenneth Reinker
C. Lawrence Malm
2112 Pennsylvania Avenue, N.W.
Washington, D.C. 20037-3229
T: 202-974-1500
F: 202-974-1999
bhoffman@cgsh.com
kreinker@cgsh.com
lmalm@cgsh.com

*Attorneys for Defendant*
*Springer Nature AG & Co. KGaA*


SIDLEY AUSTIN LLP

*/s/ Benjamin R. Nagin*
Benjamin R. Nagin
787 Seventh Avenue
New York, NY 10019
(212) 839-5300
bnagin@sidley.com

Carrie Mahan
S. Nicole Booth
1501 K Street, N.W.
Washington, D.C. 20005
carrie.mahan@sidley.com
nicole.booth@sidley.com
(202) 736-8000

*Attorneys for Defendants Wolters Kluwer*
*N.V.; and Wolters Kluwer Health, Inc.*

WHITE & CASE LLP

*/s/ Robert A. Milne*
Robert A. Milne
Jack E. Pace III
Bryan Gant
Daniel Grossbaum
1221 Avenue of the Americas
New York, NY 10020
tel.: (212) 819-8200
fax: (212) 354-8113
rmilne@whitecase.com
jpace@whitecase.com
bgant@whitecase.com
dan.grossbaum@whitecase.com

*Attorneys for Defendants Taylor & Francis*
*Group, Ltd.; Taylor & Francis Group,*
*LLC; and Informa plc*

27