Dean M. Harvey (*pro hac vice*)
Jallé H. Dafa (*pro hac vice*)
Benjamin A. Trouvais (*pro hac vice*)
LIEFF CABRASER HEIMANN
  & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Fax: (415) 956-1008
dharvey@lchb.com
jdafa@lchb.com
btrouvais@lchb.com

Emily N. Harwell (NY Bar # 5985585)
LIEFF CABRASER HEIMANN
  & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
Fax: (212) 355-9592
eharwell@lchb.com

Benjamin D. Elga (NY Bar #5332861)
Janet Herold (*pro hac vice*)
JUSTICE CATALYST LAW
40 Rector Street
New York, NY 10006
Phone: (518) 732-6703
belga@justicecatalyst.org
jherold@justicecatalyst.org

*Counsel for Plaintiffs and the Proposed Class*
(Additional counsel listed below)

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF NEW YORK

DR. ELVISHA DHAMALA, DR.
SHELLEY FACENTE, DR. ROBERT
MAHON, and DR. LUCINA UDDIN,

               Plaintiffs,

v.

ELSEVIER, B.V., INFORMA PLC,
INTERNATIONAL ASSOCIATION OF
SCIENTIFIC, TECHNICAL, AND
MEDICAL PUBLISHERS, JOHN WILEY
& SONS, INC., SAGE PUBLICATIONS,
INC., SPRINGER NATURE AG & CO.
KGaA., TAYLOR & FRANCIS GROUP,
LLC, TAYLOR & FRANCIS GROUP,
LTD., WOLTERS KLUWER HEALTH,
INC., WOLTERS KLUWER N.V., and
JOHN DOES 1 THROUGH 50,,

               Defendants.

Case No. 1:24-cv-06409-HG

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................1

II.     BACKGROUND .........................................................................................................3

        A.      The Rise of For-Profit Publishers ................................................................3

        B.      STM and the Anticompetitive Scheme ........................................................4

        C.      The Principles ..............................................................................................6

                1.      The Single Submission Rule (Principle 3.1.4) ...............................6

                2.      The Gag Rule (Principle 2.2) .........................................................7

                3.      The Unpaid Peer-Review Rule (Principles 1 and 3.3.1) ................8

        D.      Publisher Defendants' Anticompetitive Scheme Harms Science, Scholars,
                and the Public ..............................................................................................9

III.    LEGAL STANDARD ...............................................................................................11

IV.     ARGUMENT ............................................................................................................11

        A.      The Principles Are Direct Evidence of an Agreement. ..............................11

                1.      The Principles Contain an Agreement Prohibiting Concurrent
                        Submission of Manuscripts. .........................................................19

                2.      The Principles Contain an Agreement Prohibiting Authors From
                        Sharing Submitted Manuscripts. ..................................................22

                3.      The Principles Contain an Agreement That Peer Review Work Is
                        Uncompensated. ...........................................................................23

        B.      Scholar Plaintiffs' Plausibly Allege a Restraint of Trade. .......................24

                1.      The Per Se or Quick Look Rule Applies to Each Alleged
                        Agreement .....................................................................................25

        C.      Even if the Court Applies the Rule of Reason, Scholar Plaintiffs Plausibly
                Allege the Challenged Principles Restrain Trade. ....................................30

                1.      Scholar Plaintiffs Allege that Defendants Possess Market Power. ...........30

                2.      Scholar Plaintiffs Allege Harm to Competition in a Relevant
                        Market. .........................................................................................34

V.      THIS COURT ALSO HAS PERSONAL JURISDICTION OVER PJ
        DEFENDANTS. ........................................................................................................37

        A.      Personal Jurisdiction Is Proper Over Wolters Kluwer N.V. and Taylor &
                Francis Group, Ltd. Because They Participated in a Conspiracy with Overt
                Acts Committed in New York and the United States. ................................38

Table of Contents
(continued)

B. Personal Jurisdiction Is Also Proper Under New York's Long Arm Statute Over Wolters Kluwer N.V. and Informa PLC Because They Transacted Business in New York, and They Knew, Controlled, and Benefited From Their Subsidiaries' Activities in New York. .......................................................... 41

C. Personal Jurisdiction Is Also Proper Under Rule 4 Over Wolters Kluwer N.V. and Informa PLC Because They Transact Business in the United States. ................................................................................................................... 46

D. Personal Jurisdiction Is Also Proper Under the Clayton Act Over Informa PLC Because It Has an Office In This District, and Transacts Business in the United States. .................................................................................................... 47

E. Personal Jurisdiction Over PJ Defendants Is Reasonable. .................................... 48

VI. JURISDICTIONAL DISCOVERY AND LEAVE TO AMEND .................................... 50

VII. CONCLUSION ................................................................................................................ 50

# TABLE OF AUTHORITIES

**Page**

**Cases**

*1-800 Contacts, Inc. v. Fed. Trade Comm'n*,
  1 F.4th 102 (2d Cir. 2021) ............................................................................................... 35

*Allstate Ins. Co. v. Rozenberg*,
  771 F. Supp. 2d 254 (E.D.N.Y. 2011) ................................................................................ 5

*In re Aluminum Warehousing Antitrust Litig.*,
  90 F. Supp. 3d 219 (S.D.N.Y. 2015) ................................................................................ 46

*In re Amaranth Nat. Gas Commodities Litig.*,
  587 F. Supp. 2d 513 (S.D.N.Y. 2008) ............................................................................. 49

*Arizona v. Maricopa Cnty. Med. Soc'y*,
  457 U.S. 332 (1982) ......................................................................................................... 13

*Aspen Specialty Ins. Co. v. RCI Hosp. Holdings, Inc.*,
  No. 20-CV-4308 (VSB), 2023 WL 4080550 (S.D.N.Y. June 20, 2023) ............................ 46

*Associated Press v. United States*,
  326 U.S. 1 (1945) ....................................................................................................... 12, 13

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
  305 F.3d 120 (2d Cir. 2002) ......................................................................................... 48, 49

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ......................................................................................................... 12

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
  985 F. Supp. 2d 612 (S.D.N.Y. 2013) ............................................................................. 33

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
  441 U.S. 1 (1979) ............................................................................................................. 28

*Cal. Dental Ass'n v. FTC*,
  526 U.S. 756 (1999) .............................................................................................. 13, 19, 26

*Celestin v. Martelly*,
  698 F. Supp. 3d 465 (E.D.N.Y. 2023) ......................................................................... 20, 24

*Chambers v. Time Warner, Inc.*,
 282 F.3d 147 (2d Cir. 2002) ........................................................................5

*Chapman v. N.Y. State Div. for Youth*,
 546 F.3d 230 (2d Cir. 2008) ......................................................................31

*Charles Schwab Corp. v. Bank of Am. Corp.*,
 883 F.3d 68 (2d Cir. 2018)........................................................................38

*Chloe v. Queen Bee of Beverly Hills, LLC*,
 616 F.3d 158 (2d Cir. 2010) ................................................................44, 49

*In re Citric Acid Litig.*,
 191 F.3d 1090 (9th Cir. 1999) ...................................................................20

*City of Long Beach v. Total Gas & Power N.A., Inc.*,
 465 F. Supp. 3d 416 (S.D.N.Y. 2020)........................................................46

*City of Pontiac Police & Fire Retirement Sys. v. BNP Paribas Sec. Corp.*,
 92 F.4th 381 (2d Cir. 2024) .......................................................................20

*Coast to Coast Energy, Inc. v. Gasarch*,
 53 N.Y.S.3d 16 (2017)................................................................................45

*In re Collegiate Athlete NIL Litig.*,
 No. 20-cv-03919 (N.D. Cal. June 6, 2025), ECF. No. 978.......................34

*Compass, Inc. v. Real Est. Bd. of N.Y., Inc.*,
 No. 21-cv-2195 (AJN),
 2022 WL 992628 (S.D.N.Y. Mar. 31, 2022) ........................... 11, 14, 19, 24

*Daniel v. American Board of Emergency Medicine*,
 428 F.3d 408 (2d Cir. 2005) ......................................................................47

*Dardana Ltd. v. Yuganskneftegaz*,
 317 F.3d 202 (2d Cir. 2003) ......................................................................46

*Davitashvili v. Grubhub Inc.*,
 No. 20-cv-3000 (LAK), 2022 WL 958051 (S.D.N.Y. Mar. 30, 2022) ...................27

*Deslandes v. McDonald's USA, LLC*,
 81 F.4th 699 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 1057 (2024) ...................22, 27

*DiFolco v. MSNBC Cable L.L.C.*,
    622 F.3d 104 (2d Cir. 2010) .................................................................................5

*Donnelly v. Anand*,
    No. 21-cv-9562 (PKC), 2022 WL 4385901 (S.D.N.Y. Sept. 22, 2022) ...................................43

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
    722 F.3d 81 (2d Cir. 2013)...............................................................................47, 48

*In re Eur. Gov't Bonds Antitrust Litig.*,
    No. 19 Civ. 2601 (VM), 2023 WL 11646009 (S.D.N.Y. Sept. 25, 2023) .........................47, 48

*FTC v. Ind. Fed'n of Dentists*,
    476 U.S. 447 (1986) ...................................................................................13, 26

*Giordano v. Saks Inc.*,
    654 F. Supp. 3d 174 (E.D.N.Y. 2023)..........................................................................33

*Goel v. Bunge, Ltd.*,
    820 F.3d 554 (2d Cir. 2016) ................................................................................5

*Goldfarb v. Va. State Bar*,
    421 U.S. 773 (1975) .......................................................................................13

*Hollins v. U.S. Tennis Ass'n*,
    469 F. Supp. 2d 67 (E.D.N.Y. 2006)...........................................................................50

*Hutton v. Priddy's Auction Galleries, Inc.*,
    275 F. Supp. 2d 428 (S.D.N.Y. 2003) .....................................................................42, 43

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) .............................................................................12, 24

*Jazini v. Nissan Motor Co.*,
    148 F.3d 181 (2d Cir. 1998) .............................................................................45, 50

*Jien v. Perdue Farms, Inc.*,
    No. 19-cv-02521, 2022 WL 2818950 (D. Md. July 19, 2022) .................................................33

*Kernan v. Kurz-Hastings, Inc.*,
    175 F.3d 236 (2d Cir. 1999) ...............................................................................49

*Laborers Loc, 17 Health & Benefit Fund v. Philip Morris, Inc.*,
    26 F. Supp. 2d 593 (S.D.N.Y. 1998) ........................................................................49

*LaSalle Nat'l Bank v. Vitro, Sociedad Anonima*,
    85 F. Supp. 2d 857 (N.D. Ill. 2000)............................................................46

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ...................................................................................28

*Lensky v. Turk Hava Yollari, A.O.*,
    No. 21-2567-cv, 2023 WL 6173334 (2d Cir. Sept. 29, 2023) ....................46

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013) .......................................................................37

*Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*,
    No. 15 Civ. 8459 (LGS), 2016 WL 3748480 (S.D.N.Y. July 8, 2016) ......49

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008) .......................................................................28

*Marine Midland Bank, N.A. v. Miller*,
    664 F.2d 899 (2d Cir. 1981) .......................................................................43

*Mayor of Baltimore v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013) .......................................................................12

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
    883 F.3d 32 (2d Cir. 2018).........................................................................30

*N. Pac. Ry. Co. v. United States*,
    356 U.S. 1 (1958) .......................................................................................26

*Nasso v. Seagal*,
    263 F. Supp. 2d 596 (E.D.N.Y. 2003).......................................................50

*Nat'l Collegiate Athletic Ass'n v. Alston*,
    594 U.S. 69 (2021) ...............................................................13, 19, 26, 34

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*,
    468 U.S. 85 (1984) .....................................................................................13

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
    No. 76-1767, 1977 WL 205310 (U.S. Nov. 17, 1977)...............................18

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
    435 U.S. 679 (1978) ............................................................................ *passim*

*Nostalgic Partners, LLC v. Off. of Comm'r of Baseball*,
637 F. Supp. 3d 45 (S.D.N.Y. 2022) ........................................................... 29

*O.E.M. Glass Network, Inc. v. Migrant Glass Co.*,
436 F. Supp. 3d 576 (E.D.N.Y. 2020) .......................................................... 12

*Okla. Firefighters Pension & Ret. Sys. v. Banco Santander (México) S.A.*
*Institución de Banca Múltiple*,
92 F.4th 450 (2d Cir. 2024) ............................................................... *passim*

*Osborn v. Visa Inc.*,
797 F.3d 1057 (D.C. Cir. 2015) ................................................................... 13

*Palmer v. BRG of Ga., Inc.*,
498 U.S. 46 (1990) ..................................................................................... 25

*In re Platinum & Palladium Antitrust Litig.*,
61 F.4th 242 (2d Cir. 2023) ................................................... 38, 39, 40, 48

*Porat v. Lincoln Towers Cmty. Ass'n*,
464 F.3d 274 (2d Cir. 2006) ...................................................................... 50

*In re Propranolol Antitrust Litig.*,
249 F. Supp. 3d 712 (S.D.N.Y. 2017) ......................................................... 49

*Ranza v. Nike, Inc.*,
793 F.3d 1059 (9th Cir. 2015) .................................................................... 46

*Regeneron Pharms., Inc. v. Novartis Pharma AG*,
96 F.4th 327 (2d Cir. 2024) ...................................................................30, 31

*Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.*,
61 F.4th 299 (2d Cir. 2023) ............................................................. *passim*

*Robertson v. Sea Pines Real Estate Cos.*,
679 F.3d 278 (4th Cir. 2012) ...................................................................... 14

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
22 F.4th 103 (2d Cir. 2021) .............................................. 37, 38, 39, 47

*Shak v. JPMorgan Chase & Co.*,
156 F. Supp. 3d 462 (S.D.N.Y. 2016) ......................................................... 30

*In re Ski Train Fire*,
230 F. Supp. 2d 403 (S.D.N.Y. 2002) .........................................................................50

*Societe Des Baines De Mer Et Du Cercle Des Etrangers a Monaco v. MGM Mirage*,
No. 08cv03157(HB), 2008 WL 4974800 (S.D.N.Y. Nov. 24, 2008) ......................42

*Spetner v. Palestine Inv. Bank*,
70 F.4th 632 (2d Cir. 2023) .....................................................................................41

*Starr v. Sony BMG Music Ent.*,
592 F.3d 314 (2d Cir. 2010) ....................................................................................11

*State Oil Co. v. Khan*,
522 U.S. 3 (1997) .....................................................................................................28

*Stutts v. De Dietrich Grp.*,
465 F. Supp. 2d 156 (E.D.N.Y. 2006) .....................................................................50

*In re Terrorist Attacks on Sept. 11, 2001*,
538 F.3d 71 (2d Cir. 2008).......................................................................................50

*In re Tether & Bitfinex Crypto Asset Litig.*,
576 F. Supp. 3d 55 (S.D.N.Y. 2021) ........................................................................30

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001) ......................................................................... 31, 32, 33

*Two's Co. v. Hudson*,
No. 13-cv-3338-NSR, 2014 WL 903035 (S.D.N.Y. Mar. 6, 2014) ........................43

*United States v. Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015) ....................................................................................11

*United States v. Bertelsmann SE & Co. KGaA*,
646 F.Supp.3d 1 (D.D.C. 2022)...............................................................................32

*United States v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940) .................................................................................................35

*United States. v. Topco Assocs.*,
405 U.S. 596 (1972) ............................................................................................13, 25

**Statutes**

15 U.S.C. § 1 ........................................................................................................ *passim*

Clayton Act § 12 (15 U.S.C. § 22) ..................................................................... 38, 47, 48

**Court Rules**

Fed. R. Civ. P. 15(a)(2) ...........................................................................................50

N.Y. C.P.L.R. § 302(a)(1) ........................................................................................37

Individual and representative Plaintiffs Dr. Elvisha Dhamala, Dr. Shelly Facente, Dr. Robert Mahon, and Dr. Lucina Uddin ("Scholar Plaintiffs") respectfully submit their opposition brief to: (1) Defendants' joint Rule 12(b)(6) motion to dismiss; and (2) Defendants Informa PLC, Taylor & Francis Group, Ltd., and Wolters Kluwer N.V.'s Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. ECF Nos. 111, 112.

## I.  __INTRODUCTION__

Scholar Plaintiffs challenge an entrenched scheme among the world's largest academic journal publishers and their trade association, the International Association of Scientific, Technical, and Medical Publishers ("STM"), to suppress competition for scholarly manuscripts and peer review services. The journals at issue are owned or controlled by six for-profit scientific publishers: (1) Elsevier B.V.; (2) John Wiley & Sons, Inc.; (3) Springer Nature AG & Co. KGaA; (4) Taylor & Francis Group, Ltd., Taylor & Francis Group, LLC, and Informa PLC; (5) Sage Publications, Inc.; and (6) Wolters Kluwer N.V. together with its subsidiary Wolters Kluwer Health, Inc. ("Publisher Defendants"). The Amended Complaint details a conspiracy that is not inferred from circumstantial evidence or parallel conduct, but is established by direct evidence: STM's "International Ethical Principles for Scholarly Publication" ("Principles"). These Principles are not mere suggestions; they are binding rules that each Publisher Defendant must affirmatively accept as a condition of STM membership. The Principles explicitly prohibit authors from submitting to more than one journal at a time, restrict the sharing of scientific research while under submission, and require peer review work to be uncompensated. Publisher Defendants' own policies and public statements confirm their adherence to these anticompetitive rules.

The consequences of this conspiracy are severe. The ban on concurrent submissions strips authors of bargaining power and delays the dissemination of research. Restrictions on sharing academic research stifle scientific progress. And the concerted refusal to pay for peer review suppresses compensation for a critical service necessary to publication, distorting the market and depriving scholars of fair remuneration. These are not independent business decisions—they are the product of a collusive effort to cement Publisher Defendants' dominance and extract uncompensated labor and money from the research community.

Publisher Defendants' arguments that Scholar Plaintiffs have failed to plead an unlawful agreement are contradicted by the detailed, well-pleaded allegations in the Amended Complaint. Courts in this Circuit have repeatedly held that alleged direct evidence of agreement—such as the mandatory Principles—satisfies the requirements of Rule 12(b)(6) for a Section 1 claim. Publisher Defendants' attempts to justify their conduct as procompetitive are, at best, factual disputes and, as a matter of law, cannot defeat a well-pleaded complaint at this stage.

Certain Defendants' challenge to personal jurisdiction fares no better. Only three of six foreign Defendants—Informa PLC, Taylor & Francis Group Ltd., and Wolters Kluwer N.V. ("PJ Defendants")—seek dismissal for lack of personal jurisdiction. The interests of justice and judicial economy demand that all foreign Defendants, including PJ Defendants, answer for their actions in this forum. Scholar Plaintiffs have alleged, and, if necessary, can further demonstrate through discovery, that these entities have purposefully availed themselves of the U.S. market, participated in the conspiracy, and transacted business in New York.

Scholar Plaintiffs have sufficiently alleged a scheme that has harmed competition for academic manuscripts, suppressed compensation for peer review services, and delayed scientific progress. The motions to dismiss should be denied, and this case should proceed to discovery.

## II.    BACKGROUND

Scholar Plaintiffs are four accomplished research scientists who, like the proposed class they seek to represent, routinely submit scholarly manuscripts for publication and perform peer-review services at the request of academic journals. Am. Compl. ("AC") ¶¶ 15-18. The six Publisher Defendants dominate the scholarly-journal industry, controlling over 50 percent of all peer-reviewed titles worldwide. *Id*. ¶¶ 112-13, 115.

### A.    The Rise of For-Profit Publishers

For centuries, the diffusion of scientific knowledge was driven by non-profit learned societies and university presses that viewed publishing as a public-spirited endeavor. AC ¶ 28. Academic journals operated on a "public interest" model: scholars donated manuscripts and editorial expertise, university presses underwrote production, and the resulting work circulated largely at cost. *Id*. That landscape changed dramatically in the mid-twentieth century. *Id*. ¶ 29. World War II led to the existential importance of scientific innovation, prompting governments worldwide to pour unprecedented resources into research universities, graduate education, and basic science. *Id*. The number of doctoral graduates exploded, tenure-track positions became scarce, and the now-familiar "publish or perish" model took hold. *Id*. ¶ 30. The resulting tidal wave of new manuscripts—each essential to a scholar's career advancement—created fresh commercial opportunities that for-profit publishers were quick to exploit. *Id*. ¶ 31

Commercial publishers entered the market with the same strategy: be first. AC ¶ 32. By launching or acquiring the initial specialist journal in every sub-field, they positioned themselves as indispensable gatekeepers between scholars and their audiences. *Id*. Almost overnight, these firms converted a historically nonprofit ecosystem into a profit-seeking industry. *Id*.

Once established, the leading commercial publishers embarked on an aggressive consolidation campaign that reshaped academic publishing. AC ¶ 33. Two major acquisition

waves accelerated their dominance. *Id*. ¶¶ 34-35. In 1997-1998, Taylor & Francis absorbed Gordon & Breach Science Publishers, Harwood Academic Publishers, Scandinavian University Press, Carfax Publishing, and Routledge, while Elsevier simultaneously acquired Butterworth-Heinemann, Ablex Publications, JAI Press, Gauthier-Villars, and Expansion Scientifique Française. *Id*. ¶ 34. A second wave followed in 2001: Elsevier purchased Academic Press, Churchill Livingstone, Mosby, and W.B. Saunders, and Wiley steadily acquired thirty-nine journals annually from 2001 to 2004. *Id*. ¶ 35. By 2006, the six Publisher Defendants controlled roughly 50 percent of the world's peer-reviewed titles. *Id*. ¶ 35. Today, they own approximately 53 percent of all peer-reviewed journals and an even higher share of the most prestigious, high-impact journals across nearly every scientific discipline. *Id*. ¶¶ 36, 112-15.

The digital era further entrenched Publisher Defendants' market power. AC ¶ 33. Electronic distribution slashed production costs, yet subscription prices and article processing charges ("APCs") soared, resulting in operating profit margins that outstrip those of even the most successful technology companies, including Google and Apple. *Id*. ¶¶ 7, 76-88. Network effects, institutional inertia, and the career stakes attached to journal prestige created formidable barriers to entry. *Id*. ¶¶ 114, 116. Publisher Defendants sit atop an industry critical to the progress of science, controlling the lion's share of scholarly communication and extracting billions of dollars in rents from publicly-funded research. *Id*. ¶¶ 7-8, 10, 36, 60, 89-90.

### B. STM and the Anticompetitive Scheme

Publisher Defendants are members of, and act through, STM. AC ¶¶ 19-25. STM is a Dutch-based international trade association that was founded by senior executives of Publisher Defendants, including representatives of Elsevier, Wiley, and Springer, and is commonly regarded within the industry as the place where commercial publishers "learn, in order to earn."

*Id.* ¶ 38. STM is not an academic society or a neutral standards body; it is a trade group created and controlled by Publisher Defendants. *Id.* ¶¶ 20, 38-41.

The Amended Complaint explains how Publisher Defendants used STM to orchestrate an unlawful conspiracy that suppresses competition for both research manuscripts and peer-review labor. AC ¶¶ 50-109. Through STM, Publisher Defendants memorialized and enforced an anticompetitive three-part scheme—prohibiting simultaneous submissions (the "Single Submission Rule"), fixing the price of peer-review labor at zero (the "Unpaid Peer Review Rule"), and restricting dissemination of scientific work (the "Gag Rule"). *Id.* ¶¶ 37, 39. The conspiracy is set forth in STM's Principles,[1] which expressly incorporate each element of the scheme. *Id.* ¶ 39. The Principles are presented to every applicant for STM membership alongside a mandatory "Confirmed and agreed" check-box:



> 23. Please confirm that you have read the STM Ethical Principles for Scholarly Publishing (note that all STM members must adhere to these guidelines), and are agreeing that your organization abides by these principles or equivalent principles, such as those of the Committee on Publication Ethics. https://www.stm-assoc.org/2013_05_21_STM_Ethical_Principles_for_Scholarly_Publication.pdf *
>
> 🖰 Confirmed and agreed

---

[1] Plaintiffs do not contest Defendants' request that the Court deem the Principles (Ex. 1) incorporated by reference, as the Amended Complaint makes "a clear, definite and substantial reference," *Allstate Ins. Co. v. Rozenberg*, 771 F. Supp. 2d 254, 268 (E.D.N.Y. 2011), to that document and "relies heavily upon its terms and effect." *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citation omitted); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). Exhibits 2-5, however, are a different matter. Plaintiffs take no position on whether the Court deems these exhibits incorporated by reference. Exhibits 2-5 are not "integral" and need not be incorporated by reference for purposes of this Rule 12(b)(6) motion. *See Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). Even if the Court incorporates Exhibits 2-5 by reference, Defendants' pro-competitive arguments must be disregarded at the pleading stage, and the Supreme Court has held that purported ethical justifications are unpersuasive where the language at issue restricts competition between trade association members. *Nat'l Soc'y of Pro. Eng'rs v. United States ("NSPE")*, 435 U.S. 679, 696 (1978).

STM will not admit or retain a publisher that does not agree because "all STM members must adhere to these guidelines." *Id*. ¶¶ 41, 43-45.

STM published the Principles in 2013. AC ¶ 39. STM's Board of Directors in 2012-2013 included senior executives from each Publisher Defendant—Elsevier, Springer, Taylor & Francis, Wiley, Sage, and Wolters Kluwer—all of whom approved and ratified the Principles. *Id*. ¶ 45. STM's Board meets at least once each year in Frankfurt, Germany, to maintain their conspiracy in closed-door meetings. *Id*. ¶¶ 43-44, 46-48. The Annual General Meeting that follows the Board meeting is likewise closed to the public and serves as a forum where Publisher Defendants further develop and enforce the scheme by sharing policies and practices concerning manuscript submission and peer review. *Id*. ¶¶ 46-48. Publishing professionals recognize that STM "works through the consensus of its members," with a governance structure that "by design gives greater say to the larger companies," thereby enabling Publisher Defendants to defend the "legacy models on which [they] have long depended." *Id*. ¶ 49.

### C.    The Principles

The Principles are not merely guidelines for ethical conduct but memorialize agreements among Publisher Defendants to restrain trade at each step of the publishing process: (1) authors are prohibited from submitting the same manuscript to more than one journal concurrently (Principle 3.1.4); (2) after submission, authors cannot share or discuss the content of their manuscripts with anyone other than the designated journal (Principle 2.2); and (3) peer reviewers are "obligat[ed]" to do a "fair share" of peer review on a "volunteer" basis (Principles 1 and 3.3.1). AC ¶¶ 37, 52, 91, 100.

### 1.    The Single Submission Rule (Principle 3.1.4)

Publisher Defendants agreed to prohibit scholars from submitting the same manuscript to more than one journal at a time through the Single Submission Rule. AC ¶¶ 3, 37. STM Principle

3.1.4 states, "[s]ubmitting the same manuscript to more than one journal concurrently []
constitutes unethical behaviour and is unacceptable." *Id*. ¶ 91. By forcing authors to submit their
manuscripts to only one journal at a time, the Single Submission Rule substantially reduces
competition among Publisher Defendants, allows any accepting journal to dictate publication
terms unilaterally, substantially decreases incentives to review manuscripts promptly,
dramatically delays the publication of meritorious research, and further entrenches Publisher
Defendants' market dominance. *Id*. Once an author submits to one journal, the author
immediately loses all bargaining leverage because the Single Submission Rule flatly prohibits
contemporaneous submissions to rival journals that might offer faster review and better terms,
such as retention of copyright or waivers of publication fees, or greater visibility. *Id*. ¶ 93.

Each Publisher Defendant enforces the Single Submission Rule through its editorial
policies, confirming that the restraint is uniform across the cartel. *Id*. ¶ 96. To ensure compliance,
Publisher Defendants jointly developed STM's so-called "Integrity Hub," including a "Duplicate
Submission Checker Tool" that detects multi-journal submissions and alerts co-conspirators,
thereby policing the Single Submission Rule in real time. *Id*. ¶¶ 97-98. Executives from Elsevier,
Springer, Wiley, Sage, and Taylor & Francis actively contributed to the design and rollout of this
tool, underscoring their concerted commitment to the Single Submission Rule. *Id*. ¶ 99.

## 2. The Gag Rule (Principle 2.2)

After submission, Publisher Defendants also agreed to prohibit scholars from sharing or
discussing the content of their submitted manuscripts while under review, treating these works as
the publishers' property even before publication. AC ¶ 100. Principle 2.2 provides in full: "No
information shall be disclosed about any submitted manuscript to anyone other than the
corresponding author, potential reviewers, actual reviewers, other editorial advisers, and the
publisher, as appropriate. Manuscripts received for review must be treated as confidential

documents. They must not be shown to or discussed with others except as authorized by the editor." *Id.*; Ex. 1 at 2. By its plain terms, the Gag Rule forbids authors from showing or discussing the content of their own manuscript with anyone other than the single journal considering the work, thereby preventing scholars from discussing their manuscripts with their colleagues or presenting their research at academic conferences. *Id.* ¶¶ 100-01. Publisher Defendants' confidentiality requirements as to submissions govern scientists and scholars regardless of whether an article's findings are critical to other researchers, policymakers, or society more broadly, and regardless of the author's wishes. *Id.* After publication, authors are often required to transfer or exclusively license their copyrights to the publishers without compensation, further restricting the dissemination of scientific knowledge. *Id.* ¶ 102.

### 3. The Unpaid Peer-Review Rule (Principles 1 and 3.3.1)

After submission, academic manuscripts must be peer reviewed. AC ¶ 50. Peer review is the process by which a manuscript is evaluated by other experts in the same field to assess its quality and validity before publication. *Id.* ¶ 51. Publisher Defendants agreed to fix the price of peer-review services at zero, refusing to compensate scholars for essential labor. *Id.* ¶¶ 2, 52. Principle 1 provides that peer review is "volunteer work," thereby expressly stating that reviewers are not compensated. *Id.* ¶ 52. Principle 3.1.1 declares: "It is generally agreed that scholars who wish to have their own work published in journals have an obligation to do a fair share of reviewing for these journals." *Id.* Through these provisions, Publisher Defendants jointly fixed the price of peer-review services at $0, and coerced scholars into providing those services by linking uncompensated peer review to the ability to publish their own research. *Id.* ¶¶ 37, 52-53.

Peer review is indispensable to scholarly publication because it validates research findings and transforms authors' manuscripts into articles the scientific community may rely

upon. AC ¶¶ 50-51. Recognizing this, each Publisher Defendant incorporated the Principles into its editorial policies and explicitly reaffirmed that peer reviewers would perform their work without monetary compensation, referring to the activity as "free advice" and "providing services to the academic community." *Id*. ¶ 54. By enforcing the Unpaid Peer Review Rule, Publisher Defendants eliminated a major cost of producing journals and generated extraordinary profit margins—exceeding even those of some of the world's most successful technology companies—at the expense of the scholars whose labor they exploited. *Id*. ¶¶ 55-61.

The economic impact of the Unpaid Peer Review Rule is staggering: in 2020 alone, unpaid peer-review labor in the United States was conservatively valued at $1.5 billion, a figure that understates the true cost because it does not include every journal and adopts conservative assumptions. AC ¶ 60. STM itself has acknowledged that the global value of uncompensated peer review approaches $3.7 billion per year, thereby confirming the magnitude of the transfer from public research funds to Publisher Defendants' private coffers. *Id*. ¶ 61. Unsurprisingly, scholars have forcefully criticized the arrangement, describing it as a "triple-pay" system wherein taxpayers finance the production of research, provide the labor to vet that research, and then must purchase access to the finished product they created, at exorbitant prices. *Id*. ¶ 58-59.

In short, the Unpaid Peer Review Rule is a naked price-fixing agreement that suppresses compensation for essential scholarly labor, magnifies Defendants' market power, and inflicts continuing antitrust injury on Scholar Plaintiffs and the proposed class. *Id*. ¶¶ 55-66, 70-72.

**D.**     **Publisher Defendants' Anticompetitive Scheme Harms Science, Scholars, and the Public**

Publisher Defendants' anticompetitive scheme inflicts direct, measurable, and ongoing harm on science, individual scholars, and the public at large. AC ¶ 100. The scheme has enabled Publisher Defendants to extract enormous profits from the research community, far exceeding

those of most other major corporations. AC ¶ 7. For example, in 2023, Elsevier generated $3.8 billion in revenue from its peer-reviewed journals, with an operating profit margin of 38 percent—higher than Apple's (30 percent) and Google's (28 percent). *Id.* Taylor & Francis reported a 35 percent profit margin on $739 million in revenue from peer-reviewed journals. *Id.* Collectively, Publisher Defendants received over $10 billion in revenue from their peer-reviewed journals in 2023 alone. *Id.*

These profits are not the result of legitimate value creation. AC ¶¶ 55-61. Instead, Publisher Defendants have engineered a system where the costs of producing, reviewing, and validating scientific research are largely borne by the public—through government grants, university funding, and the unpaid labor of scholars—while Publisher Defendants capture the resulting intellectual property and sell it back to the public. *Id.* The consequences for science and the public are severe:

**Peer Review Crisis**. By colluding to fix the price of peer review at zero, Publisher Defendants have created a labor shortage. AC ¶ 10. Despite the growing demand for peer reviewers as the number of submitted articles have increased, the refusal to pay for this essential work has led to delays, burnout, and a "peer review crisis." *Id.* ¶¶ 63-75. Manuscripts languish for months or even years awaiting review, slowing the dissemination of important and often lifesaving scientific discoveries. *Id.* ¶ 64.

**Exorbitant Access Fees**. Publisher Defendants charge universities high subscription fees and "article processing charges" ("APCs"). AC ¶¶ 77-90. The purported justification for these fees is to cover the costs of peer review, yet Publisher Defendants admit they do not pay for peer review, allowing them to pocket nearly all of the APCs as profit. *Id.* ¶¶ 87-88.

**Negative Impact on Public Health and Innovation**. The resulting harm is felt not only by individual researchers, who face delayed publication, diminished career prospects, lost ownership over their work, and lost pay, but also by society at large, which is deprived of timely access to scientific advances in critical fields such as medicine and technology.

## III.  LEGAL STANDARD

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy[ ] in restraint of trade or commerce." *Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.*, 61 F.4th 299, 306 (2d Cir. 2023) (quoting 15 U.S.C. § 1). Plaintiffs state a viable Section 1 claim by alleging facts that show "(1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) such combination or conduct constituted an unreasonable restraint of trade either *per se* or under the rule of reason." *Compass, Inc. v. Real Est. Bd. of N.Y., Inc.*, No. 21-cv-2195 (AJN), 2022 WL 992628, at *3 (S.D.N.Y. Mar. 31, 2022) (citations omitted).

## IV.  ARGUMENT

### A.  The Principles Are Direct Evidence of an Agreement.

"The first question is 'whether the challenged conduct stems from independent decision or from an agreement, tacit or express.'" *Relevent Sports*, 61 F.4th at 306 (quoting *United States v. Apple, Inc.*, 791 F.3d 290, 314-15 (2d Cir. 2015)). "While for purposes of a summary judgment motion, a Section 1 plaintiff must offer evidence that tend[s] to rule out the possibility that the defendants were acting independently, to survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only allege enough factual matter (taken as true) to suggest that an agreement was made." *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 321 (2d Cir. 2010) (citations omitted). There is no "probability requirement at the pleading stage;" rather, a plaintiff need only plead "enough fact[s] to raise a reasonable expectation that discovery will reveal

evidence of illegal agreement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id*. (citation omitted). "Those facts can constitute either direct evidence that the defendants entered into an agreement or circumstantial facts supporting the *inference* that a conspiracy existed." *Relevent Sports*, 61 F.4th at 306 (citation omitted).

Scholar Plaintiffs plausibly allege direct evidence of an unlawful agreement. Direct evidence "may include a document or conversation explicitly manifesting the existence of the agreement in question." *O.E.M. Glass Network, Inc. v. Migrant Glass Co.*, 436 F. Supp. 3d 576, 587 (E.D.N.Y. 2020) (citation omitted). "Allegations of direct evidence of an agreement . . . are independently adequate' under *Twombly*." *Mayor of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 135-36 (2d Cir. 2013) (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323-24 (3d Cir. 2010)).

Trade associations like STM are "subject to federal antitrust laws if their members demonstrate a conscious commitment to a common scheme designed to achieve an unlawful objective." *Relevent Sports*, 61 F.4th at 306-07 (citation omitted). The focus is on "those improprieties reducing competition among the members or with their competitors." *Id*. at 307 (citation omitted). "Competitors do not avoid antitrust liability by hiding behind or acting through third-party intermediaries." *Id*. at 306-07. The Supreme Court has long held that a membership association's adoption of a mandatory policy restraining competition by its participants is an "agreement" subject to Section 1 of the Sherman Act. *See, e.g., Associated Press v. United States*, 326 U.S. 1, 19 (1945).

Scholar Plaintiffs challenge explicit, written trade association policies—the Principles—that govern its members' conduct. The Second Circuit has explained that when a plaintiff challenges an association's written policies, the association's "promulgation of them would constitute direct evidence of § 1 concerted action in that undertaking." *See Relevent Sports*, 61 F.4th at 308 (citation omitted). Case after case has treated association rules as "concerted decisions" or "agreements" subject to Section 1. *See, e.g.*, *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 80-81 (2021) (NCAA rules restricted the types and amounts of compensation student-athletes could receive for their athletic services); *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 759-60 (1999) (dental trade association's "Code of Ethics" prohibited discounted fee and quality of dental services advertising); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (dental trade association policy required dentist members to withhold customer desired x-ray services); *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 99 (1984) (NCAA television plan limited the total number of intercollegiate football games any one university member could televise); *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 356-57 (1982) (medical foundation's fee schedules limited the amount member doctors could recover for patient services); *NSPE*, 435 U.S. at 681 (rule against competitive bidding by engineer members); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 781-83 (1975) (bar association set minimum fee schedule for common legal services by member attorneys); *United States. v. Topco Assocs.*, 405 U.S. 596, 602-03 (1972) (supermarket association bylaws established territorial licenses granting members exclusive rights to sell Topco products within designated geographic areas); *Associated Press*, 326 U.S. at 5 (cooperative news association's bylaws restricted membership and prohibited members from distributing news to nonmembers); *Relevent Sports*, 61 F.4th at 307 (soccer association rules included a geographic market-division policy); *Osborn*

*v. Visa Inc.*, 797 F.3d 1057, 1067 (D.C. Cir. 2015) (bankcard association rules adopted supracompetitive pricing regime for ATM access fees); *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 289 (4th Cir. 2012) (real estate brokerages conspired in the form of "multiple listing service" rules); *Compass*, 2022 WL 992628, at *8 (real estate trade association required agents, after moving to a different brokerage, to obtain their former brokerage's prior written consent before contacting a homeowner-client).

Publisher Defendants do not dispute that they agreed to the Principles. Instead, they argue that the Principles do not set forth the agreements alleged in the Amended Complaint. MTD at 10-15. No so. The Principles plainly and explicitly state that submitting the same manuscript to more than one journal is "**unacceptable**," submitted manuscripts "**must not** be shown to or discussed with others except as authorized by the editor," and scholars have an "**obligation** to do a fair share" of "**voluntary work**" to get published. AC ¶¶ 52, 91, 100 (emphases added). These rules plainly contain "improprieties reducing competition among the [STM] members" at every step of the publishing process: (1) prohibiting simultaneous manuscript submissions to competing journals reduces author leverage to compare offers, negotiate better terms, or select the most favorable or timely publishing opportunity; (2) once submitted, the article cannot be shared with other publishers or researchers, thereby impeding the timely dissemination of scientific knowledge; and (3) by collectively agreeing not to pay for peer review, the publishers remove any incentive for individual publishers to compete for the valuable labor of scholars and artificially depress compensation for peer reviewers. *See Relevent Sports*, 61 F.4th at 307 (citation omitted). Nothing more is required to plead an unlawful agreement under Section 1 of the Sherman Act. *See NSPE*, 435 U.S. at 695.

Further, contrary to Publisher Defendants' contention, *see* MTD at 10, this case is on all fours with the Second Circuit's decision in *Relevent Sports*. There, the plaintiff soccer promoter alleged that U.S. Soccer and FIFA adopted and enforced a written geographic market-division policy prohibiting professional soccer leagues from staging official-season matches outside each league's home territory. The plain language of the policy read: "official league matches **must** be played within the territory of the respective member association." 61 F.4th at 304 (emphasis added). The Second Circuit held that the association's written policy dictates how members will conduct their separate businesses and thus constitutes "direct evidence" of concerted action under Section 1 of the Sherman Act; no further allegation of a behind-the-scenes agreement is necessary. *Id.*

The Principles parallel the FIFA policy at issue in *Relevent Sports* in every material respect. The Principles are (i) formally adopted and published by an association, (ii) framed as mandatory guidelines that all members "must adhere to," (iii) directed at the core competitive conduct of the members' separate businesses, and (iv) use mandatory terms like "must" and "shall." For example, Principle 2.2 states submitted manuscripts "**must not** be shown to or discussed with others except as authorized by the editor" and "**no** information **shall** be disclosed" to anyone other than peer reviewers and the publisher. AC ¶ 100; Ex. 1 at 2 (emphases added); *see also* Principle 3.3.1 (deeming peer review "an **obligation**", AC ¶ 100; Ex. 1 at 4 (emphasis added)). Thus, the linguistic elements, in particular the mandatory language, in the FIFA policy ("must") is similar to the mandatory language found in the Principles ("must not," "shall," and "obligation"). This Court should reject Publisher Defendants' argument that the "*actual* text" of the Principles does not state or reflect an unlawful agreement. MTD at 10.

The binding nature of these policies is also analogous. FIFA's Statutes require that each member association agree to "comply fully with the Statutes, regulations, directives and decisions of FIFA bodies at any time." *Relevent Sports*, 61 F.4th at 303. STM requires members to agree and "adhere" to the Principles. AC ¶ 41. Further, both policies were adopted by a decision-making body empowered to bind competitors. FIFA's Council is a formal governing organ authorized by the FIFA Statutes, and STM's Board, composed of executives from each Publisher Defendant, adopted the Principles, requiring every member to accede to them as a condition of entry. *Relevent Sports*, 61 F.4th at 303; AC ¶¶ 41, 45. The mandatory language in the Principles combined with their binding nature is more than enough to allege concerted action under Section 1. AC ¶¶ 41, 52, 91, 100; *Relevent Sports*, 61 F.4th at 309.

The plain language of the policy at issue in *National Society of Professional Engineers* is also instructive. There, the Supreme Court confirmed that a professional association's formally adopted ethical rule is itself direct evidence of concerted action under Section 1. The Court focused on § 11(c) of the NSPE Code of Ethics, which provided that an engineer "shall not" submit competitive bids for engineering services. 435 U.S. at 692-93; *see also id.* at 683-85 (describing the "ban on competitive bidding" embodied in § 11(c)). The Court held that the policy alone established the requisite agreement because each member had committed to abide by the rule. *Id.* at 684, 695-96. Thus, the rule itself—adopted under the color of professional "ethics"—functioned as an explicit horizontal restraint that eliminated competition. *Id.* at 695-96.

The language in the Principles challenged here operates in precisely the same way. *See* Principle 3.1.4 (labeling simultaneous submission of manuscripts "unethical behavior" that is "unacceptable," AC ¶ 91; Ex. 1 at 3); Principle 2.2 (manuscripts "must not" be shown to others and "no information shall" be disclosed, AC ¶ 100; Ex. 1 at 2); and Principle 3.3.1 ("obligation

to do a fair share of reviewing for these journals," AC ¶ 52; Ex. 1 at 1, 4). Like § 11(c) in *NSPE*, each of these provisions is cast as an ethical mandate, adopted by a professional association of horizontal competitors, and accepted by every Publisher Defendant as a condition of membership. AC ¶ 41. The Principles' prescriptive wording ("unacceptable," "must not," "shall") is no less categorical than the NSPE command that engineers "shall not" bid competitively, and STM likewise polices compliance through ongoing membership requirements. *See NSPE*, 435 U.S. at 691, n.3; AC ¶ 41.

Given these parallels, the reasoning of *NSPE* applies with full force. When a trade association, like STM, adopts language that on its face restrains a dimension of competition among its members—whether that is simultaneous submission of manuscripts, dissemination of research, or compensation of reviewers—the policy language itself is sufficient to meet the "agreement" requirement under Section 1. *See NSPE*, 435 U.S. at 696. Courts need not search for additional circumstantial "plus factors" because the written rule is "*direct evidence* of concerted action." *Relevent Sports*, 61 F.4th at 307 (citing cases).

Moreover, Publisher Defendants' effort to recast the Principles as innocuous "ethical guidelines," MTD at 3, fails for the same reason the Second Circuit rejected FIFA's characterization of its policy as a mere "sporting principle." *Relevent Sports*, 61 F.4th at 310. In both cases, the rule at issue directly limits how competitors may offer, accept, or disseminate the very product they sell—in *Relevent Sports*, the staging of official matches; here, the acquisition and dissemination of scholarly content. In *Relevent Sports*, the Second Circuit held that when an association's written rule governs the conduct of members' separate businesses, the rule itself is direct evidence of concerted action under Section 1, regardless of its label. *See* 61 F.4th at 310. The same logic applies here. For example, inaptly labeled "ethics" Principle 3.1.4 in fact forbids

concurrent submissions, dictating how competitors acquire and disseminate manuscripts—the lifeblood of their businesses. AC ¶ 91; Ex. 1 at 4. Similarly, in *NSPE*, the Supreme Court condemned the code of ethics provision barring competitive bidding, holding that antitrust analysis focuses on whether a restraint eliminates competition, and that a policy suppressing competition cannot be justified by ethical claims. 435 U.S. at 696. Just as the ban on price competition among engineers was unlawful despite its ethical veneer, the Principles' prohibitions on competing for manuscripts, sharing research, and compensating peer reviewers are unlawful despite Publisher Defendants' pretextual branding. Under both *Relevent Sports* and *NSPE*, a written rule that limits the core competitive conduct of horizontal rivals is a paradigmatic antitrust violation, *see* 435 U.S. at 696; 61 F.4th at 310; changing the label from "rule" to "ethics" does not shield conspirators from antitrust liability.

Further, Publisher Defendants' assertion that their longstanding policies negate any inference of concerted action is fundamentally flawed, as it disregards the direct evidence of agreement: the Principles. *See* MTD at 4. Scholar Plaintiffs allege that a representative from each Publisher Defendant approved, ratified, and agreed to abide by the Principles in 2013. AC ¶¶ 41-45. This is precisely the kind of "smoking gun" direct evidence the Second Circuit has recognized as sufficient to allege an agreement. *See Relevent Sports*, 61 F.4th at 304. The Supreme Court has also made clear that the formal adoption of a code of ethics by competitors is direct evidence of agreement, regardless of whether similar practices predated the written document. *NSPE*, 435 U.S. at 692-93; *see also* Pet'r's Br., *Nat'l Soc'y of Pro. Eng'rs v. United States*, No. 76-1767, 1977 WL 205310, at *22 (U.S. Nov. 17, 1977) ("The ethical principles observed by engineers developed over many years, long antedat[es] NSPE's formation. . . . NSPE's Code of Ethics does not create ethical principles, but merely states them."). Scholar

Plaintiffs identify every element of the agreement: who agreed (the six dominant commercial publishers), what they agreed to (zero compensation, single-submission, and gag rules), when they agreed (2012-2013), and how the agreement is enforced (through uniform manuscript-review and sharing policies, annual STM Board and member meetings, and other means like the "Duplicate Submission Checker Tool").

Last, consider the following analogy: Suppose two firms, A and B, have independently sold widgets for $1 for many years. If, at some point, A and B enter into an agreement to continue selling widgets at $1, that agreement is itself a restraint of trade, regardless of the fact that $1 was the prevailing price before the agreement, because it eliminates independent decision-making and prevents competitive responses to changing market conditions. The antitrust violation is the agreement itself, which forecloses future rivalry. Courts have held that an agreement to maintain existing practices is actionable under Section 1, regardless of whether those practices predate the agreement; what matters is the collective commitment not to compete, not the novelty or duration of the conduct. *See NSPE*, 435 U.S. at 696; *Alston*, 594 U.S. at 110 (Kavanaugh, J., concurring); *Cal. Dental Ass'n*, 526 U.S. at 780. Accordingly, Publisher Defendants' reliance on the mere historical existence of similar policies is wholly insufficient to undermine Scholar Plaintiffs' well-pleaded claim. The Principles stand as direct evidence of an unlawful horizontal agreement under Section 1. *See Compass*, 2022 WL 992628, at *8.

### 1. The Principles Contain an Agreement Prohibiting Concurrent Submission of Manuscripts.

The Principles memorialize an express, industry-wide agreement that competing publishers will refuse to consider manuscripts that have been submitted to another journal at the same time. The language in Principle 3.1.4 is mandatory and unconditional. "Submitting the same manuscript to more than one journal concurrently also constitutes **unethical behavior** and

is **unacceptable**." Ex. 1 at 3 (emphasis added). When Publisher Defendants assented to the Principles, they too adopted the categorical ban on concurrent submission. The rule is itself the agreement required by Section 1. *See NSPE*, 435 U.S. at 696; *Relevent Sports*, 61 F.4th at 307 (citing cases). Publisher Defendants' attempts to resist that conclusion are unavailing. See MTD at 13. None of the cited cases involved a trade association policy or a written agreement among competitors. *See City of Pontiac Police & Fire Retirement Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 408 (2d Cir. 2024) (dismissing Section 1 claim supported only by executive statements and market chatter in chat transcripts, without any binding written rule on the dealers); *In re Citric Acid Litig.*, 191 F.3d 1090, 1097-1100 (9th Cir. 1999) (affirming summary judgment where plaintiffs' circumstantial proof of trade-association meetings of citric acid manufacturers failed to show a written policy fixing prices); *Celestin v. Martelly*, 698 F. Supp. 3d 465, 466 (E.D.N.Y. 2023) (rejecting purported "direct evidence" of statements made about new phone taxes in video-recordings of news conferences because plaintiffs did not provide any basis "to conclude that Defendants conspired to fix prices and that the taxes were a mechanism for doing so").

Publisher Defendants insist that Principle 3.1.4 merely "acknowledges" professional norms, that its language "do[es] not refer to competition at all," and therefore any antitrust significance must be supplied by impermissible inference. *See* MTD at 13. That position misapprehends both the text of the Principles and the established antitrust doctrine governing explicit rules adopted by associations of horizontal competitors.

First, the plain text of Principle 3.1.4 is not a passive "acknowledgment," as Publisher Defendants contend. MTD at 13. It imposes a mandatory prohibition: "Submitting the same manuscript to more than one journal concurrently . . . is unacceptable." AC ¶ 91. By its own

terms, the provision bars authors from placing their works into more than one editorial marketplace at the same time. Second, the fact that the rule does not employ the word "competition" is beside the point. MTD at 13. Antitrust jurisprudence has long rejected the notion that a restraint must contain magic words to be condemned. As discussed *supra*, in *NSPE*, the Supreme Court struck down an ethical canon that, like Principle 3.1.4, spoke in terms of "unethical" conduct rather than competition, recognizing that a prohibition on competitive bidding was a naked restraint of trade. 435 U.S. at 696-97. Likewise, the Second Circuit held that an association rule dividing geographic markets constituted direct evidence of unlawful concerted action even though the text framed the restriction as a "sporting principle." *Relevent Sports*, 61 F.4th at 310. The decisive question is functional: does the rule, on its face, regulate the competitive conduct of separate economic actors? Principle 3.1.4 does exactly that. Third, Publisher Defendants' assertion that reading competitive meaning into Principle 3.1.4 requires extra-textual "inference," MTD at 13, ignores the very nature of an association rule. When a plaintiff challenges an explicit rule adopted by an association of horizontal rivals, the promulgation of that rule is, by itself, direct evidence of concerted action; no additional "agreement to agree" need be alleged. *Relevent Sports*, 61 F.4th at 307.

Finally, it is not necessary, as Publisher Defendants suggest, to allege that the rule dictates how a publisher must behave in the event of concurrent submission. MTD at 13. Courts have repeatedly held that when an association of competitors adopts an explicit rule governing their conduct, the promulgation of that rule itself constitutes direct evidence of concerted action under Section 1. *See Relevent Sports*, 61 F.3d at 307 ("[T]he adoption of a binding association rule designed to prevent competition is *direct evidence* of concerted action.").

Thus, under controlling precedent, the text of Principle 3.1.4 alone suffices to plead concerted action.

        2.        **The Principles Contain an Agreement Prohibiting Authors From Sharing Submitted Manuscripts.**

Principle 2.2 is an affirmative, concerted agreement among Publisher Defendants to bar authors from sharing the contents of any manuscript submitted for publication until—and unless—Publisher Defendants give permission. *See* AC ¶ 100; Ex. 1 at 2 ("Manuscripts received for review **must** be treated as confidential documents" and "**must not** be shown to or discussed with others **except as authorized by the editor**." (emphasis added)). The repeated use of "must" leaves no room for discretion by authors. It is a prohibition, not a suggestion. The phrase "except as authorized" places the unilateral power to permit disclosure squarely in the hands of Publisher Defendants' editorial personnel, thereby preventing independent author dissemination unless the publisher affirmatively grants permission. A rule that bars authors from "show[ing] or discuss[ing]" their work with others is, by its plain terms, a restriction on sharing.

Publisher Defendants' arguments to the contrary are unavailing. First, Publisher Defendants' attempt to frame Principle 2.2 as an innocuous measure that merely "*protect[s]* the scholar's work," MTD at 14, is a defense that is improper at the pleading stage. *See Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 705 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 1057 (2024) ("[C]omplaints need not anticipate and plead around defenses."). Further, each Publisher Defendant has adopted policies that mirror Principle 2.2 by imposing embargo periods, limiting posting of accepted manuscripts to hidden or private repositories, mandating assignment of copyrights to the publisher, and barring unapproved dissemination. These uniform restrictions show that Principle 2.2's true function is not merely to guard against reviewer misconduct but to preserve Publisher Defendants' exclusive control over the dissemination of scientific findings

during the lengthy review process. That control, in turn, allows Publisher Defendants to monetize publication rights and reinforce their market power—exactly the type of competitive harm Section 1 forbids. Further, the confidentiality requirement results in "output" being reduced because manuscripts are distributed to the scientific community long after completion. Publisher Defendants' argument that Principle 2.2 "says nothing whatsoever about copyrights," MTD at 14, misses the point.

Last, Publisher Defendants' accusation that Scholar Plaintiffs "cherry-pick" words collapses under the text itself. MTD at 14-15. Plaintiffs rely on the complete operative sentences with prescriptive language—"**must be** treated as confidential" and "**must not** be shown or discussed"—not isolated fragments. The prohibition is explicit, comprehensive, and directed at the entire class of "others," which necessarily includes peers, conference audiences, institutional repositories, and competing publishers. *See* AC ¶ 100.

### 3. The Principles Contain an Agreement That Peer Review Work Is Uncompensated.

Scholar Plaintiffs also sufficiently allege an agreement regarding unpaid peer review. Principle 1 praises "the often unsung **volunteer** work undertaken by peer reviewers," and Principle 3.3.1 declares that "scholars who wish to have their own work published in journals **have an obligation** to do a fair share of reviewing for these journals." AC ¶ 52; Ex. 1 at 1 (emphases added). By labeling peer review as "volunteer work" and coupling publication with an "obligation" to review, the Publisher Defendants collectively commit themselves to not offering monetary compensation. This is a textbook price-fixing agreement: it establishes the baseline price (zero) and employs market power—control over publication outlets—to coerce compliance.

Publisher Defendants argue that "nothing" in Principles 1 or 3.3.1 suggests a common understanding. MTD at 12. To the contrary, Principle 3.3.1 explicitly reflects a collective consensus: "**It is generally agreed**" that authors have an "**obligation**" to perform peer review in order "to have their own work published in journals." AC ¶ 52 (emphases added). Misstating the legal test, Publisher Defendants also contend that the Principles do not explicitly *prohibit* payment or *require* any publisher to adopt a specific practice. MTD at 12. Section 1 forbids agreements that fix a price; it does not require that the agreement expressly bar every deviation from that price or prescribe every implementation detail. The relevant inquiry is simply whether the language agreed to by the members of the trade association restrains trade between competitors. *See Relevent Sports*, 61 F.4th at 307. That requirement is clearly met here: it restrains trade for peer reviewing scholarship at any other price other than zero. Finally, neither case relied upon by Publisher Defendants (MTD at 12) concerns a written trade association policy like the one at issue here. *See Celestin*, 698 F. Supp. 3d at 465 (evidence consisted of video recording and transcript of news conferences); *Ins. Brokerage*, 618 F.3d at 339-40 (contracts between brokers).

Read together, Principles 1 and 3.3.1 expressly memorialize a concerted agreement among Publisher Defendants that peer-review services shall be provided on a volunteer basis, and that scholars who wish to publish "their own work"—that is, if they wish to maintain their careers—"have an obligation" to comply.

**B.**      **Scholar Plaintiffs' Plausibly Allege a Restraint of Trade.**

Scholar Plaintiffs also sufficiently allege that the three agreements challenged in the Principles unreasonably restrain trade. *See Compass*, 2022 WL 992628, at *3.

1. **The Per Se or Quick Look Rule Applies to Each Alleged Agreement.**

The three agreements memorialized in the Principles—(1) the ban on concurrent manuscript submissions (Principle 3.1.4); (2) the prohibition on sharing research contained in submitted manuscripts (Principle 2.2); and (3) the concerted refusal to pay peer reviewers (Principles 1 and 3.3.1)—are paradigmatic "naked" restraints that warrant condemnation without the burdens of a full rule-of-reason inquiry. Under binding Supreme Court and Second Circuit authority, each restraint is either unlawful *per se* or, at minimum, subject to abbreviated "quick look" review because they are anticompetitive and lack plausible pro-competitive justification.

First, the ban on concurrent submissions is a naked market-allocation agreement. The Supreme Court in *Topco* and *Palmer* condemned geographic and customer allocations among horizontal competitors as *per se* unlawful. *See Topco*, 405 U.S. at 608-09 (each member supermarket chain's exclusive license to sell Topco-brand products in its designated geographic territory was *per se* unlawful); *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990) (agreement in which BRG received exclusive rights to market HBJ's bar review materials in Georgia and HBJ agreed not to compete there was a *per se* unlawful market allocation under Section 1). Here, Publisher Defendants—with competing journals in a myriad of disciplines— have agreed to allocate the supply of manuscripts by forbidding authors from offering their work simultaneously to rival outlets. This market allocation restricts output: authors must queue serially rather than transact in parallel, which predictably reduces the volume and speed of published research and eliminates competition for scholarly content. The restraint is therefore *per se* unlawful.

Second, the confidentiality prohibition operates as a concerted refusal to allow authors to disclose or discuss their own findings during the review period. That restriction forecloses comparison shopping by authors and blocks downstream users (universities, funders, the public)

from obtaining timely access to research. Like other horizontal restraints that deny competitors critical inputs or information, the rule either falls in the *per se* or quick look categories. *See Cal. Dental Ass'n.*, 526 U.S. at 770; *Ind. Fed'n of Dentists*, 476 U.S. at 459 (finding a collective agreement to withhold services subject to quick-look analysis because its anticompetitive effects were obvious). No sophisticated market study is required to see that preventing authors from even discussing their work with alternative outlets forecloses inter-journal competition. *See Cal. Dental Ass'n.*, 526 U.S. at 770 (stating that a quick-look analysis is appropriate where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets").

Third, the concerted agreement not to pay for peer-review labor is textbook horizontal price-fixing in a labor market. The Supreme Court has long held that price-fixing among competitors is "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to . . . the business excuse for [its] use." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958); *see also Alston*, 594 U.S. at 110 (Kavanaugh, J., concurring) ("Price-fixing labor is price-fixing labor. And price-fixing labor is ordinarily a textbook antitrust problem because it extinguishes the free market in which individuals can otherwise obtain fair compensation for their work.").

Publisher Defendants' arguments to the contrary are unavailing. First, Publisher Defendants' appeal to "long-standing historical practice" is irrelevant. *See* MTD at 19. The *per se* rule is triggered by the nature of the restraint, not by how long the industry has engaged in it. The Supreme Court has condemned entrenched practices when those practices were found to be the sort of plain agreement that suppresses competition. *See NSPE*, 435 U.S. at 696. Longevity is not a defense; it is often evidence of market power. *See id*; *see also Alston*, 594 U.S. at 110

(Kavanaugh, J., concurring) (decades-long agreement to fix the price of student athlete labor at zero violated Section 1); *McDonald's*, 81 F.4th at 699 (alleged decades-long no-hire agreement was unlawful *per se*).

Second, Publisher Defendants' procompetitive arguments that the Principles combat "fraudulent paper mill submissions" and are necessary to preserve "the value of the original work" are improper at the pleading stage. *See* MTD at 20; *Davitashvili v. Grubhub Inc.*, No. 20-cv-3000 (LAK), 2022 WL 958051, at *6 (S.D.N.Y. Mar. 30, 2022). Additionally, the Supreme Court and the Second Circuit have explicitly held that ethical considerations cannot be used to justify a policy that suppresses competition. *NSPE*, 435 U.S. at 696 (rejecting the association's argument that "a total ban on competitive bidding is necessary because otherwise engineers will be tempted to submit deceptively low bids"); *Relevent Sports*, 61 F.4th at 310 (rejecting FIFA's characterization of its policy as a mere "sporting principle"). Just as the Principles bar Publisher Defendants from competing for manuscripts, NSPE's "canons of ethics" flatly banned competitive bidding. 435 U.S. at 684. The engineering society argued that competition would supposedly harm the public by driving down the quality of engineering services; here, Publisher Defendants now rely on the same tired rationale, claiming that competition would force them to "expend[] . . . limited editorial resources on an article that another journal may also be publishing." MTD at 17. The Supreme Court rejected this argument outright, holding that the Sherman Act does not tolerate a defense based on the idea that competition itself is unreasonable because doing so would be a "frontal assault on the basic policy of the Sherman Act." *NSPE*, 435 U.S. at 695. Publisher Defendants' attempt to justify their restraint on competition is no more valid here.

Third, Publisher Defendants' cases do not aid them. *Khan*, *Leegin*, *Broadcast Music*, and *Salvino* all concerned vertical restraints or joint-venture licensing arrangements whose competitive effects were ambiguous, leading the courts to insist on a full rule-of-reason inquiry; they therefore shed no light on the proper treatment of the naked horizontal agreement alleged here—an express, industry-wide pact among competing publishers to fix the price of peer-review services at zero and to block rival journals from bidding for manuscripts—which fits squarely within established *per se* categories prohibiting wage-fixing and market allocations.[2] *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (vertical minimum-resale price-maintenance agreements with both procompetitive and anticompetitive effects should be analyzed under rule of reason, and differ from "[r]estraints that are *per se* unlawful includ[ing] horizontal agreements among competitors to fix prices . . . or to divide markets"); *State Oil Co. v. Khan*, 522 U.S. 3, 18-19 (1997) (vertical maximum price fixing agreement between a gas station and Shell Oil to sell gasoline at a certain price should be analyzed under the rule of reason); *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 16 (1979) (joint venture between two music organizations to issue "blanket licenses" that charged a single fee to play any musical work was not the type of practice that always restricts competition and decreases output); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 315-16 (2d Cir. 2008) (unlike "geographic division of markets" or "horizontal price fixing" which are *per se* illegal, joint licensing arrangements should be analyzed under rule of reason because "the economic and competitive effects of the challenged practice are unclear").

---

[2] Further, all four cases were decided at the summary judgment or post-trial stage, not on a motion to dismiss.

Last, *Nostalgic Partners, LLC* is readily distinguishable. MTD at 19. There, the plaintiffs challenged a horizontal agreement among Major League Baseball (MLB) clubs to exclude certain minor league teams from MLB's new professional development league. *See Nostalgic Partners, LLC v. Off. of Comm'r of Baseball*, 637 F. Supp. 3d 45, 48-49, 52 (S.D.N.Y. 2022). The Court held the *per se* rule was inappropriate because, while there was a horizontal agreement among competitors, it arose in the context of a highly integrated professional sports league where some degree of cooperation is necessary for the product (professional baseball) to exist at all. *Id.* at 53. The Court also rejected the quick look analysis due to the complexity of the MLB-minor league relationship. *Id.* By contrast, the challenged conduct here is not a byproduct of a complex, integrated joint venture or league. Unlike *Nostaglic Partners*, where the court found it necessary to weigh the procompetitive justifications of league cooperation and the unique economics of professional sports, the allegations of the Amended Complaint do not arise from a context where such balancing is inherently required.

Publisher Defendants do not operate rival sports teams who must coordinate to create a product like competitive athletics, or anything analogous. Instead, the challenged misconduct governs and restricts what would otherwise be independent and separate business decisions concerning separately-produced products: how Publisher Defendants compete (or not) for manuscripts; how Publisher Defendants pay (or not) for the peer review essential to their products; and how Publisher Defendants permit (or not) the sharing of research pending publication. Further, Publisher Defendants' own—meritless—arguments that the terms of the challenged conspiracy are mere suggestions or only memorialize historic practice admit that their collusion cannot be necessary to create their separately-produced products. Publisher Defendants cannot have it both ways: their collusion cannot be both non-existent and essential.

### C. Even if the Court Applies the Rule of Reason, Scholar Plaintiffs Plausibly Allege the Challenged Principles Restrain Trade.

In the alternative, Publisher Defendants' conduct violates the "rule of reason." To survive a motion to dismiss in a rule-of-reason case, the plaintiff must allege that the defendant has market power and that the defendant engaged in an anticompetitive act. *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 42 (2d Cir. 2018).

#### 1. Scholar Plaintiffs Allege that Defendants Possess Market Power.

Under the rule of reason, "[t]here are two ways a plaintiff can show the possession of monopoly power: [i] through direct evidence . . . or [ii] by defining a relevant market and showing defendants' excess market share." *In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55, 95 (S.D.N.Y. 2021) (citations omitted). Scholar Plaintiffs allege both.

"[D]irect evidence of a defendant's price control or exclusion of competitors from a particular market" is "indicative of its possession of monopoly power." *Id.* (quoting *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 482 (S.D.N.Y. 2016)). Scholar Plaintiffs allege that Publisher Defendants agreed to set the price for peer review at zero. AC ¶¶ 52-61, 72-90. That means Publisher Defendants paid $0 for services estimated to be worth $1.5 billion, in 2020 alone. *Id.* ¶¶ 60-61. The underpayment has produced a shortage of peer review. *Id.* ¶ 63. In a competitive market, the labor shortage would drive wages up as buyers of labor compete among each other to attract workers. *Id.* In their motion to dismiss, Publisher Defendants do not even attempt to refute Scholar Plaintiffs' direct evidence of market power.

Scholar Plaintiffs also adequately plead market power using indirect evidence, i.e., "by defining a relevant market and showing defendants' excess market share." *Tether & Bitfinex Crypto*, 576 F. Supp. 3d at 95 (citation omitted). "[M]arket definition is a deeply fact-intensive inquiry." *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024)

(quoting *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008)). Courts "hesitate to grant motions to dismiss for failure to plead a relevant product market." *Id.*

The Amended Complaint alleges two related product markets: (i) the market in which scholars seek to sell peer-review services to publishers, and (ii) the market in which scholars seek to publish their research in peer-reviewed journals. AC ¶¶ 110-122. In both markets, Defendants act as ***buyers*** of labor—in the form of peer-review services and production of academic manuscripts for publication. This is therefore "not [a] market of competing ***sellers*** but of competing ***buyers***," as in *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (Sotomayor, J.) (emphasis added) (citation omitted).

In *Todd*, the plaintiff alleged that major oil and petrochemical companies exchanged salary information to suppress the wages of certain employees. *Id.* The "market [wa]s comprised of buyers" (petrochemical companies), "who are seen by sellers" (their employees), "as being reasonably good substitutes." *Id.* (citation omitted). As the Court explained, "[t]he proper focus [for defining the market in an oligopsony or monopsony case] is the commonality and ***interchangeability of the buyers***, not the commonality or interchangeability of the sellers." *Id.* (emphasis added) (citation omitted). While lawyers and engineers were not held to be interchangeable employees, that did not matter. *Id.*; *see also id.* at 210 ("[T]he fact that a job as an attorney and one as a geologist are not comparable does not bear on the ability of defendants to coordinate salaries."). What mattered was "from the perspective of an . . . employee," whether "a job opportunity in the oil industry," for example, was interchangeable with "one in the pharmaceutical industry." *Id.* at 202.

So too here. Scholar Plaintiffs challenge a horizontal conspiracy among Publisher Defendants to suppress competition among buyers of peer-review services and the production of

manuscripts for publication. The question is whether scholars who perform those services view *buyers*—i.e., publishers—as interchangeable. As the Amended Complaint alleges, they do. Each Publisher Defendant owns journals across the full spectrum of disciplines. AC ¶¶ 113-16. Thus, an economist, for example, who submits a manuscript to a top-ranked journal owned by Elsevier would view a top-ranked journal owned by any other Publisher Defendant as a reasonable alternative. Like the defendants in *Todd*, Defendants look through the "wrong end of the telescope." 275 F.3d at 201 (citation omitted). They object that Scholar Plaintiffs do not "allege that all peer reviewers are interchangeable," MTD at 23, when the relevant question is actually whether Publisher Defendants are interchangeable from the standpoint of the scholars. They are.

Publisher Defendants' argument that "*journal[s]*" in different "discipline[s] or sub-discipline[s]" are not interchangeable, MTD at 22 (emphasis added), is also irrelevant. Publisher Defendants are publishers, not journals. Because a scholar in any particular discipline views each publisher—that owns journals in that discipline—as interchangeable, the market is defined by the services purchased by publishers. *United States v. Bertelsmann SE & Co. KGaA*, 646 F.Supp.3d 1 (D.D.C. 2022) is illustrative. There, the court evaluated a horizontal merger between Penguin Random House and Simon & Schuster—two of the largest book publishers in the United States—based on its impact on authors selling the rights to their books. *Id.* at 24. The court accepted the government's argument that the relevant market was "publishing rights to anticipated top-selling books." *Id.* While the publishers offered different so-called "imprints" that grouped books by the genres different authors worked in, the court correctly rejected the plaintiffs' argument that those imprints competed against each other. *Id.* at 49-51. The court defined the market as the reasonably interchangeable publishers that authors sold manuscripts to rather than the imprints that each publisher housed. *Id.* at 56.

Having failed to challenge direct evidence of their market power, Publisher Defendants attempt to tear down the indirect evidence establishing that power by arguing that the markets alleged by Scholar Plaintiffs are "overbroad." MTD at 23. But Publisher Defendants do not identify buyers who are improperly included in the market, as defined. Moreover, courts rarely dismiss complaints that supposedly allege "overbroad market[s]. *Giordano v. Saks Inc.*, 654 F. Supp. 3d 174, 207 (E.D.N.Y. 2023). That is because allegations of an overbroad market "do[] not create deficiencies analogous to those that plague, contradictory, undefined, or implausibly narrow markets." *Id.* (quoting *Jien v. Perdue Farms, Inc.*, No. 19-cv-02521, 2022 WL 2818950, at *10 (D. Md. July 19, 2022)).[3]

Publisher Defendants argue that Scholar Plaintiffs "fail to allege any facts demonstrating how they grouped 'disciplines' to arrive at their percentages, or how they arrived at their characterization of certain journals as 'top ten.'" MTD at 23. But Publisher Defendants' position would demand far more specificity than the law requires from a complaint. In *Todd*, the plaintiffs were workers from different disciplines and they applied for jobs in those disciplines. 275 F.3d at 201-02. The court did not require the plaintiffs to allege market share information on a discipline-by-discipline basis. *Id.* Plaintiffs need not, at this juncture, provide such detail.

Finally, the Amended Complaint alleges that the Publisher Defendants have significant market shares, ¶¶ 112-15, and that the markets are protected by entry barriers, ¶ 116. Publisher Defendants do not dispute these allegations.

---

[3] Publisher Defendants' citation to *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 621 (S.D.N.Y. 2013), in support of its argument that an overbroad market requires dismissal, fails. MTD at 23. There, the court rejected the plaintiffs' attempt to gerrymander an overly ***narrow*** "single brand" market for e-books. *Bookhouse*, 985 F. Supp. 2d at 620-21. Because the market was far larger than alleged, the plaintiffs there failed to allege "harm . . . to the U.S. e-book market as a whole." *Id.*

## 2.    Scholar Plaintiffs Allege Harm to Competition in a Relevant Market.

Publisher Defendants next contend that Scholar Plaintiffs fail to allege actual adverse effects on competition. MTD at 23-25. This argument ignores that Scholar Plaintiffs plausibly allege multiple forms of competitive harm flowing from Publisher Defendants' anticompetitive agreements. AC ¶¶50-104.

First, the agreement not to pay peer reviewers directly harms competition by eliminating price competition for peer-review services. AC ¶¶52-61. Publisher Defendants' argument that "peer review has been voluntary since its inception" is no response. MTD at 24. The NCAA and its member schools made the same argument about student-athletes, who were denied monetary compensation until antitrust litigation put an end to the conspiracy. *In re Collegiate Athlete NIL Litig.*, No. 20-cv-03919 (N.D. Cal. June 6, 2025), ECF. No. 978 (Opinion Regarding Order Granting Motion for Final Approval of Settlement Agreement). Marveling that the NCAA had maintained this conspiracy for decades, Justice Kavanaugh pointed out the obvious: "price-fixing labor is price-fixing labor. And price-fixing labor is ordinarily a textbook antitrust problem because it extinguishes the free market in which individuals can otherwise obtain fair compensation for their work." *Alston*, 594 U.S. at 110 (Kavanaugh, J., concurring). What Publisher Defendants euphemize as "a purported agreement to treat peer review as 'voluntary,'" Mot. at 24, is an agreement to fix the price of labor—at $0. Like the NCAA and its member schools, Publisher Defendants made enormous profits while paying nothing for labor that made those profits possible.

Even if the original practice of unpaid peer reviews arose as the result of independent decisions by publishers and scholars, and was thus possibly lawful at its inception, that distant history does not immunize Publisher Defendants today. Publisher Defendants launched a conspiracy to ***maintain*** a practice that threatened to break down under pressure from the peer-

review crisis and other market changes. AC ¶¶ 62-72. Their agreement was adopted in response to a rising chorus of demands from the academic community—amplified by high-profile public criticism—for peer reviewers to be compensated for their labor. AC ¶ 9; *cf. United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 228 (1940) (anticompetitive buying program permitted under National Industrial Recovery Act nevertheless violated antitrust laws after Act was struck down). In a competitive market, Publisher Defendants "would have paid these scholars for the expertise and peer review work that made the Publisher Defendants' immense profits possible." AC ¶ 69. That is all that is required at the pleading stage.

The Amended Complaint also alleges that Publisher Defendants' anticompetitive scheme has resulted in a "shortage of peer reviewers," an obvious consequence of the agreement not to pay reviewers a market wage. *Id*. ¶ 64. That shortage has adversely affected the market by "inject[ing] delay into the editorial process" and has reduced peer-review quality because of "reviewer fatigue." AC ¶¶ 64-65. The agreement not to pay peer reviewers makes it difficult to recruit peer reviewers and lengthens the duration of the review process itself. *Id.* ¶¶ 65-69. These allegations are direct evidence of actual harm to competition in the form of "output reductions" and "reduced quality in the relevant market." *1-800 Contacts, Inc. v. Fed. Trade Comm'n*, 1 F.4th 102, 118 (2d Cir. 2021). Because delay in peer review slows publication, it necessarily means the production of fewer articles.

Second, the concurrent submission ban reduces proposed class members' ability to efficiently place their work. AC ¶¶ 91-95. The Amended Complaint alleges that the single submission rule forces authors into sequential submission processes that delay publication by months, or years. AC ¶ 94. By contrast, in a competitive market, authors would submit their manuscripts to multiple publishers at the same time, increasing the probability that an article

would be published soon after its completion. The delay caused by the concurrent submission ban reduces the number of articles that can be published at any given time, thereby suppressing output, at immense cost to society.

Third, the manuscript confidentiality restrictions also limit output and reduce quality. AC ¶¶ 103-04. By restricting authors' ability to share their research during the often-lengthy review process, confidentiality restrictions delay feedback from other scholars that could improve their scholarship. *Id.* Along with this reduction in quality, output declines. The confidentiality restrictions prevent other scholars from building on the research findings reported in completed-but-still-unpublished manuscripts, thus interfering with the output of academic articles—and the advancement of science. *Id.*

Publisher Defendants argue that rather than allege a reduction in output, "Plaintiffs generally allege an 'explo[sive]' *increase* in the number of manuscripts submitted for publication over the past eighty years, *and* an increase in publishing 'at rates never before seen.'" MTD at 24 (quoting AC ¶¶ 30, 62-63). But the mere fact that the academic publication market has grown over 80 years does not contradict the allegation that publishers have suppressed competition for the services of authors and reviewers, who are paid less (in fact, $0) than they would have been if publishers had competed for their services in order to satisfy that demand. As the Amended Complaint explains, academic publishing has increased because of the rise in demand for research. AC ¶¶ 62-63. Further, the Amended Complaint alleges numerous facts from which the Court can infer adverse effects from the elimination of labor market competition, such as a shortage of peer review and long delays in the publication of manuscripts, harming both Class Members and the advancement of scientific research.

## V. THIS COURT ALSO HAS PERSONAL JURISDICTION OVER PJ DEFENDANTS.

The Court should also deny the 12(b)(2) motion to dismiss for lack of personal jurisdiction. Only three of six foreign Defendants in this case challenge jurisdiction: Informa PLC, Taylor & Francis Group, Ltd., and Wolters Kluwer N.V.[4] At the motion to dismiss stage, Scholar Plaintiffs need only make a prima facie showing of personal jurisdiction. *Okla. Firefighters Pension & Ret. Sys. v. Banco Santander (México) S.A. Institución de Banca Múltiple*, 92 F.4th 450, 455-56 (2d Cir. 2024). The Court may exercise personal jurisdiction where (1) service of process is procedurally proper, (2) a statutory basis exists, and (3) constitutional due process is satisfied. *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC* ("*Schwab II*"), 22 F.4th 103, 121 (2d Cir. 2021); *Okla. Firefighters*, 92 F.4th at 456. Due process is satisfied when a defendant has "minimum contacts with the forum" such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. *Id.* Where, as here, Scholar Plaintiffs assert specific jurisdiction,[5] minimum contacts "exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) (citation omitted). The relevant "forum" depends on the statute used to assert personal jurisdiction.

The Court may exercise specific personal jurisdiction over each PJ Defendant under multiple, independent statutory bases. The Court may exercise personal jurisdiction over Wolters Kluwer N.V. under New York's long-arm statute (N.Y. C.P.L.R. § 302(a)(1)) and Federal Rule

---

[4] The foreign Defendants that concede jurisdiction are Elsevier, Springer Nature, and STM.
[5] PJ Defendants argue that this Court does not have general personal jurisdiction over them. *See* Mot. to Dismiss by PJ Defs. ("PJ MTD"), ECF. No. 111 at 12-13. Plaintiffs do not rely on a theory of general personal jurisdiction and instead assert that this Court has specific personal jurisdiction over PJ Defendants.

of Civil Procedure 4(k)(2) because it participated in the alleged conspiracy with overt acts, including the solicitation of peer-review services and academic articles, in New York and the United States, and transacted business in New York and the United States through its own offices and its subsidiary Wolters Kluwer Health, Inc. The Court may also exercise personal jurisdiction over Taylor & Francis Group, Ltd. under New York's long-arm statute and Rule 4(k)(2) through the conspiracy theory of jurisdiction because its co-conspirators committed overt acts in New York and the United States. Last, the Court may exercise personal jurisdiction over Informa PLC under New York's long-arm statute, Rule 4(k)(2), and Section 12 of the Clayton Act (15 U.S.C. § 22) because it transacts business in the United States and New York—including maintaining offices in this District—and has purposefully availed itself of the forum through its control over, and receipt of profits from, its Taylor & Francis division's publishing activities in New York.

### A. Personal Jurisdiction Is Proper Over Wolters Kluwer N.V. and Taylor & Francis Group, Ltd. Because They Participated in a Conspiracy with Overt Acts Committed in New York and the United States.

A defendant is subject to personal jurisdiction under New York's long-arm statute when (1) a conspiracy exists, (2) the defendant participated in the conspiracy, and (3) an overt act committed in furtherance of the conspiracy would independently subject the co-conspirator who performed it to jurisdiction in New York.[6] *Charles Schwab Corp. v. Bank of Am. Corp. ("Schwab I")*, 883 F.3d 68, 87 (2d Cir. 2018). The Second Circuit applies the same three-part inquiry under Federal Rule of Civil Procedure 4(k)(2), except that the relevant forum for minimum contacts is the United States as a whole rather than a single state. *See Schwab II*, 22 F.4th at 122; *see also In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 271 (2d Cir.

---

[6] Although Scholar Plaintiffs raised this theory of personal jurisdiction in their pre-motion letter, *see* ECF. No. 108 at 1, PJ Defendants did not mention this theory in their motion to dismiss, *see generally* PJ MTD.

2023) (finding personal jurisdiction over defendants for Sherman Act claims "[b]ecause [overt acts] occurred in the United States"). The defendant need not have directed or supervised the overt act. *Schwab II*, 22 F.4th at 122. An in-forum sale of a price-fixed product qualifies as an overt act. *See Okla. Firefighters*, 92 F.4th at 460 (minimum contacts "existed for claims based on in-forum sales of manipulated instruments" by the defendants' co-conspirators). Because their alleged co-conspirators contracted for peer-review services and academic articles in New York and elsewhere in the United States, Wolters Kluwer N.V. and Taylor & Francis Group, Ltd. are subject to personal jurisdiction under New York's long-arm statute and Rule 4(k)(2).

First, Plaintiffs adequately allege an unlawful agreement among Publisher Defendants. *See supra* Section IV; AC ¶¶ 38-49, 52-53, 91-93, 100-01; *see also In re Platinum*, 61 F.4th at 270-71 (finding personal jurisdiction at the pleading stage where "plaintiffs have adequately alleged that a conspiracy existed").

Second, both Wolters Kluwer N.V. and Taylor & Francis Group, Ltd. participated in the conspiracy by joining STM:

**Wolters Kluwer N.V**. Scholar Plaintiffs have provided several supporting materials demonstrating that Wolters Kluwer N.V. was a member of STM. The STM membership page from 2000 specifically lists "Wolters Kluwer N.V." as a member. Dafa Decl. Ex. A at 1. Additionally, a March 1994 article entitled "Story of STM," published on STM's website, names "Herman Pabbruwe" as the chairman of STM's Library Relation Committee. Dafa Decl. Ex. B at 3. According to Mr. Pabbruwe's LinkedIn profile, he served as President of "Wolters Kluwer Academic" in 1994. Dafa Decl. Ex. C at 1. "Wolters Kluwer Academic" links directly to the LinkedIn page for Wolters Kluwer N.V., which displays "WKL," the stock ticker symbol for

Wolters Kluwer N.V., in its Overview section. Dafa Decl. Ex. D at 1, Ex. E at 1. Taken together, these materials show that Wolters Kluwer N.V. joined STM. AC ¶ 25.

**Taylor & Francis Group, Ltd**. Scholar Plaintiffs have also provided supporting materials showing that Taylor & Francis Group, Ltd. is a member of STM. Before merging with Informa PLC in 2004, the company was known as "Taylor & Francis Group plc." *See* Dafa Decl. Ex. F at 1 (a filing retrieved from Taylor & Francis Group, Ltd.'s UK Companies House page, naming "Taylor & Francis Group plc"). The STM membership page from 2002 lists "Taylor & Francis Group plc" as a member. Dafa Decl. Ex. A at 2. Currently, STM's membership page identifies "Taylor & Francis" as a "Regular Member" and describes it as the "Academic Publishing Division of Informa." Dafa Decl. Ex. G at 1. Taken together, these materials show that Taylor & Francis Group, Ltd. joined STM. AC ¶ 24.

Third, Wolters Kluwer N.V. and Taylor & Francis Group, Ltd.'s co-conspirators took overt acts in New York and the United States. Elsevier, Springer, and Wiley solicited and obtained price-fixed peer-review services from Scholar Plaintiff Dr. Elvisha Dhamala, a New York resident. AC ¶ 15. Further, each Publisher Defendant solicited and obtained price-fixed peer-review services from at least one Scholar Plaintiff, all of whom are United States residents. *Id*. ¶¶ 15-18. The other foreign Publisher Defendants do not challenge this Court's personal jurisdiction over them, nor could they: "solicitations and sales" of a price-fixed good "easily make out a prima facie showing of personal jurisdiction." *Okla. Firefighters*, 92 F.4th at 460 (citation omitted). The very transactions that subject the other Publisher Defendants to this Court's personal jurisdiction subject their co-conspirators—Wolters Kluwer N.V. and Taylor & Francis Group, Ltd.—to this Court's personal jurisdiction as well. *See In re Platinum*, 61 F.4th at 270 (holding that, under a conspiracy theory of jurisdiction, a court has personal jurisdiction over

a defendant where the overt acts of a defendant's co-conspirator subject that co-conspirator to jurisdiction in the forum).

> **B.** **Personal Jurisdiction Is Also Proper Under New York's Long Arm Statute Over Wolters Kluwer N.V. and Informa PLC Because They Transacted Business in New York, and They Knew, Controlled, and Benefited From Their Subsidiaries' Activities in New York.**

Under New York's long-arm statute, a defendant has "minimum contacts" when it purposefully conducts business in New York, thereby availing itself of the state's market and legal protections. *See Spetner v. Palestine Inv. Bank*, 70 F.4th 632, 644-45 (2d Cir. 2023). These contacts also exist when the defendant knows of, benefits from, and controls its subsidiary's New York activities. *Id.* at 640; *Okla.Firefighters*, 92 F.4th at 457-58. In this case, the Court may exercise personal jurisdiction over Wolters Kluwer N.V. and Informa PLC under New York's long-arm statute because both companies (i) maintain offices and conduct business directly in New York, and (ii) are aware of, benefit from, and control the academic publishing activities of their subsidiaries operating in New York.

### a.       Business Operations in New York

Both Wolters Kluwer N.V. and Informa PLC are subject to personal jurisdiction in New York because they have intentionally taken advantage of New York's business environment by establishing a significant presence in the state. AC ¶ 25 (identifying Wolters Kluwer N.V. offices in New York). The "Contact Us" webpage copyrighted to "Wolters Kluwer N.V." states that "Wolters Kluwer has offices all around the world," including five within New York State. *See* Dafa Decl. Ex. H at 1-3. These public statements directly refute the arguments made by Wolters Kluwer N.V. *See* PJ MTD at 14.

Wolters Kluwer N.V. is not just physically present in New York; it is also actively involved in the publishing activities at issue here. The company's own website includes

statements that set out and enforce the very unlawful agreement that Scholar Plaintiffs challenge. For example, the website states that "Submitted manuscripts should not have been . . . currently submitted elsewhere." *See* Dafa Decl. Ex. H at 5; AC ¶ 96(b). These public statements demonstrate that Wolters Kluwer N.V. is not a distant or uninvolved parent company. Instead, it is directly participating in the publishing business and is actively involved in carrying out the alleged scheme within New York.

Informa PLC is also subject to personal jurisdiction in New York because it has deliberately established a substantial and ongoing presence in the state. For example, the "Office Locator" page on Informa PLC's website lists several offices throughout the United States, including three in Manhattan and one in Long Island. Dafa Decl. Ex. I at 2-3. Among its New York operations is the "Taylor & Francis" division, located at 605 Third Avenue, New York, NY 10158. *Id*. at 4. According to Informa PLC's own descriptions, this division functions as its academic publishing arm. *Id.* at 5. These facts demonstrate that Informa PLC has purposefully availed itself of the New York market by establishing a business presence in the state, including operating its publishing division in New York City. By choosing to conduct business activities in New York, Informa PLC has subjected itself to the jurisdiction of New York courts. Therefore, Scholar Plaintiffs have more than met their burden to make a prima facie showing of personal jurisdiction over Informa PLC.

The weight PJ Defendants place on *Hutton v. Priddy's Auction Galleries, Inc.*, 275 F. Supp. 2d 428 (S.D.N.Y. 2003), is misplaced and conflicts with a long line of Second Circuit district court opinions. *See* PJ MTD at 10. Numerous courts have held that even a single transaction conducted within New York is sufficient to satisfy the requirements of the New York long-arm statute. *See, e.g.*, *Societe Des Baines De Mer Et Du Cercle Des Etrangers a Monaco v.*

*MGM Mirage*, No. 08cv03157(HB), 2008 WL 4974800, at *3 (S.D.N.Y. Nov. 24, 2008);

*Donnelly v. Anand*, No. 21-cv-9562 (PKC), 2022 WL 4385901, at *5 (S.D.N.Y. Sept. 22, 2022);

*Two's Co. v. Hudson*, No. 13-cv-3338-NSR, 2014 WL 903035, at *3 (S.D.N.Y. Mar. 6, 2014). In

fact, *Hutton* itself recognizes that even one New York transaction will do. *Hutton*, 275 F. Supp.

2d at 439 ("A single business transaction can satisfy this provision, even where the defendant

never enters the state, so long as the claim arises from that transaction."). Nor are Scholar

Plaintiffs required to plead every evidentiary fact necessary to establish personal jurisdiction, as

PJ Defendants contend. PJ MTD at 14. Second Circuit precedent makes clear that a plaintiff may

make a prima facie showing through its "own affidavits and supporting materials." *Marine

Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981).

### b.      Subsidiaries in New York

The Court may also exercise personal jurisdiction over Wolters Kluwer N.V. and Informa

PLC pursuant to New York's long-arm statute because they are fully aware of, directly benefit

from, and exert control over their subsidiaries in New York.

Wolters Kluwer Health, Inc. operates within New York. AC ¶ 25; *see also* Dafa Decl. Ex.

J at 3 (listing "Wolters Kluwer Health, Inc." as a subsidiary of Wolters Kluwer N.V.'s "Health"

division). Wolters Kluwer Health, Inc. has offices at 28 Liberty Street in New York City. Dafa

Decl. Ex. K at 1. There is no doubt that Wolters Kluwer N.V. benefits from its American

subsidiary's operations in New York. *See* Dafa Decl. Ex. L at 2, 4 (Wolters Kluwer N.V.'s 2023

annual report, attributing €1.5 billion in revenue from its Health division); PJ MTD at 14

(admitting Wolters Kluwer N.V. "does not earn any commercial revenue separate from its

various subsidiaries"); *Okla. Firefighters*, 92 F.4th at 458 (principal benefits from its agents

actions and is subject to personal jurisdiction when "the resulting gain or loss from the

transaction [was] recorded in the profit and loss records of the [principal]" (citation omitted)).

Nor is there any doubt that Wolters Kluwer N.V. maintains control over its subsidiary's operations. It admits that it "transact[s] business only *through* subsidiaries." PJ MTD at 9 (emphasis added). Wolters Kluwer N.V. also describes Wolters Kluwer Health, Inc. as one of its divisions, never stating it is an autonomous legal entity. Dafa Decl. Ex. L at 3; Ex. H at 7. Wolters Kluwer N.V. also claims that its executive leadership has spent considerable time working for Wolters Kluwer N.V.'s "operating companies in North America." Dafa Decl. Ex. H at 12. Furthermore, Wolters Kluwer N.V. has posted statements to its websites concerning peer review, effectively instructing its family of companies to fall in line with the scheme. *See* Dafa Decl. Ex. H at 5 (stating that multiple submissions in Wolters Kluwer journals are prohibited); AC ¶ 96(b) (same); *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 169 (2d Cir. 2010) (minimum contacts over agent's acts in New York because principal "shared in the decision-making and execution of" the New York contacts).

Similarly, Informa PLC's Taylor & Francis subsidiary operates in New York. The Taylor & Francis "Locations" page, copyrighted to "Informa plc," expressly states "Our head office is based at Milton Park, in Oxfordshire. We also have a big presence in the USA with offices in Florida, **New York** & Philadelphia." Dafa Decl. Ex. M at 1 (emphasis added). Its "Office Locator" page, also copyrighted to "Informa plc," identifies a "Taylor & Francis" office at 605 Third Avenue in New York City. Dafa Decl. Ex. I at 4. Informa PLC acknowledges that "Taylor & Francis" is its "provider of academic research, advanced learning and open research." Dafa Decl. Ex. N at 2; *see also* Ex. I at 5 (Informa PLC's website calling "Taylor & Francis" its publishing "division").

Informa PLC benefits substantially from the publication activities of its Taylor & Francis division, earning approximately £619 million a year from those activities. Dafa Decl. Ex. N at 2;

*see also* AC ¶ 7 (alleging that Informa PLC's Taylor & Francis division experiences profit margins greater than those of Apple and Google); ECF No. 105 at 3 (admitting that Informa PLC derives "no independent revenues" from its subsidiaries).

Finally, Informa PLC's public statements evidence its extensive control over its subsidiaries' publishing operations. First, Informa PLC has admitted to this Court that it "transact[s] business only *through* subsidiaries." PJ MTD at 9 (emphasis added). Informa PLC publicly refers to Taylor & Francis as its publishing "division," never specifying whether that division is an autonomous legal entity. Dafa Decl. Ex. N at 2, Ex. I at 5. Informa PLC also staffs Taylor & Francis's c-suite executives with its own leadership: Penny Ladkin-Brand serves as the "CEO of Taylor & Francis" while concurrently serving on Informa PLC's executive leadership team. Dafa Decl. Ex. M at 2. Furthermore, Informa has enforced the scheme on behalf of its subsidiaries by, among other actions, describing peer review as a "voluntary" service. AC ¶ 54(e); Dafa Decl. Ex. O at 3 (Taylor & Francis Editor Resources webpage, copyrighted to "Informa UK Limited, an Informa Group Company").

None of PJ Defendants' authorities defeat this Court's agency-based jurisdiction. *Jazini* focused almost entirely on the "mere department" theory, which Scholar Plaintiffs do not assert here. *See Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184-85 (2d Cir. 1998). Its brief rejection of agency rested on a single conclusory allegation that merely parroted the legal standard. *Id.* Scholar Plaintiffs, by contrast, anchor their agency allegations in PJ Defendants' own websites and annual reports.

PJ Defendants' other authorities also miss the mark. In *Coast to Coast Energy* the complaint contained "unsubstantiated allegations" and the plaintiffs lacked supporting documents—unlike the record here. *Coast to Coast Energy, Inc. v. Gasarch*, 53 N.Y.S.3d 16, 19

(2017). *City of Long Beach* and *Ranza* address alter-ego theories; *Aspen Specialty* and *Tansey*

concern veil-piercing—none of which Plaintiffs invoke. *See City of Long Beach v. Total Gas &*

*Power N.A., Inc.*, 465 F. Supp. 3d 416 (S.D.N.Y. 2020); *Ranza v. Nike, Inc.*, 793 F.3d 1059 (9th

Cir. 2015). *Aspen* also disclaimed any argument for specific jurisdiction. *Aspen Specialty Ins.*

*Co. v. RCI Hosp. Holdings, Inc.*, No. 20-CV-4308 (VSB), 2023 WL 4080550, at *3 n.5

(S.D.N.Y. June 20, 2023). *In re Aluminum Warehousing* turned on affidavits that plaintiffs left

unrebutted, while Scholar Plaintiffs here provide evidence that contradicts PJ Defendants'

declarations. *In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 238 (S.D.N.Y.

2015). *LaSalle* applies Illinois law to general jurisdiction and is therefore irrelevant. *LaSalle*

*Nat'l Bank v. Vitro, Sociedad Anonima*, 85 F. Supp. 2d 857, 864 (N.D. Ill. 2000). None of these

cases undermines agency-based specific jurisdiction over PJ Defendants.

**C.    Personal Jurisdiction Is Also Proper Under Rule 4 Over Wolters Kluwer N.V. and Informa PLC Because They Transact Business in the United States.**

Even if the Court concludes that neither Wolters Kluwer N.V. nor Informa PLC have

sufficient minimum contacts with New York, it may nonetheless exercise personal jurisdiction

over them pursuant to Federal Rule of Civil Procedure 4(k)(2). When applying Rule 4(k)(2) to

establish personal jurisdiction, the Court analyzes a defendant's contacts with the United States

as a whole rather than with any particular state. *See Dardana Ltd. v. Yuganskneftegaz*, 317 F.3d

202, 207 (2d Cir. 2003) (jurisdiction based on contacts with the United States as a whole when

defendant is not subject to personal jurisdiction in any state); *see also Lensky v. Turk Hava*

*Yollari, A.O.*, No. 21-2567-cv, 2023 WL 6173334, at *3 (2d Cir. Sept. 29, 2023) (minimum

contacts where a defendant "transacts a great deal of business in the United States").

Wolters Kluwer N.V. and Informa PLC have both publicly described extensive business

operations throughout the United States. Wolters Kluwer N.V.'s website states that it maintains

offices "all around the world," including more than forty offices in the United States. Dafa Decl.

Ex. H at 1-3. Similarly, webpages copyrighted to Informa PLC state the company maintains a

"big presence in the USA," including thirty-six offices. Dafa Decl. Ex. M at 1, Ex. I at 2. Both

Defendants have also solicited peer review services from Scholar Plaintiffs who reside

throughout the United States. AC ¶¶ 15-19. These supporting materials regarding the U.S.

business activities of Wolters Kluwer N.V. and Informa PLC are sufficient to establish a prima

facie showing of personal jurisdiction under Rule 4(k)(2), notwithstanding any controverting

showing Wolters Kluwer N.V. and Informa PLC may attempt to make at this stage of the

proceedings. *See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013)

(in the absence of an evidentiary hearing it is error for a district court to resolve factual disputes

in favor of the party who moves to dismiss for lack of personal jurisdiction).

### D. Personal Jurisdiction Is Also Proper Under the Clayton Act Over Informa PLC Because It Has an Office In This District, and Transacts Business in the United States.

The Court may also exercise personal jurisdiction over Informa PLC under the Clayton

Act because it has an office in this District. Section 12 of the Clayton Act allows antitrust

lawsuits against a corporation to be filed in any district where the corporation does business or

can be found. 15 U.S.C. § 22. The relevant "forum" by which to measure the defendant's

minimum contacts under the Clayton Act is the United States.[7] *See Schwab II*, 22 F.4th at 122-23

(analyzing defendant's contacts with the United States because plaintiffs' claims "arise under

federal statutes containing provisions authorizing nationwide service of process" (citing 15

---

[7] Although a finding of minimum contacts under Clayton Act Section 12 requires a defendant to be an inhabitant, be found, or transact business in the district in which the court sits, *Daniel v. American Board of Emergency Medicine*, 428 F.3d 408, 427 (2d Cir. 2005), the minimum contacts inquiry for such a defendant still looks to the United States as a whole, *see European Government Bonds*, 2023 WL 11646009, at *11.

U.S.C. § 22) (citation omitted)). A defendant that transacts business in the United States has minimum contacts. *In re Eur. Gov't Bonds Antitrust Litig.*, No. 19 Civ. 2601 (VM), 2023 WL 11646009, at *11 (S.D.N.Y. Sept. 25, 2023) (finding minimum contacts with the United States under Clayton Act Section 12 because of transactions in Connecticut).

Here, Informa PLC transacts business in this District because it has an office in this District: 1983 Marcus Avenue, Lake Success, NY 11042. *See* Dafa Decl. Ex. I at 3. Further, Informa PLC has minimum contacts with the United States because it maintains "a big presence in the USA with offices in Florida, **New York** & Philadelphia." Dafa Decl. Ex. M at 1 (emphasis added). Thus, Scholar Plaintiffs have made out a prima facie showing of personal jurisdiction under Clayton Act Section 12 over Informa PLC. *See Dorchester*, 722 F.3d at 86.

### E. Personal Jurisdiction Over PJ Defendants Is Reasonable.

Because Scholar Plaintiffs have established a prima facie showing of sufficient minimum contacts, the burden shifts to PJ Defendants to demonstrate that exercising jurisdiction would be unreasonable. *In re Platinum*, 61 F.4th at 273. Courts weigh five factors: (1) the burden on the defendant, (2) the forum's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient, effective relief, (4) the judicial system's interest in efficient resolution, and (5) the states' shared substantive-policy interests. *Id.* Only in "exceptional situation[s]" is personal jurisdiction unreasonable despite the presence of minimum contacts. *See In re Platinum*, 61 F.4th at 274 (citation omitted). This is not such a case.

First, any burden on PJ Defendants is slight. Wolters Kluwer and Taylor & Francis maintain offices in New York City and Long Island and derive substantial U.S. revenue. Dafa Decl. Ex. H at 3 (Wolters Kluwer maintaining offices in New York City), Ex. I at 3-4 (Taylor & Francis and Informa maintaining offices in New York City and Long Island); *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002). Modern

transportation and communication further lessen any hardship. *Id*. And the *Laborers Local 17 Health & Benefit Fund* decision upon which PJ Defendants rely is inapposite because the court there found no minimum contacts. *See Laborers Loc, 17 Health & Benefit Fund v. Philip Morris, Inc.*, 26 F. Supp. 2d 593, 598 (S.D.N.Y. 1998).

Second, this forum has a strong interest in resolving claims that injured U.S. scholars, including Scholar Plaintiff Dr. Elvisha Dhamala, a scholar in New York, and diverted billions in public funds. *See Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 244 (2d Cir. 1999) (finding jurisdiction in New York reasonable where the plaintiff was a New York resident).

Third, contrary to PJ Defendants' contentions, the forum's interest is directly implicated: the Amended Complaint describes misconduct occurring nationwide, including in New York. PJ MTD at 22; AC ¶10. Forcing Scholar Plaintiffs to litigate piecemeal abroad would undermine effective relief and impose reciprocal burdens. *See Chloe*, 616 F.3d at 173 (defendant traveling to New York imposed some burden, but plaintiff's witnesses would face similar inconvenience if the case were in California); *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 536 (S.D.N.Y. 2008) (substantial interest in American citizens receiving relief "as a result of [defendant's] alleged violations of American law").

Fourth, keeping all Publisher Defendants, including PJ Defendants, in one forum promotes efficiency, especially given the remaining foreign Publisher Defendants consent to this Court's jurisdiction. *See In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 731 (S.D.N.Y. 2017) ("A joint trial of all the defendants will ensure convenient and effective relief for all parties, and enhance the efficiency of the proceedings . . . .").

Last, because the claims arise under federal antitrust law, adjudicating them here advances the states' shared interest in enforcing national economic policy. *See Lifeguard*

*Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*, No. 15 Civ. 8459 (LGS), 2016 WL 3748480, at

*4 (S.D.N.Y. July 8, 2016) (fifth factor "weigh[ed] in favor of personal jurisdiction" in New

York where plaintiffs' claims arose from the Lanham Act, a federal trademark statute).

## VI.   JURISDICTIONAL DISCOVERY AND LEAVE TO AMEND

If the Court finds any pleading defect, Scholar Plaintiffs request leave to amend. Rule 15

directs courts to grant leave "freely … when justice so requires." Fed. R. Civ. P. 15(a)(2); *Porat*

*v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 275 (2d Cir. 2006). Further, if the Court finds

Scholar Plaintiffs have not made a prima facie jurisdictional showing, Scholar Plaintiffs request

limited jurisdictional discovery. Courts routinely permit such discovery where plaintiffs have

made "a sufficient start toward establishing personal jurisdiction." *Hollins v. U.S. Tennis Ass'n*,

469 F. Supp. 2d 67, 70 (E.D.N.Y. 2006) (collecting cases) (citation omitted).[8]

## VII.   CONCLUSION

Scholar Plaintiffs respectfully request the Court deny Publisher Defendants' joint motion

to dismiss and PJ Defendants' motion to dismiss for lack of personal jurisdiction. In the

alternative, Scholar Plaintiffs respectfully request the Court grant leave to file an amended

complaint and/or conduct limited jurisdictional discovery on PJ Defendants, as appropriate.

---

[8] *Hollins* specifically rejected the same argument PJ Defendants advance here: that *Jazini*
requires a prima facie showing of personal jurisdiction before discovery. *See Hollins*, 469 F.
Supp. 2d at 70-71. Moreover, *Janzini* is inapposite due to the conclusory allegations and
extensive discovery sought. *See Jazini*, 148 F.3d at 184-85. PJ Defendants' reliance on other
cases is similarly unavailing. *See In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 96 (2d
Cir. 2008) (articulating no categorical bar on jurisdictional discovery if prima facie showing not
made); *Stutts v. De Dietrich Grp.*, 465 F. Supp. 2d 156, 162, 169 (E.D.N.Y. 2006) (denying
discovery into subsidiary relationship where complaint did not mention subsidiary); *Nasso v.
Seagal*, 263 F. Supp. 2d 596, 615 n.31 (E.D.N.Y. 2003) (denying discovery where plaintiff did
not identify "the factual issues on which he seeks discovery"); *In re Ski Train Fire*, 230 F. Supp.
2d 403, 410 (S.D.N.Y. 2002) (denying discovery where plaintiffs offered no facts to support an
entire factor of the personal jurisdiction test).

Dated: July 7, 2025

Respectfully submitted,

By: _____

Dean M. Harvey (*pro hac vice*)
Jallé H. Dafa (*pro hac vice*)
Benjamin A. Trouvais (*pro hac vice*)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Phone: (415) 956-1000
Fax: (415) 956-1008
dharvey@lchb.com
jdafa@lchb.com
btrouvais@lchb.com

Emily N. Harwell (NY Bar # 5985585)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Phone: (212) 355-9500
Fax: (212) 355-9592
eharwell@lchb.com

Benjamin Elga (NY Bar # 5332861)
Janet Herold (*pro hac vice*)
JUSTICE CATALYST LAW
40 Rector St
New York, NY 10006
Phone: (518) 732-6703
belga@justicecatalyst.org
jherold@justicecatalyst.org

Steven F. Molo (NY Bar # 4221743)
Jennifer Schubert (NY Bar # 4921201)
Pratik Kumar Raj Ghosh (NY Bar # 5754940)
MOLOLAMKEN LLP
430 Park Avenue
New York, NY 10022
Phone: (212) 607-8160
Fax: (212) 607-8161
smolo@mololamken.com
jschubert@mololamken.com
prajghosh@mololamken.com

Eric Posner (*pro hac vice*)
MOLOLAMKEN LLP
300 North LaSalle Street
Chicago, IL 60654
Phone: (312) 450-6700
Fax: (312) 450-6701
eposner@mololamken.com

Roberta D. Liebenberg (*pro hac vice*)
Gerard A. Dever (*pro hac vice*)
Jeffrey B. Gittleman (*pro hac vice*)
FINE, KAPLAN AND BLACK, R.P.C.
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
Phone: (215) 567-6565
Fax: (215) 568-5872
rliebenberg@finekaplan.com
gdever@finekaplan.com
jgittleman@finekaplan.com

Eric L. Cramer (*pro hac vice*)
Michael J. Kane (*pro hac vice*)
Joseph E. Samuel, Jr. (*pro hac vice*)
Patrick F. Madden (*pro hac vice*)
BERGER MONTAGUE
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (215) 875-3009
ecramer@bm.net
mkane@bm.net
jsamuel@bm.net
pmadden@bm.net

Scott A. Martin (NY Bar # 2387843)
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Phone: (646) 357-1100
Fax: (212) 202-4322
smartin@hausfeld.com

*Counsel for Plaintiffs and the Proposed Class*