UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. ELVISHA DHAMALA, DR. SHELLEY FACENTE, DR. ROBERT MAHON, and DR. LUCINA UDDIN,<br><br>              Plaintiffs,<br><br>      v.<br><br>ELSEVIER, B.V., INFORMA PLC, INTERNATIONAL ASSOCIATION OF SCIENTIFIC, TECHNICAL, AND MEDICAL PUBLISHERS, JOHN WILEY & SONS, INC., SAGE PUBLICATIONS, INC., SPRINGER NATURE AG & CO. KGaA, TAYLOR & FRANCIS GROUP, LLC, TAYLOR & FRANCIS GROUP, LTD., WOLTERS KLUWER HEALTH, INC., WOLTERS KLUWER N.V., and JOHN DOES 1 THROUGH 50,<br><br>              Defendants. | **MEMORANDUM & ORDER**<br>24-CV-6409 (HG) |

**HECTOR GONZALEZ**, United States District Judge:

This case revolves around allegations of a conspiracy. Plaintiffs, a group of scholars, scientists, and professors, claim that Defendants—the world's largest publishers of peer-reviewed scholarly journals and their trade association—conspired to suppress competition by capitalizing on a maxim that's well-known in academia: "publish or perish."

Specifically, Plaintiffs allege that Defendants conspired to suppress competition by adopting a set of principles that: (1) prohibit authors from submitting their manuscripts to more than one journal at a time; (2) restrict the exchange of scientific research while a manuscript is

under submission; and (3) enact requirements that peer review work be uncompensated.  *See* ECF No. 63 ("Amended Complaint").[1]

There are two motions to dismiss pending before the Court.  All Defendants move to dismiss the case for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).  *See* ECF No. 109 (Defendants' Motion to Dismiss); ECF No. 110 (Defendants' Supporting Memorandum).  A subset of Defendants—Informa PLC, Taylor & Francis Group, Ltd. ("T&F Ltd."), and Wolters Kluwer N.V. ("WKNV") (collectively, the "Foreign Defendants")— move to dismiss for lack of personal jurisdiction, pursuant to Rule 12(b)(2).  *See* ECF No. 110 (Foreign Defendants' Motion to Dismiss); ECF No. 111 (Foreign Defendants' Supporting Memorandum).

For the reasons that follow, the Foreign Defendants' motion to dismiss for lack of personal jurisdiction is GRANTED, and Defendants' motion to dismiss for failure to state a claim is GRANTED.

## BACKGROUND

### I.    Relevant Facts[2]

Plaintiffs allege that Defendants Elsevier B.V., Informa PLC, John Wiley & Sons, Inc., Sage Publications, Inc., Springer Nature AG & Co. KGaA, Taylor & Francis Group, LLC, T&F Ltd., Wolters Kluwer Health, Inc., and WKNV (collectively, the "Publishers"), together with the

---

[1]     Unless otherwise indicated, when quoting cases and the parties' papers, the Court omits all internal quotation marks, alteration marks, emphases, footnotes, and citations.  The Court refers to the pages assigned by the Electronic Case Files system ("ECF").

[2]     The Court "recite[s] the substance of the allegations as if they represented true facts, with the understanding that these are not findings of the [C]ourt, as [I] have no way of knowing at this stage what are the true facts."  *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d Cir. 2021).

International Association of Scientific, Technical, and Medical Publishers ("STM"), colluded to form a cartel that increased their profits and maintained market dominance. ECF No. 63 ¶¶ 36–49. Plaintiffs focus exclusively on Defendants' development, adoption, promulgation, and enforcement of the "International Ethical Principles for Scholarly Publication" (the "Principles") that were issued by STM, the trade association of which Defendants are members, in or around 2013. *See id.* ¶¶ 37, 39. In Plaintiffs' view, Defendants' promulgation and enforcement of these principles is tantamount to adoption of a set of binding anticompetitive rules.

Defendants' scheme, according to Plaintiffs, is a three-part endeavor. First, Defendants "agreed to not compensate scholars for . . . their peer review services" (Plaintiffs' term: the "Unpaid Peer Review Rule"). ECF No. 63 ¶ 37. As for part two, Plaintiffs allege that Defendants "colluded to require scholars to submit their articles to only one journal at a time, suppressing competition between publishers and substantially decreasing incentives to review submissions promptly and publish research quickly" (*i.e.*, the "Single Submission Rule"). *Id.* For the third act, Plaintiffs allege that Defendants "agreed to prevent scholars from freely sharing their scientific findings" (Plaintiffs refer to this as the "Gag Rule"). *Id.*

## II.    Procedural History

Plaintiffs commenced this action on September 12, 2024. *See* ECF No. 1. Approximately two months later, Plaintiffs amended their complaint. *See* ECF No. 63. In February 2025, the Foreign Defendants filed a letter seeking leave to file a motion to dismiss pursuant to Rule 12(b)(2). *See* ECF No. 105. That same day, all Defendants filed a joint letter in anticipation of their motion to dismiss the Amended Complaint for failure to state a claim. *See* ECF No. 106. After Plaintiffs filed letters responding to Defendants' proposed motions to dismiss, *see* ECF Nos. 107, 108, the Court set a briefing schedule, *see* Mar. 5, 2025, Text Order.

Two months later, Defendants filed a joint motion to dismiss Plaintiff's Amended Complaint for failure to state a claim, *see* ECF No. 109, and the Foreign Defendants filed their motion to dismiss for lack of personal jurisdiction, *see* ECF No. 110.  Plaintiffs filed a consolidated opposition to those motions, *see* ECF No. 116 (the "Opposition"), and on August 6, 2025, Defendants filed their respective replies, *see* ECF No. 121 (Foreign Defendants' Reply); ECF No. 122 (all Defendants' Reply).

## LEGAL STANDARD

### I.    Rule 12(b)(2)

Defendants may move to dismiss a plaintiff's claims for "lack of personal jurisdiction." Fed. R. Civ. P. 12(b)(2).  When responding to a Rule 12(b)(2) motion, "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant."  *Bank Brussels Lamberts v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999); *see also Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) ("[P]laintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit.").  To defeat this jurisdiction-testing motion, the plaintiff's burden of proof "varies depending on the procedural posture of the litigation."  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013).  At the pleading stage, a plaintiff need only make a prima facie showing that jurisdiction exists.  *Id.* at 84–85; *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167–68 (2d Cir. 2015) ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists.").

The plaintiff's prima facie showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant."  *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013).  That is, a showing

that demonstrates: "(1) there was proper service, (2) there is a statutory basis for personal jurisdiction, and (3) 'the exercise of personal jurisdiction . . . comports with constitutional due process principles.'" *Zurich Am. Life Ins. Co. v. Nagel*, 571 F. Supp. 3d 168, 175 (S.D.N.Y. 2021) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59–60 (2d Cir. 2012) ("*Licci I*")). "Due process demands that each defendant over whom a court exercises jurisdiction have some 'minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 121 (2d Cir. 2021) ("*Schwab II*") (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Courts may rely on materials outside the pleading in considering a motion to dismiss for lack of personal jurisdiction. *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). And, "[t]he allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012). If the parties present conflicting affidavits, however, "all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993) ("*Seetransport*"). That said, the Court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks*, 714 F.3d at 673. Further, "conclusory allegations are not enough to establish personal jurisdiction." *Marczeski v. Kamba*, No. 99-cv-2479, 2001 WL 237204, at *1 (D. Conn. Feb. 23, 2021), *aff'd,* 355 F.3d 206 (2d Cir. 2004); *accord Megna v. Biocomp Labs. Inc.*, 166 F. Supp. 3d 493, 496–97 (S.D.N.Y. 2016).

## II.      Rule 12(b)(6)

Defendants also may move to dismiss a plaintiff's claims for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss under this Rule, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  When assessing a complaint, courts "must construe it liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor."  *Id.* at 106–07.  Stated otherwise, a complaint is not required to have "detailed factual allegations, but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.  The Court must, however, disregard any "conclusory allegations, such as formulaic recitations of the elements of a cause of action."  *Id.* at 107 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

"An antitrust plaintiff must plead facts with sufficient particularity in the complaint to state a cause of action or face dismissal of the lawsuit."  *Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, 156 F.4th 68, 76 (2d Cir. 2025).  Antitrust plaintiffs must plead more than the "mere possibility of misconduct," *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 154–55 (E.D.N.Y. 2010); they must plausibly allege "that the defendants entered into an agreement in violation of the antitrust laws," *Mosaic Health*, 156 F.4th at 76 (quoting *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)).  Stated otherwise, "the complaint must contain enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  *Id.* (quoting *Twombly*, 550 U.S. at 556).

A plaintiff may satisfy this pleading requirement in one of two ways:

First, a plaintiff may, of course, assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws. . . .  But, in many antitrust cases,

6

> this type of "smoking gun" can be hard to come by, especially at the pleading stage. Thus a complaint may, alternatively, present circumstantial facts supporting the *inference* that a conspiracy existed.

*Mayor & City Council of Baltimore*, 709 F.3d at 136 (emphasis in original). A plaintiff seeking to proceed by way of circumstantial evidence must plausibly allege parallel conduct and "must show the existence of additional circumstances, often referred to as 'plus' factors." *Id.* (quoting *Apex Oil Co. v. DiMauro,* 822 F.2d 246, 253–54 (2d Cir. 1987)). These "plus factors" include: (1) "a common motive to conspire"; (2) "evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators"; and (3) "evidence of a high level of interfirm communications." *Id.*;[3] *see also Mosaic Health*, 156 F.4th at 76–77.

## DISCUSSION

The Court begins with Foreign Defendants' motion to dismiss the Amended Complaint on the grounds that the Court lacks personal jurisdiction. *In re Rationis Enters., Inc. of Panama,* 261 F.3d 264, 267–68 (2d Cir. 2001) (treating personal jurisdiction as a threshold determination that precedes adjudication of the merits).[4]

---

[3]    This list is "neither exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might permit a [factfinder] to infer the existence of an agreement." *Mayor & City Council of Baltimore*, 709 F.3d at 136 n.6.

[4]    The Second Circuit notes that "in cases such as this one with multiple defendants—over some of whom the court indisputably has personal jurisdiction—in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action," courts "*may* address first the facial challenge to the underlying cause of action," but "[o]rdinarily," courts "address any challenge to personal jurisdiction prior to deciding the merits of the cause of action." *Chevron Corp. v. Naranjo*, 667 F.3d 232, 247 n.17 (2d Cir. 2012) (emphasis added). Here, the Court addresses Foreign Defendants' Rule 12(b)(2) motion first. *See Bayshore Cap. Advisors, LLC v. Creative Wealth Media Fin. Corp.*, 667 F. Supp. 3d 83, 117 (S.D.N.Y. 2023) ("[T]he Court must first address the preliminary question[ ] of . . . personal jurisdiction before considering the legal sufficiency of the allegations in the amended complaint.") (quoting *Corrado v. N.Y. Unified Court Sys.*, 163 F. Supp. 3d 1, 10 (E.D.N.Y. 2016) *aff'd*, 698 F. App'x 36 (2d Cir. 2017)); *see also Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963) ("Not only does logic compel initial consideration of the issue of jurisdiction over the

## I.    Foreign Defendants' Rule 12(b)(2) Motion

The "specific-jurisdiction analysis proceeds in two steps." *Oklahoma Firefighters Pension & Ret. Sys. v. Banco Santander (Mexico) S.A. Institucion de Banca Multiple*, 92 F.4th 450, 456 (2d Cir. 2024) ("*Okla. Firefighters*") (citing *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)).  For step one, "the court applies the forum's long-arm statute," and, for step two, "if the long-arm statute permits the exercise of jurisdiction, the court determines whether that exercise would comport with the Due Process Clause." *Id.*  Step two of the specific-jurisdiction analysis—*i.e.*, the constitutional analysis under the Due Process Clause—"has two parts of its own:  minimum contacts and reasonableness." *Id.*  The two parts of this constitutional analysis have their own requirements:

> The "minimum contacts" inquiry requires us to consider "whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction."  The "reasonableness" inquiry requires us to decide "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case."

*Licci I*, 673 F.3d at 60 (quoting *Chloé*, 616 F.3d at 164).

Foreign Defendants move to dismiss the Amended Complaint, arguing that Plaintiffs fail to establish a statutory basis for jurisdiction.  *See* ECF No. 111 at 12–16.  Plaintiffs respond that the Court has specific personal jurisdiction over each of the Foreign Defendants pursuant to three alternative bases for jurisdiction:  New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1);

---

defendant—a court without such jurisdiction lacks power to dismiss a complaint for failure to state a claim—but the functional difference that flows from the ground selected for dismissal likewise compels considering [the personal] jurisdiction . . . question[] first.").

Federal Rule of Civil Procedure 4(k)(2);[5] and Section 12 of the Clayton Act, 15 U.S.C. § 22, *see* ECF No. 116 at 47–48.

Plaintiffs allege Sherman Act claims against all Defendants in this case, including the Foreign Defendants, *see* ECF No. 63, and, because the Sherman Act provides for nationwide service of process, the Court will first analyze whether Foreign Defendants have sufficient minimum contacts in the United States to satisfy the first prong of the due process requirement. *See In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d 290, 319 (S.D.N.Y. 2020), *aff'd in part, vacated in part, rev'd in part,* 61 F.4th 242 (2d Cir. 2023) (citing *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014) ("[W]hen a civil case arises under federal law and a federal statute authorizes nationwide service of process, the relevant contacts for determining personal jurisdiction are contacts with the United States as a whole.")).

### A.    Minimum Contacts

Under the first prong of the due process requirement—also known as the "minimum contacts" requirement—the Court must "consider 'whether the defendant has sufficient contacts with the [United States] to justify the court's exercise of personal jurisdiction.'" *Licci I*, 673 F.3d at 60.  Courts recognize two "independent, if conceptually overlapping, methods of demonstrating minimum contacts." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 243 (2d Cir. 2007).  The first method—*i.e.*, "purposeful availment"—demonstrates minimum contacts where "the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Licci ex rel Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) ("*Licci II*").  The second method—*i.e.*, "purposeful direction"

---

[5]    Plaintiffs explicitly disclaimed that the Foreign Defendants are subject to general personal jurisdiction and assert only that the Court has specific personal jurisdiction over the Foreign Defendants.  *See* ECF No. 116 at 47 n.5.

or, better known as the "effects test"—may demonstrate minimum contacts if "the defendant took intentional, and allegedly tortious, actions expressly aimed at the forum." *In re Terrorist Attacks*, 714 F.3d at 674.  The "effects test" is a "theory of personal jurisdiction typically invoked where . . . the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." *Licci II*, 732 F.3d at 173.  "In such circumstances, the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum." *Id.*

In the Amended Complaint, Plaintiffs allege that each of the Foreign Defendants are subject to personal jurisdiction because they:

> either directly or through the ownership and/or control of its subsidiaries: (a) transacted business throughout the United States, including in this District; (b) transacted for the publication of articles in peer-reviewed journals and labor associated with peer review throughout the United States and in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

*See* ECF No. 63 ¶ 13.  The Foreign Defendants argue that they "have nothing approaching the minimal contacts required for personal jurisdiction to attach" because they "have no contacts with this District, one Foreign Defendant does no business at all (as it is dormant), and the other Foreign Defendants do not transact business in the United States."  ECF No. 111 at 12.  The Court agrees.

### i.    <u>WKNV</u>

Plaintiffs have not made a prima facie showing that WKNV purposefully availed itself of the privilege of doing business in the United States.  The Amended Complaint includes only one paragraph about WKNV, and most of that paragraph appears to conflate WKNV with its U.S.-

based subsidiary, Wolters Kluwer Health, Inc.  *See* ECF No. 63 ¶ 25.  With respect to WKNV specifically, Plaintiffs allege only that it:  (1) "publish[es] scholarly articles in journals [it] own[s]"; (2) is a Dutch company with a principal place of business located in Alphen aan den Rijn, The Netherlands; and (3) has "offices throughout the United States, including an office located [in Manhattan]."  *Id.*[6]

The Foreign Defendants argue that these contacts are insufficient for personal jurisdiction over WKNV.  *See* ECF No. 111 at 8–9.  They directly refute Plaintiffs' allegations with respect to this particular entity by submitting the supporting declaration of Maarten C. Thompson, WKNV's Senior Vice President, and "General Counsel/Company Secretary."  *See* ECF No. 113 ¶ 1 ("Thompson Declaration").  Thompson asserts that WKNV is "primarily a holding company with minimal operations" that has no U.S.-based employees, no U.S.-based operations, and "does not earn any commercial revenue or conduct commercial activity worldwide."  *Id.* ¶¶ 5–9.  Thompson states further that WKNV does not own any scholarly journals or publish articles in such journals, and that it "has *no physical office* or *other regular place of business* in New York or in any other state in the United States."  *Id.* ¶¶ 9, 12 (emphasis added).

The problem with Plaintiffs' theory of personal jurisdiction as it pertains to WKNV is two-fold.  The first issue is that Plaintiffs lumped two distinct entities, WKNV and Wolters Kluwer Health, Inc., into one amorphous entity, which they refer to as "Wolters Kluwer."  *See* ECF No. 63 at 12 ("Defendants Wolters Kluwer Health, Inc. and Wolters Kluwer N.V. shall be

---

[6]  Although the Court must resolve all factual disputes in Plaintiffs' favor at this stage, *Seetransport*, 989 F.2d at 580, that tenet is "inapplicable to threadbare recitals" that are "supported by mere conclusory statements," *Iqbal*, 556 U.S. at 663.

That said, the Court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation."  *In re Terrorist Attacks*, 714 F.3d at 673.  Further, "conclusory allegations are not enough to establish personal jurisdiction."  *Marczeski*, 2001 WL 237204, at *1; *accord Megna* , 166 F. Supp. 3d at 496–97.

referred to collectively as 'Wolters Kluwer.'").  This pleading tactic makes it difficult to delineate which allegation concerns WKNV, the Dutch naamloze vennootschap,[7] and which allegations concern Wolters Kluwer Health, Inc., WKNV's wholly owned-subsidiary.

Consider the following example:  Plaintiffs' Amended Complaint alleges that "Wolters Kluwer Health, Inc. and Wolters Kluwer N.V. [] have offices throughout the United States, including an office located at 28 Liberty Street, New York, NY 10005," ECF No. 63 ¶ 25, but the declaration of WKNV's senior vice president and general counsel states that WKNV "has no physical office or other regular place of business in New York or in any other state in the United States," ECF No. 113 ¶ 9.  At first glance, this appears to create a direct factual dispute, which the Court would be required to resolve in Plaintiffs' favor, even if there was reason to doubt the credibility of their allegation.  *See MacDermid*, 702 F.3d at 727 (requiring courts take the allegations in the Amended Complaint "as true *to the extent they are uncontroverted by the defendant's affidavits*") (emphasis added); *Seetransport*, 989 F.2d at 580 (requiring courts resolve factual disputes in plaintiffs' favor only if the parties' present conflicting affidavits); *see also Dorchester Fin. Sec., Inc.*, 722 F.3d at 85–86.  Under scrutiny, however, there is no conflict because Plaintiffs concede this point by failing to rebut it in their Opposition.

Plaintiffs allege that both Wolters Kluwer Health, Inc. and WKNV have "an office located at 28 Liberty Street [in Manhattan]" and "offices throughout the United States."  ECF No. 63 ¶ 25.  The Foreign Defendants directly refute this in their brief, *see* ECF No. 111 at 19 (noting that "[t]he Amended Complaint makes broad conclusory allegations that [WKNV] has an

---

[7]    A naamloze vennootschap is a Dutch phrase used to denote a public limited liability company in the Netherlands and other Dutch-influenced nations.  The phrase, which translates literally to "anonymous venture," is commonly abbreviated to the acronym "N.V." and listed after the company's name, as is the case with Defendant Wolters Kluwer N.V.

office in New York . . . (which is factually incorrect and rebutted by the Thompson Declaration)"), and in the Thompson Declaration, *see* ECF No. 113 ¶ 9 (declaring WKNV "has no physical office or regular place of business in New York or in any other state in the United States"). Despite Foreign Defendants' direct challenge, Plaintiffs fail to rebut this point in their Opposition. Instead, Plaintiffs reiterate their allegation that WKNV has offices in New York by citing the exact paragraph that the Foreign Defendants refute, *see* ECF No. 116 at 51 (citing ECF No. 63 ¶ 25), and stating, in conclusory fashion, that public statements on a website "directly refute the arguments made by [WKNV]," *see id.*

Plaintiffs' assertions notwithstanding, they fail to "directly refute" the Thompson Declaration because the exhibit they rely on does not distinguish WKNV—the entity at issue—from the collection of entities with the broader "Wolters Kluwer" name. Plaintiffs rely on one exhibit, attached to the supporting declaration of their counsel, Jalle H. Dafa, in their attempt to demonstrate that they "directly refute[d]" WKNV's assertions concerning its offices in New York. That exhibit, a collection of screenshots from the "Contact Wolters Kluwer" page of the company's website, ECF No. 117-8 at 2–4, is, in Plaintiffs' view, "sufficient to establish a prima facie showing of personal jurisdiction . . . notwithstanding any controverting showing [WKNV] . . . may attempt to make at this stage of the proceedings," ECF No. 116 at 56–57. Not so. Plaintiffs' declaration which, under a charitable reading, asserts that a group of entities sharing the "Wolters Kluwer" name have offices in the United States, is much different than WKNV's declaration that unequivocally asserts that a specific entity—WKNV—"has no physical office or other regular place of business in New York or in any other state in the United States." ECF No. 113 ¶ 9. Yes, this is an apples-to-apples comparison, but it is a comparison of a group of

apples to a single apple.  That does not create a direct conflict, and without such conflict, Plaintiffs do not "directly refute" WKNV's assertion.

While the Court must resolve factual disputes in Plaintiffs' favor, it must do so only if the parties present conflicting affidavits.  *See transport*, 989 F.2d at 580.  Here, however, Plaintiffs' declaration does not actually refute WKNV's supporting declaration, and without direct refutation, Plaintiffs effectively concede WKNV's point.  *See Corbia v. Port Chester-Rye Union Free Sch. Dist.*, No. 23-cv-08227, 2024 WL 4987035, at *8 (S.D.N.Y. Dec. 5, 2024); *Ventillo v. Falco*, No. 19-cv-03664, 2020 WL 7496294, at *12 (S.D.N.Y. Dec. 18, 2020) (plaintiff's failure to respond to defendant's argument in motion to dismiss means the point is conceded).  In this posture, there's no factual dispute.  In any event, to read Plaintiffs' allegation that WKNV has an office in the United States simply because some of its subsidiaries or affiliates have offices in the United States would, at least, force the Court to credit a "mere conclusion[], [that is] not entitled to the assumption of truth."  *In re Terrorist Attacks*, 714 F.3d at 673; *Iqbal*, 556 U.S. at 664.

Still, even if the Court were to accept Plaintiffs' conclusory statement as true (which is exactly what they ask for), their imprecision fails to make a prima facie showing.  *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 84 (2d Cir. 2018) ("*Schwab I*") (finding that the requirements for personal jurisdiction were not met when complaint impermissibly "collapse[d] . . . two distinct [d]efendants—a parent and a wholly owned subsidiary—. . . into one"); *see also In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 383–84 (S.D.N.Y. 2016) ("[A]t the pleading stage in [an] antitrust case," a defendant is entitled to know "how [it] is alleged to have conspired, with whom and for what purpose"; "[m]ere generalizations," bare allegations of "corporate affiliation," and "simply stat[ing] in conclusory terms that separate legal entities are sometimes collectively referred to by a shared generic name," are insufficient.).  Plaintiffs cannot

use imprecision as a sword against the Foreign Defendants and a shield from making their prima facie case.

The second issue is that Plaintiffs have not otherwise connected WKNV and its subsidiary so that Wolters Kluwer Health, Inc.'s contacts may be imputed to WKNV. Plaintiffs have alleged only that WKNV "formed a cartel" and devised the Principles as part of a conspiracy, *see* ECF No. 63 ¶¶ 38–49;[8] and that employees of the U.S.-based Wolters Kluwer Health, Inc. "transacted business throughout the United States, including in this District; [and] transacted for the publication of articles in peer-reviewed journals and labor associated with peer review throughout the United States and in this District," allegedly to profit from the conspiracy, *see id.* ¶¶ 13, 50–60. But those allegations are not yet connected, and for the Court to exercise personal jurisdiction over WKNV, Plaintiffs must bridge the gap between the Netherlands and WKNV, and the United States and Wolters Kluwer Health, Inc.

Plaintiffs seek to bridge that gap by arguing, in effect, that there is purposeful availment by proxy, under two different theories. The first, conspiracy jurisdiction, is discussed in detail below. *See* Part I.B, *infra*. The Court addresses Plaintiffs' agency-based theory of purposeful availment, the second theory, in the context of each Foreign Defendant.

With respect to WKNV, Plaintiffs argue that its control over its subsidiary, Wolters Kluwer Health, Inc., is sufficient to impute that entity's contacts to WKNV. *See* ECF No. 116 at 53–56 (alleging that the Court has "agency-based specific jurisdiction" with respect to WKNV). This agency-based theory presumes that WKNV is intertwined with Wolters Kluwer Health, Inc.

---

[8]     Although Plaintiffs still use the imprecise and amorphous term "Wolters Kluwer" in connection with this allegation, Plaintiffs' omnibus Opposition clarifies that this particular allegation concerns WKNV. *See* ECF No. 116 at 49.

such that WKNV can be said to have purposefully availed itself of the privilege of doing business in the forum.

To be sure, "[i]t is well established that a defendant can purposefully avail itself of a forum by directing its agents or distributors to take action there," *Okla. Firefighters*, 92 F.4th at 457, but the purposeful availment requirement is a mechanism that "ensures that a defendant will not be haled into a jurisdiction solely as a result of . . . the unilateral activity of another party or a third person," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985); *see also Schwab II*, 22 F.4th at 122 ("[C]ontacts must be created by the defendant itself, rather than from the unilateral activity of another party or a third person."). Therefore, to establish that a nonresident defendant purposefully availed itself of the forum based on the conduct of its subsidiary, a plaintiff must plausibly allege that the nonresident's subsidiary acted "for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal," in the forum. *Okla. Firefighters*, 92 F.4th at 457 (citing *Schwab I*, 883 F.3d at 85). Once a plaintiff establishes that a subsidiary is a nonresident defendant's "agent[] for jurisdictional purposes, the agent['s] contacts can be 'imputed' to [the defendant]." *Id.* at 458 (citing *Schwab I*, 883 F.3d at 86). However, allegations that are "sparse" or "merely assert[] in conclusory fashion that the [Foreign Defendants] controlled and benefitted" from their respective subsidiaries are insufficient to establish an agency relationship. *Id.* at 457.

Here, Plaintiffs' allegations that Wolters Kluwer Health, Inc. was acting "for the benefit of, with the knowledge and consent of, and under some control by" WKNV are precisely the sort of sparse and conclusory assertions that the Second Circuit cautions against. *See id.* Plaintiffs "anchor their agency allegations in the [Foreign] Defendants' own websites and annual reports,"

16

ECF No. 116 at 55,[9] but for the reasons that follow, the Court finds that reliance on these anchors is misplaced.

To start, Plaintiffs' allegations concerning the content of WKNV's website are insufficient.  Although Plaintiff is correct that WKNV's website acknowledges a presence throughout the United States and New York, *see* ECF No. 116 at 51–54; ECF No. 117-8 at 2–4, as a practical matter, WKNV's website does not provide any indication that Wolters Kluwer Health, Inc. was acting "for the benefit of" WKNV, *contra Okla. Firefighters*, 92 F.4th at 457.[10] Nor does the website provide any support for Plaintiffs' conclusion that WKNV exerts outsized control over its subsidiary by mandating compliance with the Principles.  *Contrast* ECF No. 116 at 51–52 ("The company's own website includes statements that set out and enforce the very unlawful agreement that [] Plaintiffs challenge.") *with* ECF No. 117 at 6 (noting that "redundant or duplicate publication . . . is a violation of the [American Psychological Association ("APA")] code of ethics" and citing the 2010 edition of the "APA Publication Manual" instead of the "International Ethical Principles for Scholarly Publication" that were published on STM's website in 2013).

Further, courts in this Circuit have declined to find that website content alone is sufficient to establish a principal-agent relationship between a foreign parent and a local U.S. subsidiary, and, therefore, have declined to exercise personal jurisdiction over a foreign parent company based on its garden-variety website content.  *See Arthur v. Orchestrate Bus. LLC*, No. 24-cv-

---

[9]    The Cout has neither occasion nor need to analyze the "mere department," "alter-ego," and "veil-piercing" theories of agency-based specific jurisdiction because, although Foreign Defendants raise these theories in their motion to dismiss, *see* ECF No. 111 at 21–22, 25–26, Plaintiffs expressly disclaim them in their Opposition brief, *see* ECF No. 116 at 55–56.

[10]    In this instance, it is clear that Plaintiffs' decision to use of an imprecise, catch-all term like "Wolters Kluwer" to describe two distinct corporate entities works against them.

02985, 2025 WL 2201067, at *5 (S.D.N.Y. Aug. 1, 2025) (website "depicting [d]efendants in connection with New York-related landmarks" not enough to support the exercise of specific jurisdiction); *see also Nypl v. JPMorgan Chase & Co.*, No. 15-cv-9300, 2018 WL 1472506 at *7 (S.D.N.Y. Mar. 22, 2018) (finding plaintiffs failed to make prima facie showing of specific jurisdiction when allegations were based on foreign parent companies' websites that listed only "various legal entities and brick and mortar addresses" in the forum).

Plaintiffs' allegations regarding WKNV's annual reports also fall short. Plaintiffs highlight excerpts from WKNV's 2023 Annual Report, *see* ECF No. 117-12, and argue that these materials—which indicate that WKNV's Health division generated approximately €1.5 billion in revenue—leave "no doubt" that WKNV benefits from Wolters Kluwer Health, Inc.'s conduct in the United States, *see* ECF No. 116 at 53 (citing ECF No. 117-12 at 3, 5), and "are sufficient to establish a prima facie showing of personal jurisdiction," *id.* at 57. The Court disagrees.

Notably, Plaintiffs' allegations concerning WKNV's business materials are insufficient, without more, to establish a prima facie showing of personal jurisdiction. Here too, Plaintiffs offer only "a legal conclusion couched as a factual allegation," which the Court does not credit. *See In re Terrorist Attacks*, 714 F.3d at 673; *Marczeski*, 2001 WL 237204, at 1 ("[C]onclusory allegations are not enough to establish personal jurisdiction.").

And again, even if the Court did credit these allegations, they fail as a matter of law. As one court recently described:

> It is not unusual for a subsidiary to have financial and accounting ties to its parent company, or to be functionally organized as part of a division of a parent company. Such facts suggest some level of coordination and that, at least at a high level of generality, the subsidiary is charged with carrying out some of the business of the combined corporation. However, *a significantly greater showing of control, and*

> *not just coordination, is needed to justify attributing the actions of the subsidiary to the parent for purposes of personal jurisdiction.*

*Raspberry Holdings LLC v. NextBank Int'l Inc.*, No. 24-cv-1529, 2025 WL 438270, at *7 (S.D.N.Y. Feb. 7, 2025) (emphasis added).

Accordingly, Plaintiffs have failed to make a prima facie showing that Wolters Kluwer Health, Inc. was an agent of WKNV, and they have therefore failed to show that WKNV "purposefully availed itself of the privilege of doing business in the [United States] and could foresee being haled into court there." *Licci II*, 732 F.3d at 170.[11]

#### ii.    Informa

Plaintiffs' allegations concerning Informa are insufficient for largely the same reasons. As is the case with WKNV, Plaintiffs fail to demonstrate that Informa "purposefully availed itself of the privilege of doing business in the forum." *Id.*

The Amended Complaint alleges that Informa is a "a British publishing company" with a principal place of business in London.  ECF No. 63 ¶ 24.  And, in an apparent attempt to connect Informa to the United States, Plaintiffs allege that Informa maintains "a big presence in the USA with offices in Florida, New York & Philadelphia," ECF No. 116 at 58 (quoting ECF No. 117-13 at 2), including allegations that Informa has an office in Lake Success, New York, *see id.* (citing ECF No. 117-9 at 4).

---

[11]    Plaintiffs do not attempt to demonstrate WKNV's minimum contacts under the effects test, despite Foreign Defendants' argument that WKNV has not "'purposefully directed' its actions at the forum."  ECF No. 111 at 19.  Accordingly, the Court treats Plaintiffs' silence as abandonment of any such claim.  *See Wilkov v. Ameriprise Fin. Servs., Inc.*, 753 F. App'x 44, 46 n.1 (2d Cir. 2018); *see also Corbia*, 2024 WL 4987035, at *8 (S.D.N.Y. Dec. 5, 2024) ("Plaintiffs do not contest, and thus concede, [d]efendants' argument"); *Ventillo*, 2020 WL 7496294, at *12 (S.D.N.Y. Dec. 18, 2020) (same).

Even if Plaintiffs did respond to Foreign Defendants' arguments under the effects test, the result would be the same because for the reasons similar to those discussed above, WKNV did not "expressly aim[] its conduct at the forum." *Licci II*, 732 F.3d at 173 (citing *Calder v. Jones*, 465 U.S. 783, 789 (1984)).

The Foreign Defendants argue that Plaintiffs have not alleged facts that make it plausible that Informa has sufficient contacts with the United States such that it is subject to this Court's personal jurisdiction.  The Foreign Defendants again assert that Plaintiffs' "allegations as to Informa PLC and T&F Ltd. are nothing more than lumping together these two entities with Taylor & Francis, LLC under a single definition of 'Taylor & Francis.'"  ECF No. 111 at 23. They also refute Plaintiffs' characterization of Informa's global locations, arguing that "as the Amended Complaint itself acknowledges . . . those offices are not leased or owned by Informa PLC, but rather other corporately separate entities."  *Id.* at 25.

The Court has already analyzed why Plaintiffs' imprecise grouping strategy fails to comport with due process principles and it need not repeat that analysis here.  *See Schwab I*, 883 F.3d at 84; *In re Zinc*, 155 F. Supp. 3d at 383–84.  The result is the same here.

Further, the Court agrees with Foreign Defendants that a subsidiary's office locations are not enough, without more, to impute the subsidiary's contacts to the foreign parent.  The Court also agrees that the Amended Complaint acknowledges that Informa's subsidiary—not Informa itself—maintains offices in the United States.  *Compare* ECF No. 63 ¶ 24 (listing Taylor & Francis Group, LLC's office locations in Florida, New York, and Philadelphia), *with* the supporting declaration of Rupert Hopely, Informa's "Company Secretary and General Counsel," ECF No. 114 ¶¶ 11–16 (Informa "does not maintain offices," "has no operations or physical presence," and "does not conduct . . . business meetings," in the United States).[12]

---

[12]    Here, there is no factual dispute that the Court must resolve in Plaintiffs' favor because Plaintiffs allege only that Informa's wholly-owned subsidiary has a presence in the United States and those allegations, even when read in Plaintiffs' favor, do not amount to allegations that Informa has a presence in the United States.

Plaintiffs try to bridge this similar gap in a similar way, arguing, in effect, that Informa has purposefully availed itself by proxy because of the conduct of Taylor and Francis Group, LLC, Informa's U.S.-based subsidiary.  *See* ECF No. 116 at 52–55.

This argument fails for reasons similar to Plaintiff's agency-based argument concerning WKNV, and here too, the Court need not repeat its analysis—the result is the same:  Plaintiffs have not plausibly alleged that Taylor & Francis, LLC conducted itself in the forum "for the benefit of, with the knowledge and consent of, and under some control by, [Informa]."  *Okla. Firefighters*, 92 F.4th at 457.  Accordingly, Plaintiffs fail to provide the Court with sufficient reason to disregard that Taylor & Francis, LLC's contacts are "the unilateral activity of another party or a third person."  *See Schwab II*, 22 F.4th at 122.

Accordingly, Plaintiffs have failed to demonstrate that Informa "purposefully availed itself of the privilege of doing business in the [United States] and could foresee being haled into court there," and, therefore, failed to make a prima facie showing of personal jurisdiction with respect to Informa through minimum contacts or the effects test.  *See Licci II*, 732 F.3d at 173.[13]

   iii.  <u>T&F Ltd.</u>

The same goes for T&F Ltd.  In the Amended Complaint, Plaintiffs allege that T&F Ltd. is a wholly-owned subsidiary of Informa with a principal place of business in the United Kingdom.  ECF No. 63 ¶ 24.  They do not, however, allege that T&F Ltd. purposefully availed

---

[13] Plaintiffs do not attempt to demonstrate Informa's minimum contacts under the effects test either, despite Foreign Defendants' argument.  *See* ECF No. 111 at 25.  Thus, again, the Court treats Plaintiffs' silence as abandonment of any such claim.  *See Wilkov*, 753 F. App'x at 46 n.1; *Corbia*, 2024 WL 4987035, at *8; *see also* note 11, *supra*.

itself of the privilege of doing business in the United States, nor do they allege that T&F Ltd. expressly aimed its conduct at the forum.[14]

Foreign Defendants' arguments with respect to T&F Ltd. are, for the most part, similar to the arguments they raised with respect to WKNV and Informa. For example, the Foreign Defendants argue that the allegations concerning T&F Ltd. are improperly "lump[ed] together" with allegations concerning Informa and Taylor & Francis, LLC, such that there is no way to "delineate what acts were specifically taken by which company." ECF No. 111 at 23. It should come as no surprise then, that the similarities in Foreign Defendants' respective arguments on Plaintiffs' similar allegations lend themselves to similar conclusions, and for the reasons already discussed, Plaintiff's undifferentiated pleading fails to adequately allege that due process principles have been satisfied. *See Schwab I*, 883 F.3d at 84; *In re Zinc*, 155 F. Supp. 3d at 383–84.

The Foreign Defendants also argue that an agency-based theory of purposeful availment is insufficient with respect to T&F Ltd. because:

> [there is] no authority for the proposition that an entity with no subsidiaries in the United States can nonetheless be subject to personal jurisdiction in the United States based on the presence of an affiliate in the same corporate family—i.e., not a subsidiary, or a parent, but rather simply another company owned (at some level) by the same corporate parent.

ECF No. 111 at 24. The Court agrees. If the relationship between Informa and Taylor & Francis, LLC was not enough to establish sufficient contacts with the United States, the relationship between T&F Ltd. and Taylor & Francis, LLC—two tangentially-related subsidiaries—fares no better. Thus, because Plaintiffs fail to plausibly allege that Taylor &

---

[14]    The Court understands that Plaintiffs have effectively conceded any claim that T&F Ltd. has minimum contacts *vis-à-vis* the effects test for the reasons already discussed. *See* notes 11 and 13, *supra*.

Francis, LLC acted in the forum "for the benefit of, with the knowledge and consent of, and under some control by, [T&F Ltd.]," Plaintiffs fail to plausibly allege that the exercise of personal jurisdiction over T&F Ltd. comports with due process. *See Okla. Firefighters*, 92 F.4th at 457 (citing *Schwab I*, 883 F.3d at 85).

These pleading deficiencies, in conjunction with Plaintiffs' inability to demonstrate that neither WKNV nor Informa "purposefully availed itself of the privilege of doing business in the [United States] and could foresee being haled into court [here]," *Licci II*, 732 F.3d at 170, strongly suggest that Plaintiffs have failed to establish that any of the Foreign Defendants, standing alone, have sufficient contacts with the United States, or that the conduct of the Foreign Defendants' respective U.S.-facing subsidiaries (or, in the case of T&F Ltd., the conduct of a U.S.-facing affiliate owned by the same corporate parent) is sufficient for the U.S.-based entities' conduct to be imputed to the Foreign Defendants. These failures, in turn, strongly suggest that Foreign Defendants lack the minimum contacts necessary to ensure that any exercise of personal jurisdiction over them comports with due process.

### B.     Conspiracy Jurisdiction

Plaintiffs' failure to establish a prima facie case thus far means they can only defeat Foreign Defendants' motion to dismiss if they can establish a conspiracy-based theory of personal jurisdiction. Conspiracy-based jurisdiction is another method of purposeful availment by proxy. This method establishes that a nonresident defendant may nonetheless be subject to personal jurisdiction if a plaintiff shows that it "purposefully 'avail[ed] itself of a forum through certain actions taken by a co-conspirator in the forum.'" *Sullivan v. UBS AG*, 149 F.4th 206, 218 (2d Cir. 2025) (quoting *Schwab II*, 22 F.4th at 125). For Plaintiffs to succeed here, they must demonstrate that:

> (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a [forum], such that the other conspirators should have reasonably anticipated being haled into court in the forum as a result of their co-conspirator's contacts.

*Sullivan*, 149 F.4th at 218 (2d. Cir. 2025) (citing *Schwab I*, 883 F.3d at 87; *Schwab II*, 22 F.4th at 125).

Plaintiffs attempt to satisfy this burden by alleging that WKNV and T&F Ltd. participated in the alleged conspiracy by committing overt acts, in furtherance of that conspiracy, in New York and the United States.[15]  ECF No. 116 at 48–51.  To support their allegations, Plaintiffs point to a list of STM's members from *2000* that includes WKNV, *id.* at 49 (citing ECF No. 117-1), and a *1994* article that lists an executive of "Wolters Kluwer Academic" as chairman of STM's "Library Relations Committee," *id.* at 49–50 (citing ECF No. 117-2).  With respect to T&F Ltd., Plaintiffs point to a list of STM members from *2002* that includes "Taylor & Francis Group plc" (a former name of T&F Ltd.).  *Id.* at 50 (citing ECF Nos. 117-3–5, -7).

Foreign Defendants challenge these assertions generally, but they take particular issue with the participation element of the conspiracy jurisdiction inquiry.  They argue, specifically, that Plaintiffs fail to establish that WKNV and T&F Ltd. "participated in any alleged conspiracy such that a conspiracy-based theory of jurisdiction would be proper."  *See* ECF No. 121 at 6–7. Again, the Court agrees with Foreign Defendants.

The contested issue is whether WKNV and T&F Ltd. participated in the conspiracy.  On that score, the Court agrees with the Foreign Defendants because Plaintiffs' allegation that WKNV and T&F Ltd. participated in the conspiracy is patently implausible.

---

[15]    Notably, Plaintiffs do not allege that Informa engaged in an overt act in furtherance of the conspiracy that subjects it to jurisdiction.  *See* ECF No. 116 at 48 (arguing conspiracy jurisdiction is proper over WKNV and T&F Ltd., only).

Recall that the alleged conspiracy in this case is an agreement among Defendants to manipulate the academic publishing industry in their favor through the development and enforcement of the Principles.  *See* ECF No. 63 ¶ 39 ("[Defendants'] agreement was [memorialized] in STM's so-called 'International Ethical Principles for Scholarly Publication' . . . and published to STM's website in 2013.").  Plaintiffs' allegations that WKNV and T&F Ltd. participated in the conspiracy are supported by materials that purportedly demonstrate WKNV's membership in STM in or around 1994, on the one hand, and 2000, on the other, and T&F Ltd.'s membership in STM in or around 2002.  While the documents Plaintiffs submit to support these allegations strike the Court as speculative,[16] for the purposes of this motion, it nevertheless credits these documents and assumes without deciding that:  the executive was an employee of WKNV in or around 1994; WKNV was a member of STM in or around 2000; and T&F Ltd. was a member of STM in or around 2002.  *See Dorchester Fin. Sec., Inc.*, 722 F.3d at 85–86.  Still, those allegations fail to plausibly allege that WKNV and T&F Ltd. participated in the conspiracy in 2013—more than a decade after the last date Plaintiffs allege WKNV or T&F Ltd. were members.  As a preliminary matter, Foreign Defendants correctly point out that "Plaintiffs identify no evidence that [WKNV] or T&F Ltd. were members of STM at any point in or after 2013."  ECF No. 121 at 7.  But, even if the Court reads the record concerning membership in STM in Plaintiffs' favor, it cannot ignore the fact that Plaintiffs omit any plausible allegation of WKNV or T&F Ltd.'s *participation* in the alleged scheme to develop and promulgate the Principles in 2013.  Plaintiffs' allegation that WKNV and T&F Ltd. "participated in the

---

[16]     Specifically, Plaintiffs allege that:  (1) Wolters Kluwer Academic is synonymous with WKNV because the link for "Wolters Kluwer Academic" on the executive's LinkedIn profile, when clicked, navigates to the WKNV LinkedIn page; and (2) T&F Ltd. was a member of STM in or around 2002, because a webpage, as to which any indication that it is from, or even related to, STM is conspicuously absent, ECF No. 116 at 49–50 (citing ECF Nos. 117-3–5, -7).

conspiracy by joining STM," ECF No. 116 at 49, is not enough. *See Twombly,* 550 U.S. at 567 n.12 (rejecting inference of conspiracy based on defendants' participation in an industry trade association); *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 40 (2d Cir. 2018) ("[E]ven though a trade association by its nature involves collective action by competitors, a trade association is not by its nature a walking conspiracy."); *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 148 (E.D.N.Y. 2010) ("The court notes as an initial matter that membership and participation in a trade association alone does not give rise to a plausible inference of illegal agreement.").

Accordingly, because Plaintiffs fail to plausibly allege that WKNV and T&F Ltd. participated in the alleged conspiracy, they fail to plausibly allege that WKNV and T&F Ltd. "purposefully 'avail[ed] [themselves] of a forum through certain actions taken by a co-conspirator in the forum.'" *Sullivan*, 149 F.4th at 218.

In sum, taking all of Plaintiffs' allegations together, they have failed to plausibly allege that any of the Foreign Defendants has purposefully availed itself of the privilege of doing business in the United States through its own conduct, the conduct of its subsidiaries or affiliates, or the conduct of any alleged co-conspirator. Therefore, Plaintiffs have failed to demonstrate that the exercise of personal jurisdiction over the Foreign Defendants would comport with due process. In light of those failures, the Foreign Defendants' motion to dismiss for lack of personal jurisdiction is granted.

### C. Jurisdictional Discovery

The Court now turns to Plaintiffs' request that the Court "grant leave to . . . conduct limited jurisdictional discovery on [Foreign] Defendants." ECF No. 116 at 60.

"Whether to allow jurisdictional discovery is within the court's discretion." *Zurich Am. Life Ins. Co.*, 571 F. Supp. 3d at 181 (citing *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185–86 (2d Cir. 1998)).  When exercising that discretion, "[d]istrict courts in this Circuit routinely reject requests for jurisdictional discovery where a plaintiff's allegations are insufficient to make out a prima facie case of jurisdiction." *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2015 WL 1515358, at *7 (S.D.N.Y. Mar. 31, 2015) (citing *Stutts v. De Dietrich Grp.*, 465 F.Supp.2d 156, 169 (E.D.N.Y. 2006) (collecting cases)).  This is especially true when even "limited jurisdictional discovery" is necessarily "an attempt to gain broad discovery that goes as much to the heart of plaintiffs' claims on the merits as it does the jurisdictional issues." *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 599 (S.D.N.Y. 2017) ("*Sonterra*") (denying jurisdictional discovery when plaintiffs alleged collusion between foreign defendants and U.S.-based entities); *see also Zurich Am. Life Ins. Co.*, 571 F. Supp. 3d at 182 (denying jurisdictional discovery when discovery requests "appear to be an attempt to conduct discovery that goes as much to the merits as it does to jurisdiction").

Here, the Court denies Plaintiffs' request for jurisdictional discovery because they have failed to establish their prima facie case against any of the Foreign Defendants. *Best Van Lines*, 490 F.3d at 255 ("We conclude that the district court acted well within its discretion in declining to permit discovery because the plaintiff had not made out a prima facie case for jurisdiction."); *see also Jazini*, 148 F.3d at 185–86 (district court did not err when denying jurisdictional discovery when plaintiffs did not establish prima facie case and discovery would require "substantial jurisdictional discovery over foreign corporations—a practice in which [courts] have not hitherto engaged").  Even though that failure alone is a sufficient basis for the Court to deny jurisdictional discovery, the Court further concludes that jurisdictional discovery is unwarranted

because the jurisdictional aspects of Plaintiffs' claims are intertwined with the substantive aspects of collusion such that discovery would "go[] as much to the heart of [P]laintiffs' claims on the merits as it does the jurisdictional issues."  *Sonterra*, 277 F. Supp. 3d at 599.  The Court understands that, without discovery, it is likely that Plaintiffs will not make a prima facie showing of jurisdiction over the Foreign Defendants, but that is not grounds for granting jurisdictional discovery on this matter, rather it is:

> the consequence of the problems inherent in attempting to sue a foreign corporation that has carefully structured its business so as to separate itself from the operation of its wholly-owned subsidiaries in the United States—as it properly may do.  The rules governing establishment of jurisdiction over such a foreign corporation are clear and settled, and it would be inappropriate for [the Court] to deviate from them or to create an exception to them because of the problems plaintiffs may have in meeting their somewhat strict standards.

*Jazini*, 148 F.3d at 186.

In any event, because, as discussed further below, the Court also grants the motion to dismiss for failure to state a claim, *see* Part II, *infra*, the Court denies the request for jurisdictional discovery as unnecessary and moot.  *See Zurich Am. Life Ins. Co.*, 571 F. Supp. 3d at 182 (denying leave to conduct jurisdictional discovery after applying a similar approach and similar rationale).

## II.    Defendants' Rule 12(b)(6) Motion

The Court now turns to Defendants' motion to dismiss the Amended Complaint pursuant to Rule 12(b)(6).  As the Court previously mentioned, Plaintiffs allege a pervasive conspiracy; specifically one that violates Section 1 of the Sherman Act, which states, in relevant part, that "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce . . . is declared to be illegal."  15 U.S.C. § 1.  "Notwithstanding its broad language, this provision prohibits 'only unreasonable restraints of trade.'"  *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012) (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 723

(1988)).  To run afoul of Section 1, the unreasonable restraint must, of course, result from an agreement between at least two entities.  *See Twombly*, 550 U.S. at 553–54; *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) ("In order to establish a conspiracy in violation of § 1, whether horizontal, vertical, or both, proof of joint or concerted action is required; proof of unilateral action does not suffice.").  Courts reviewing claims under Section 1 of the Sherman Act first assess "whether the challenged conduct stems from independent decision or from an agreement, tacit or express."  *United States v. Apple, Inc.*, 791 F.3d 290, 314–15 (2d Cir. 2015).  "If the challenged conduct reflects concerted action, [the reviewing court will] then [] consider whether that action unreasonably restrains trade."  *Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*, 61 F.4th 299, 306 (2d Cir. 2023) (citing *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010)).

Recall that, at the motion to dismiss stage, a plaintiff may assert either direct evidence of an antitrust conspiracy or demonstrate a plausible inference of antitrust conspiracy by pleading "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  *Mayor & City Council of Baltimore*, 709 F.3d at 136.  Crucially, at this stage, "conflation of probability and plausibility" is disallowed.  *Mosaic Health*, 156 F.4th at 77.

The parties' arguments concern only whether there is direct evidence of an antitrust conspiracy.  Specifically, the parties' arguments concern whether the 21 principles laid out in the Principles—published in or around 2013 as the "International Ethical Principles for Scholarly Publication"—constitute direct evidence of an antitrust conspiracy.  *See generally* ECF No. 112 at 12–22 (Defendants' arguments against direct evidence); ECF No. 116 at 21–34 (Plaintiffs' response).

On a macro level, Defendants argue that Plaintiffs' Sherman Act claim should be
dismissed because Plaintiffs:  (1) fail to plead facts sufficient to show any alleged unlawful
agreement; and (2) fail to allege an unreasonable restraint of trade.  *See generally* ECF No. 112.
Plaintiffs, for their part, respond that the Principles, in and of themselves, are direct evidence of
an unlawful agreement and that they have plausibly alleged that said agreement unreasonably
restrains trade because the agreement is "either unlawful *per se* or, at minimum, subject to
abbreviated 'quick look' review."  *See* ECF No. 116 at 21–39.  Plaintiffs also argue, in the
alternative, that the Publishers' conduct violates the "rule of reason."  *Id.* at 40–46.  Notably,
Plaintiffs explicitly disavow reliance on circumstantial evidence of an alleged agreement.[17]

The Court begins its discussion of the Sherman Act claim with an analysis of whether
Plaintiffs plausibly allege direct evidence of concerted action, and for the reasons that follow, it
concludes that Plaintiffs do not plausibly allege an unlawful agreement necessary for their claim
to survive.

### A.    Direct Evidence of a Conspiracy

Adoption of "a binding association rule" constitutes direct evidence of an antitrust
conspiracy if the rule or rules are "designed to prevent competition."  *See Relevent Sports*, 61
F.4th at 307 (collecting cases).  But, "[o]f course, not every decision by an association violates

---

[17]    In their response to Defendants' pre-motion letter, Plaintiffs state that they "do not rely
upon an inference of collusion from parallel conduct."  ECF No. 107 at 3.  Defendants highlight
this point in their brief, *see* ECF No. 112 at 19–22, yet Plaintiffs do not address it directly and do
not otherwise argue that the Court should consider circumstantial evidence of an alleged
agreement, *see* ECF No. 116 at 22 ("Scholar Plaintiffs plausibly allege direct evidence of an
unlawful agreement.").  Accordingly, Plaintiffs have abandoned any argument that relies on
circumstantial evidence of an agreement.  *Wilkov*, 753 F. App'x at 46 n.1 (affirming dismissal of
claims as "abandoned" by plaintiff when plaintiff failed to oppose them in opposition to the
motion to dismiss); *Mirvis v. Quay*, No. 19-cv-2573, 2023 WL 5671935, at *10 (E.D.N.Y. Sept.
1, 2023) (deeming claim abandoned where plaintiff's opposition did "not substantively respond
to Defendants' legal argument" in the motion to dismiss).

federal antitrust laws." *Id*.  An association rule that imposes "duties and restrictions in the conduct of [a trade association's members'] separate businesses" demonstrates an agreement for purposes of Section 1 of the Sherman Act if a plaintiff proves that a member of the association "surrender[s] himself completely to the control of the association" in a "contractual restraint of interstate trade, designed in the interest of preventing competition." *Id*. (quoting *Associated Press v. United States*, 326 U.S. 1, 8 (1945)).  Stated otherwise, "it is when 'a § 1 plaintiff establishes the existence of *an illegal* contract or combination' that the plaintiff can 'proceed to demonstrate that the agreement constituted an unreasonable restraint of trade.'" *N. Am. Soccer League*, 883 F.3d at 40 (quoting *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993)).

Plaintiffs attempt to survive the instant motion to dismiss by alleging that the Principles are direct evidence of an antitrust conspiracy because the Principles are "a document or conversation explicitly manifesting the existence of [an] agreement" between Defendants to participate in an antitrust conspiracy.  *See* ECF No. 116 at 22 (quoting *O.E.M. Glass Network, Inc. v. Migrant Glass Co.*, 436 F. Supp. 3d 576, 587 (E.D.N.Y. 2020)).  The Principles are, in Plaintiffs' view, direct evidence of an antitrust conspiracy based on Plaintiffs' self-serving interpretation of only four of the 21 principles in the document.  Plaintiffs allege that these four Principles should be interpreted as a set of three "rules" that govern Defendants' conduct in scholarly publication.  Specifically, Plaintiffs allege that those four Principles should be interpreted as:  the "Unpaid Peer Review Rule," an amalgamation of Principles 1 and 3.3.1; the "Single Submission Rule," or Plaintiffs' interpretation of Principle 3.1.4; and the "Gag Rule," *i.e.*, Plaintiffs' repackaging of Principle 2.2.

Notwithstanding Plaintiffs' self-styled "rule" monikers, Plaintiffs fail to plausibly allege

that the Principles are direct evidence of a conspiracy. As a preliminary matter, to read the

Principles as anything other than a collection of policies and guidelines concerning best practices

for publishers, editors, and authors involved in the scholarly publication process requires a

significant inferential leap. To arrive at Plaintiffs' interpretation that four out of the 21

Principles are actually a set of three "rules" that bind the Defendants to anticompetitive practices

not only requires a tortured reading of the provisions that make up Plaintiffs' purported "rules,"

but otherwise ignores the plain language of the Principles as a whole.[18]

Indeed, as Defendants correctly point out: "Plaintiffs concede that an association's

adoption of policies does not constitute direct evidence of a Section 1 agreement of its members

unless the policies plainly and explicitly dictate how members will conduct their separate

businesses with respect to the allegedly anticompetitive conduct." ECF No. 122 at 4 (quoting

ECF No. 116 at 25, 31). The Court also agrees with Defendants that nothing within the four

corners of the Principles "mandate[s] any of the restrictions that Plaintiffs allege are

anticompetitive—they include no restrictions on payments to peer reviewers, they do not

mandate that Publishers reject concurrently submitted manuscripts, and they do not purport to

supplant each individual Publisher's confidentiality policies." ECF No. 112 at 14.

The Court addresses each alleged agreement below, starting with the "Unpaid Peer

Review Rule," or Principles 1 and 3.3.1, then the "Single Submission Rule," or Principle 3.1.4,

---

[18]    The Court may consider the text of the Principles without deferring to Plaintiffs'
characterization of them. *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150,
156 (2d Cir. 2006) (acknowledging that district court may consider extrinsic materials integral to
the complaint or appropriate for judicial notice); *TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d
588, 592 (S.D.N.Y. 2013) ("If a document relied on in the complaint contradicts allegations in
the complaint, the document, not the allegations, control, and the court need not accept the
allegations in the complaint as true.").

and finally the "Gag Rule," or Principle 2.2.  *See* ECF No. 63 ¶¶ 37, 52, 100.  Because the Court concludes that none of Plaintiffs' purported rules establish direct evidence of a conspiracy, the Court has no occasion to reach the question of whether any restraint on trade is reasonable or unreasonable.  See *Relevent Sports*, 61 F.4th at 306 ("If the challenged conduct reflects concerted action, then we consider whether that action unreasonably restrains trade.").

### i.     The "Unpaid Peer Review Rule"

Plaintiffs allege that the "Unpaid Peer Review Rule" is direct evidence that Defendants "agreed to fix the price of peer review services at $0."  ECF No. 63 ¶ 39.  The Court disagrees. At the outset, let's remember that Plaintiff's so-called "Unpaid Peer Review Rule" is a misnomer; it is not a rule at all.  Rather, the alleged rule is an amalgamation of two distinct guidelines:  Principle 1, which states, in relevant part, that:

> It is important to set standards of behaviour for authors, journal editors, peer reviewers, publishers or societies for society-owned or sponsored journals.  All involved must act with honesty and fairness, and the processes must be transparent and trustworthy.  These guidelines concentrate on the maintenance of ethical standards in publication, recognising that it is an important role of the publisher to support the huge efforts made by journal editors, and the often unsung volunteer work undertaken by peer reviewers, in maintaining the integrity of the scholarly record.  The publisher has a supporting, investing and nurturing role in the scholarly communication process but is also ultimately responsible for ensuring that best practice is followed in its publications.

ECF No. 115-1 at 2.  And Principle 3.3.1, which states that:

> Peer review assists editors in making editorial decisions and may also assist authors in improving their papers.  Peer review is an essential component of formal scholarly communication, and lies at the heart of the scientific method.  It is generally agreed that scholars who wish to have their own work published in journals have an obligation to do a fair share of reviewing for these journals.

*Id.* at 5.

Plaintiffs cobble together portions of these two Principles, arguing that they are direct evidence of Defendants' alleged illicit agreement to restrain trade.  *See* ECF No. 63 ¶¶ 52–53

(alleging that Principle 1 and Principle 3.3.1 should be read in conjunction such that they create a mandate to "coerce[] peer reviewers into working for free").  But just because Plaintiffs take two provisions of the Principles and say, in conclusory fashion, that they reflect an agreement to prevent peer reviewers from receiving payment does not make it so.

Indeed, even if the Court reads these portions of the Principles in the way Plaintiffs do and accepts that these portions of the Principles create a rule, Plaintiffs nevertheless fail to plausibly allege the "Unpaid Peer Review Rule" is direct evidence of an agreement.  There is nothing in the text of this "rule," or more importantly, in the Principles themselves, that is binding on STM members.  *Contra Relevent Sports*, 61 F.4th at 308 (finding direct evidence of concerted action when association policy prohibited members from certain conduct, "govern[ed] the conduct of members' separate businesses," and required "members' surrender to the control of the association").  The plain language of the "Unpaid Peer Review Rule" makes clear that it, and all of the Principles, are "guidelines" concerning "best practice[s]."  ECF No. 115-1 at 2. The bromidic generalities reflected in the Principles underlying the "Unpaid Peer Review Rule" are a far cry from the sort of direct evidence that would support Plaintiffs' assertion that "Defendants essentially agreed to hold the careers of scholars hostage so that the [Defendants] could force them to provide their valuable labor for free."  ECF No. 63 ¶ 2.

ii.    The "Single Submission Rule"

Next, the Court turns to Principle 3.1.4, or as Plaintiffs refer to it, the "Single Submission Rule" that "prohibit[s] scholars from submitting their article to more than one journal at a time." *Id.* ¶ 91.  Plaintiffs allege that Principle 3.1.4 "substantially decreases" competition among the Publishers because of "several perverse consequences." *Id.* ¶¶ 93–95.  Namely, they allege that this Principle "prohibits authors from fielding favorable publication terms from competing

publishers by requiring authors to interface with only one Publisher Defendant at a time," which

causes an author to "lose[] all bargaining leverage," and forces authors to choose between "a

more selective journal," where they risk waiting for rejection, or "a less selective journal,"

where, if published, they "will be read by fewer scholars, will have less of an impact, and

[publication] will be less helpful to the scholar's career." *Id.* ¶¶ 93–94. Plaintiffs argue that,

without the "Single Submission Rule," there would be more competition among journals, which

would result in better allocation, faster publication, and competition to provide authors with "the

best terms of publication." *Id.* ¶ 95.

> On its face, Principle 3.1.4 states none of that. Rather, it states, in relevant part, that:

> An author should not *in general* publish manuscripts describing essentially the same findings in more than one journal of primary publication. Submitting the same manuscript to more than one journal concurrently also constitutes unethical behaviour and is unacceptable. *In general, an author should not submit for consideration in another journal a previously published paper*. Publication of some kinds of articles . . . in more than one journal is *sometimes justifiable,* provided certain conditions are met. The authors and editors of the journals concerned must agree to the secondary publication, which must reflect the same data and interpretation as the primary document.

ECF No. 115-1 at 4 (emphases added).

> The Court finds that the so-called "Single Submission Rule" is not direct evidence of an

agreement because a straightforward reading of this Principle shows neither a prohibition of, nor

a ban on, the conduct of STM's members, as Plaintiffs allege. *See* ECF No. 63 ¶ 91. In other

words, Principle 3.1.4 does not "depict a rule governing how an association's separate members'

separate businesses compete." *Contra Relevent Sports*, 61 F.4th at 310.

> In fact, just like the "Unpaid Peer Review Rule," the so-called "Single Submission Rule"

is not a rule at all. The multiple instances of the phrase "in general" demonstrates that Principle

3.1.4 is merely guidance on generally accepted, industry-wide practices, not a mandate.

Moreover, the plain language of Principle 3.1.4 makes clear that concurrent submissions "are

sometimes justifiable," and even goes so far as describing how authors should proceed if they wish to submit their article to multiple journals.  ECF No. 115-1 at 4.

If that was not enough on its own, consider the most severe language in the Principle, which Plaintiffs cite as *the* agreement among Defendants:  "[s]ubmitting the same manuscript to more than one journal concurrently [] constitutes unethical behaviour and is unacceptable."  ECF No. 63 ¶ 91.  Plaintiffs' own description of Principle 3.1.4 only makes sense when it is read in conjunction with the "perverse consequences" that Plaintiffs allege in the paragraphs that follow.  *See id.* ¶¶ 92–95.  But reading the text of this Principle, or any of the Principles, in conjunction with the alleged consequences is incompatible with the definition of direct evidence because to do so requires the reader to first accept a series of inferential building blocks before arriving at the conclusion Plaintiffs allege.  *See Relevent Sports*, 61 F.4th at 308 (holding a plaintiff "must allege enough additional facts to show that agreement to such a plan exists," if plaintiff "alleges that a policy or rule *is in service of a plan* to restrain competition") (emphasis added); *contra Nat'l Soc'y of Pro. Engr's v. United States*, 435 U.S. 679, 683 n.3 (1978) (Trade association's canon that expressly prohibited members from "compet[ing] unfairly with another [] by attempting to obtain employment or advancement or professional engagements by competitive bidding," and  "solicit[ing] or submit[ting] engineering proposals on the basis of competitive bidding" was direct evidence of illicit agreement).

Here, the plain language of Principle 3.1.4 demonstrates that it is designed to guide, not govern.  Even under an extreme reading, the so-called "Single Submission Rule" is, at most, a straightforward reminder of a type of you-should-know-better maxim—that is much different than an explicit policy, or rule, that expressly prohibits members from a particular course of conduct, and far from direct evidence of "a conscious commitment to a common scheme

36

designed to achieve an unlawful objective." *Apple, Inc.*, 791 F.3d at 315.  Accordingly,

Plaintiffs' characterization of Principle 3.1.4 is implausible, as is their allegation that it is direct

evidence of concerted action.

### iii.    The "Gag Rule"

Plaintiffs' allegation concerning Principle 2.2, or, in Plaintiffs' view, the "Gag Rule," are

also insufficient to be direct evidence of an illicit agreement.  Principle 2.2 states:

> No information shall be disclosed about any submitted manuscript to anyone other
> than the corresponding author, potential reviewers, actual reviewers, other editorial
> advisers, and the publisher, as appropriate.  Manuscripts received for review must
> be treated as confidential documents.  They must not be shown to or discussed with
> others except as authorized by the editor.

ECF No. 115-1 at 3.  Plaintiffs allege that Principle 2.2 prohibits scholars "from freely sharing

the scientific advancements described in submitted manuscripts while those manuscripts are

under peer review," and that this prohibition "govern[s] scientists and scholars regardless of

whether an article's findings are critical to other researchers, policymakers, or society more

broadly, and regardless of the author's wishes."  ECF No. 63 ¶¶ 4, 100–01.

As an initial matter, the plain language of Principle 2.2 does not address what authors can

do with the research integral to their own work.  The Principle does not even mention authors'

"scientific findings" as Plaintiffs allege.  *Compare* ECF No. 63 ¶ 100 (alleging that Defendants

"agreed to prevent scholars from freely sharing their scientific findings" and "prohibit authors

from sharing their manuscripts with their colleagues, or even discussing the substance of their

research with them"), *with* ECF No. 115-1 at 3 ("Manuscripts received for review must be

treated as confidential documents.  They must not be shown to or discussed with others except as

authorized by the editor.").

Moreover, a straightforward reading of Principle 2.2 reveals that its aim is not to "gag"

authors from sharing important research, but to *protect* authors by establishing a norm that

ensures an author's work is held in confidence prior to publication. Indeed, this Principle even acknowledges that, in certain circumstances, an author's manuscript may be "shown to or discussed with others." ECF No. 115-1 at 3.

Maybe Plaintiffs' interpretation makes sense if you read Principle 2.2 in conjunction with Principle 3.1.4 (or, as Plaintiffs call it: the "Single Submission Rule"). And, like the previously discussed "rules," maybe Plaintiffs' interpretation of Principle 2.2 makes sense after a series of inferential leaps. For example, Plaintiffs allege that Principle 2.2 is actually a "Gag Rule" because, after publication, the Publishers require authors "to relinquish their copyrights." *Id.* ¶ 102. And, to support their allegation that the "Gag Rule" is an unreasonable restraint of trade, Plaintiffs assert that during the COVID-19 pandemic, the Publishers "relaxed the Gag Rule" which "allow[ed] scientists to freely share their discoveries and knowledge with each other," and led to "quick development" of the COVID-19 vaccine. *Id.* ¶ 103. In Plaintiffs' view, the temporary pause "demonstrates that the Rule impedes the pursuit of critical cures for other serious medical ailments." *Id.* But, therein lies the problem. Neither reading Principle 2.2 in conjunction with another Principle nor reading Principle 2.2 in conjunction with a series of allegations that are extraneous to its plain language is consistent with a plausible allegation that the Principle is direct evidence of an illicit agreement to restrain trade. *See City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 405 (2d Cir. 2024) ("[D]irect evidence of a conspiracy—[] must be 'explicit' and require no inferences.").

Much like Plaintiffs' other "rules," the only way the Court can accept Plaintiffs' characterization of Principle 2.2 requires again that it take a series of inferential leaps. Here, the Court must first leap from the plain language of Principle 2.2, to the language and related inferences of Principle 3.1.4, to the Publishers' alleged copyright rules (even though

Principle 2.2 is silent on the issue of copyright), and then to the alleged conduct of the Publishers during the COVID-19 pandemic. The fact that the Court must climb these rungs on a ladder of inference demonstrates that Principle 2.2—regardless of how it is characterized—cannot be direct evidence of an agreement in service of an antitrust conspiracy. *City of Pontiac Police & Fire Ret. Sys.*, 92 F.4th at 405. Accordingly, Plaintiffs do not plausibly allege that Principle 2.2 is direct evidence of concerted action.

To be sure, out of the three "rules" in the Amended Complaint, Principle 2.2 is the only one that includes language that suggests control as opposed to guidance. However, sporadic use of the words "shall," "must," and "authorized" in a document that is premised on providing guidance and best practices is not enough, without more, to establish direct evidence of an agreement. *See id.* at 403 (affirming district court's finding that plaintiffs failed to plausibly allege direct evidence when "[p]laintiffs' theory of conspiracy calls upon us to connect dots far flung among isolated episodes involving different subsets of defendants"); *Celestin v. Martelly*, 698 F. Supp. 3d 443, 465 (E.D.N.Y. 2023) (finding isolated instances of evidence are insufficient to be direct evidence when the instances "require the Court to draw many unreasonable inferences to conclude that an agreement existed").

The language of the "Gag Rule" supports Plaintiffs' point only if it is read in a vacuum, but reading the Principles in a vacuum is inconsistent with their tenor and structure. *Cf. United States v. Pacheco*, 225 F.3d 148, 154 (2d Cir. 2000) (directing courts in this Circuit to "interpret a specific provision in a way that renders it consistent with the tenor and structure of the whole"). As the Court previously discussed, the Principles are "guidelines [that] concentrate on the maintenance of ethical standards in publication," and that acknowledge that "[a] publisher has a supporting, investing and nurturing role in the scholarly communication process." ECF No. 115-

1 at 2.  This language—part of the "Aims and Scope" of the Principles—establishes that the Principles do not govern Publishers' conduct, but merely offer guidance on best practices. Indeed, the Principles recognize the individual autonomy of the publishers and editors (the entities which are allegedly bound to treat the Principles as an edict).  *See id.* at 2, 4–5, 6 (noting that "publisher[s] . . . [are] ultimately responsible for ensuring that best practice is followed in its publications," and that editors are "solely and independently responsible for deciding which of the articles submitted to the journal should be published").

Stated otherwise, the presence of words that suggest governance are not enough by themselves; the policy must actually govern such that the Court need not draw any inferences in order to conclude the "members' surrender to the control of the association." *Relevent Sports*, 61 F.4th at 309 (citing *Associated Press*, 326 U.S. at 19); *see also City of Pontiac Police & Fire Ret. Sys.*, 92 F.4th at 391 ("Direct evidence of a conspiracy is 'explicit' and can show one exists without any inferences."); *Celestin*, 698 F. Supp. 3d at 465.  Therefore, similar to the "Unpaid Peer Review Rule" and the "Single Submission Rule," the so-called "Gag Rule" fails to plausibly allege direct evidence of a conspiracy.

*          *          *

Taking each of Plaintiffs' purported rules together, it is clear that neither they nor the Principles from which they are derived "require any publisher to adopt any specific practice." ECF No. 112 at 16.  Accordingly, they are not direct evidence of an antitrust conspiracy.

In order for the Court to accept Plaintiff's characterizations it would have to read both in between the lines and outside the four corners of the document.  *See, e.g.*, ECF No. 63 ¶¶ 92–95 (describing how Principle 3.1.4 should be interpreted in the context of the "perverse consequences" that authors allegedly could experience).  Such a reading may result in the

conclusion that circumstantial evidence of an antitrust conspiracy exists, but here, unequivocally, Plaintiffs have abandoned any argument premised on circumstantial proof, ECF No. 107 at 3; *e.g.*, *Wilkov*, 753 F. App'x at 46 n.1, and "how the plaintiff frames a challenge affects how [the Court] analyze[s] the adequacy of its pleadings," *Relevent Sports*, 61 F.4th at 308. Under these circumstances, reading beyond the plain text of the Principles is incompatible with the analysis the Court must perform when confronted with an allegation that "the policy or rule *is* the agreement itself." *Relevent Sports*, 61 F.4th at 308. To read the Principles any other way would require the Court to disregard the rules that govern how it analyzes motions to dismiss in this antitrust context and accept the implausible. *Contra Twombly*, 550 U.S. at 556; *Mayor & City Council of Baltimore*, 709 F.3d at 136. The Court declines to do so, as it must, and concludes that Plaintiffs have failed to plausibly allege direct evidence of an antitrust conspiracy—the Amended Complaint must be dismissed.

### III.    Leave to Amend

In one cursory sentence at the end of their Opposition, Plaintiffs request leave to amend "[i]f the Court finds any pleading defect." ECF No. 116 at 60. Of course, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). However, that usual practice yields and leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014).

Here, the Court declines to grant leave because, having reviewed the Amended Complaint, Plaintiffs' Opposition to the motions to dismiss, and the papers attached to those

submissions, the Court finds that further amendment would not change the result. *See Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in the absence of any indication that plaintiff could or would amend such that amendment would lead to a different result); *Hayden v. Cnty. of Nassau,* 180 F.3d 42, 52 (2d Cir. 1999) (Where "plaintiff[s] [are] unable to demonstrate that [they] would be able to amend [their] complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied.").

First, Plaintiffs have not identified how they might further amend their complaint to address the defects. *See Gregory v. ProNAi Therapeutics Inc.,* 757 F. App'x 35, 39 (2d Cir. 2018) (affirming denial of leave to amend where plaintiffs included a perfunctory request for leave "at the end of their opposition to defendants' motion to dismiss" and "included no proposed amendments"); *see also Singh v. Schikan*, No. 14-cv-5450, 2015 WL 4111344, at *1 (S.D.N.Y. June 25, 2015) (describing denial of leave to amend based on a "one[-]sentence, boilerplate request").

Second, Plaintiffs have already had plenty of opportunities to allege specific facts sufficient to render their antitrust conspiracy claim plausible, including in their original complaint, the Amended Complaint, their pre-motion letters, and their papers opposing the instant motions, yet they have failed to do so, despite clear indication from Defendants regarding the ways in which they intended to attack the initial complaint and the Amended Complaint. *See Warren v. Coca-Cola Co.*, 670 F. Supp. 3d 72, 90 (S.D.N.Y. 2023) ("Generally, the failure to fix deficiencies in an initial pleading, after being provided notice of those deficiencies, is alone sufficient ground to deny leave to amend."); *Williams v. Calderoni*, No. 11-cv-3020, 2012 WL 691832, at *8 (S.D.N.Y. 2012) (denying leave to file a second amended complaint after

dismissing claims when plaintiff had "multiple opportunities to allege sufficient specific facts to render his claims plausible").

Moreover, in light of the Court's conclusion concerning Plaintiffs' allegations regarding direct evidence of an antitrust conspiracy, the obvious choice here would be to amend to include allegations that circumstantial evidence supports the existence of an agreement, but Plaintiffs foreclosed that option when they expressly disavowed such argument and abandoned it in their Opposition. *See* ECF No. 107 at 3 ("Plaintiffs do not rely upon an inference of collusion from parallel conduct."); *Wilkov*, 753 F. App'x at 46 n.1; *Mirvis*, 2023 WL 5671935, at *10.

Plaintiffs have "already had two bites at the apple and they have proven fruitless," *Harris v. Westchester Cty. Med. Ctr.*, No. 08-cv-1128, 2011 WL 2637429, at *4 (S.D.N.Y. July 6, 2011); the Court declines to allow them to take a third.

## CONCLUSION

For the reasons stated above, the Foreign Defendants' motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), ECF No. 110, is GRANTED, and Defendants' motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), ECF No. 109, is GRANTED.

The Clerk of Court is respectfully directed to enter judgment consistent with this Order and close this case.

SO ORDERED.

*/s/ Hector Gonzalez*
HECTOR GONZALEZ
United States District Judge

Dated: Brooklyn, New York
January 30, 2026